**Exhibit 1**

**Purchase Agreement**

ASSET PURCHASE AGREEMENT

By and Among

**SUN-TIMES MEDIA GROUP, INC.
AND THE SELLER SUBSIDIARIES**

AS SELLERS

And

**STMG HOLDINGS, LLC**

AS BUYER

Dated as of September 8, 2009

K&E 14573112.33

# TABLE OF CONTENTS

**ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS** ................................... 2
    1.1    Transfer of Acquired Assets ................................................................. 2
    1.2    Excluded Assets ................................................................................. 5
    1.3    Assumption of Assumed Liabilities .................................................... 7
    1.4    Excluded Liabilities .......................................................................... 9
    1.5    Assigned Contracts and Excluded Contracts ................................... 11
    1.6    Delayed Conveyance of Certain Property .......................................... 13

**ARTICLE 2 CONSIDERATION** ................................................................................ 14
    2.1    Consideration .................................................................................. 14
    2.2    Deposit ........................................................................................... 15
    2.3    Physical Inventory .......................................................................... 15

**ARTICLE 3 CLOSING AND DELIVERIES** ................................................................ 15
    3.1    Closing ........................................................................................... 15
    3.2    Seller's Deliveries ........................................................................... 16
    3.3    Buyer's Deliveries ........................................................................... 18
    3.4    Purchase Price Adjustment .............................................................. 19

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER AND SELLER
SUBSIDIARIES** ..................................................................................................... 21
    4.1    Corporate Organization .................................................................... 21
    4.2    Authorization and Validity .............................................................. 21
    4.3    No Conflict or Violation ................................................................... 21
    4.4    Consents and Approvals ................................................................... 22
    4.5    Compliance with Law ...................................................................... 22
    4.6    Litigation ........................................................................................ 22
    4.7    Financial Statements ....................................................................... 22
    4.8    Absence of Certain Developments ..................................................... 23
    4.9    Material Contracts ........................................................................... 24
    4.10   Permits ........................................................................................... 26
    4.11   Environmental Matters .................................................................... 26
    4.12   Employee Benefits ........................................................................... 27
    4.13   Owned Real Property ....................................................................... 28
    4.14   Real Property Leases and Licenses .................................................... 29
    4.15   Title to Assets; Sufficiency ............................................................... 29
    4.16   Business Records ............................................................................. 30
    4.17   Intellectual Property ........................................................................ 30
    4.18   Employees ...................................................................................... 30
    4.19   Insurance ........................................................................................ 31
    4.20   Brokerage ....................................................................................... 31
    4.21   Taxes ............................................................................................. 31
    4.22   Inventory ........................................................................................ 32
    4.23   Non-Seller Subsidiaries ................................................................... 32

K&E 14573112.33

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER** ............................... 32
    5.1     Corporate Organization............................................................................ 32
    5.2     Authorization and Validity ....................................................................... 32
    5.3     No Conflict or Violation ........................................................................... 33
    5.4     Consents, Approvals and Notifications..................................................... 34
    5.5     Availability of Funds ............................................................................... 34
    5.6     Adequate Assurances Regarding Assigned Contracts ............................ 34
    5.7     Licenses, Permits, etc............................................................................... 34
    5.8     Litigation.................................................................................................. 34
    5.9     Brokerage.................................................................................................. 34

**ARTICLE 6 COVENANTS OF SELLER AND SELLER SUBSIDIARIES** ......................... 34
    6.1     Conduct of Business Before the Closing Date......................................... 34
    6.2     Exclusivity; No Solicitation of Transactions........................................... 35
    6.3     Obligations of Seller after Entry of Sale Order ...................................... 36
    6.4     Access to Properties and Records; Confidentiality.................................. 36
    6.5     Consents and Approvals ........................................................................... 37
    6.6     Rejection of Assigned Contracts............................................................... 37
    6.7     Casualty Loss............................................................................................ 37
    6.8     Provision of Data; Transfer of Software ................................................. 38
    6.9     Litigation Support .................................................................................... 38
    6.10    Further Assurances................................................................................... 38

**ARTICLE 7 COVENANTS OF BUYER**............................................................................. 38
    7.1     Actions Before Closing Date ................................................................... 39
    7.2     Adequate Assurances Regarding Assigned Contracts ............................ 39
    7.3     Cure of Defaults....................................................................................... 39
    7.4     Availability of Business Records.............................................................. 39
    7.5     Further Assurances................................................................................... 39
    7.6     Operation of the Business Post-Closing ................................................. 40

**ARTICLE 8 BANKRUPTCY PROCEDURES** ................................................................. 40
    8.1     Bankruptcy Actions ................................................................................. 40
    8.2     Bidding Procedures.................................................................................. 40

**ARTICLE 9 EMPLOYEE AND BENEFITS MATTERS** ................................................. 41
    9.1     Business Employees................................................................................. 41
    9.2     Offers of Employment. ............................................................................ 41
    9.3     Sellers' Employee Benefit Plans. ............................................................ 42
    9.4     Sellers' Cooperation in Transferring Employees. ................................... 42
    9.5     Buyer Benefit Plans ................................................................................. 42
    9.6     Collective Bargaining Agreements .......................................................... 43
    9.7     No Third-Party Beneficiary. .................................................................... 43

**ARTICLE 10 REGULATORY MATTERS**........................................................................ 43
    10.1    No Required Antitrust And Other Filings and Notices........................... 43

K&E 14573112,33

**ARTICLE 11 TAXES AND FEES** .................................................................................. **43**
11.1    Taxes Related to Purchase of Assets ................................................................ 43
11.2    Cooperation on Tax Matters .......................................................................... 44
11.3    Allocation of Purchase Price and Purchase Price Allocation Forms .................... 44
11.4    Unbilled Transactional Taxes ......................................................................... 44

**ARTICLE 12 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES........... 45**
12.1    Conditions Precedent to Performance by Seller and Buyer.................................. 45
12.2    Conditions Precedent to Performance by Seller and Seller Subsidiaries.............. 45
12.3    Conditions Precedent to the Performance by Buyer .......................................... 46
12.4    Waiver of Condition; Frustration of Conditions ................................................ 48

**ARTICLE 13 TERMINATION AND EFFECT OF TERMINATION** ................................. **48**
13.1    Right of Termination..................................................................................... 48
13.2    Termination Without Default.......................................................................... 48
13.3    Effect of Failure of Seller's Conditions to Closing ............................................. 49
13.4    Effect of Failure of Buyer's Conditions to Closing............................................. 50
13.5    Additional Termination Provisions................................................................... 50

**ARTICLE 14 ADDITIONAL AGREEMENTS** .............................................................. **52**
14.1    Litigation Support......................................................................................... 52
14.2    Insurance Matters......................................................................................... 52
14.3    Intellectual Property; Name Change................................................................ 52

**ARTICLE 15 MISCELLANEOUS** .............................................................................. **53**
15.1    Successors and Assigns.................................................................................. 53
15.2    Governing Law; Jurisdiction........................................................................... 53
15.3    Notification of Certain Matters; Schedules........................................................ 54
15.4    Warranties Exclusive .................................................................................... 55
15.5    Survival of Representations and Warranties....................................................... 56
15.6    No Recourse Against Affiliates or Related Persons of Seller................................ 56
15.7    Mutual Drafting ........................................................................................... 57
15.8    Waiver of Bulk Sales Laws............................................................................. 57
15.9    Expenses ..................................................................................................... 57
15.10   Broker's and Finder's Fees ............................................................................ 57
15.11   Severability ................................................................................................. 58
15.12   Notices ....................................................................................................... 58
15.13   Amendments; Waivers................................................................................... 59
15.14   Public Announcements .................................................................................. 59
15.15   Entire Agreement.......................................................................................... 59
15.16   Parties in Interest.......................................................................................... 60
15.17   DAMAGES.................................................................................................. 60
15.18   WAIVER OF JURY TRIAL............................................................................. 60
15.19   Headings ..................................................................................................... 61
15.20   Construction ................................................................................................ 61
15.21   Currency...................................................................................................... 61
15.22   Time of Essence ........................................................................................... 61

K&E 14573112.33

15.23   Counterparts.................................................................................................. 61

**ARTICLE 16 DEFINITIONS**............................................................................................. **61**
16.1   Certain Terms Defined.................................................................................. 61
16.2   All Terms Cross-Referenced......................................................................... 70

K&E 14573112.33

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of General Contract Conveyance Document |
| Exhibit C | Form of IP Conveyance Document |
| Exhibit D | Form of Assumed Real Property Leases Conveyance Document |
| Exhibit E | Form of Assumed Real Property License Conveyance Document |
| Exhibit F | Form of Deed |
| Exhibit G | Form of Seller's Secretary's Certificate |
| Exhibit H | Form of Non-Foreign Status Certificate |
| Exhibit I | Form of Buyer's Secretary's Certificate |
| Exhibit J | Form of Bidding Procedures Order |
| Exhibit K | Form of Sale Order |
| Exhibit L | Form of Buyer's Bring Down Certificate |
| Exhibit M | Form of Seller's Bring Down Certificate |
| Exhibit N | Form of Transition Services Agreement |

## DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 1.1(v) | Assumed Insurance Policies |
| Schedule 1.2(d) | Excluded Real Property |
| Schedule 1.2(v) | Other Excluded Assets |
| Schedule 1.2(w) | Excluded Contracts |
| Schedule 1.4(m) | Excluded Liabilities |
| Schedule 4.4 | Consents and Approvals |
| Schedule 4.5 | Compliance with Law |
| Schedule 4.6 | Litigation |
| Schedule 4.7(a) | Financial Statements |
| Schedule 4.7(b) | Undisclosed Liabilities |
| Schedule 4.8 | Absence of Certain Developments |
| Schedule 4.9(a) | Material Contracts |
| Schedule 4.9(b) | Material Contract Exceptions |
| Schedule 4.9(c) | Material Contract Consents |
| Schedule 4.9(d) | Material Contract Termination |
| Schedule 4.9(e) | Material Contract Breach |
| Schedule 4.10 | Permits; Permit Exceptions |
| Schedule 4.11 | Environmental Matters |
| Schedule 4.12(a) | Employee Benefit Plans |
| Schedule 4.12(b) | Employee Benefit Plan Exceptions |
| Schedule 4.13 | Owned Real Property |
| Schedule 4.14 | Real Property Leases and Licenses |
| Schedule 4.15 | Title to Assets; Sufficiency |
| Schedule 4.17 | Intellectual Property ; Intellectual Property Infringements |

K&E 14573112.33

Schedule 4.18    Employees
Schedule 4.20    Brokers
Schedule 4.22    Inventory
Schedule 9.3     Assumed Benefit Plans

K&E 14573112.33

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this *"Agreement"*), dated as of September 8, 2009, is made by and among Sun-Times Media Group, Inc., a Delaware corporation ("*Seller*") and the Seller Subsidiaries listed on the signature page hereto (individually *"Seller Subsidiary"* and collectively the *"Seller Subsidiaries"*) (Seller and Seller Subsidiaries are collectively referred to herein as *"Sellers"*) and STMG Holdings, LLC, a Delaware limited liability company ("*Buyer*"). Buyer and Sellers are sometimes referred to in this Agreement, individually as a *"Party"* and collectively as the *"Parties"*. Capitalized terms used in this Agreement are defined or cross-referenced in Article 16.

### BACKGROUND INFORMATION

WHEREAS, Seller and the Seller Subsidiaries own, license and lease assets used in the operation of the Business;

WHEREAS, on March 31, 2009 (the *"Petition Date"*), Seller and certain of its Affiliates, including Seller Subsidiaries, filed voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer (or a Buyer Designee) desires to purchase from Sellers, and Sellers desire to sell to Buyer, or in Buyer's sole discretion, to one or more Buyer Designees, the Acquired Assets, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer also desires to assume, and Sellers desire to assign and transfer to Buyer, or in Buyer's sole discretion, to one or more Buyer Designees, the Assumed Liabilities;

WHEREAS, Buyer and Sellers desire to enter into this Agreement providing for the purchase by Buyer (or a Buyer Designee) and sale by Sellers of the Acquired Assets and the assumption by Buyer (or a Buyer Designee) of the Assumed Liabilities;

WHEREAS, the board of directors of each of the Sellers has approved this Agreement and the transactions contemplated hereby (including the purchase and sale of the Acquired Assets and the assumption by Buyer (or a Buyer Designee) of the Assumed Liabilities) upon the terms and conditions set forth in this Agreement and in accordance with the Delaware General Corporation Law (the *"Delaware Corporation Law"*); and

WHEREAS, the board of managers of Buyer has (and the board of directors or board of managers of any Buyer Designee will have prior to Closing) approved this Agreement and the transactions contemplated hereby (including the purchase and sale of the Acquired Assets and the assumption by Buyer or such Buyer Designee of the Assumed Liabilities) upon the terms and conditions set forth in this Agreement and in accordance with the Delaware Limited Liability Company Act (the *"Delaware LLC Act"*).

-1-

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained, and intending to be legally bound, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

1.1    <u>Transfer of Acquired Assets</u>.  At, and effective as of, the Closing, and subject to the terms and conditions set forth in this Agreement (including <u>Sections 1.5</u> and <u>1.6</u>) and in reliance on the representations and warranties contained herein, Sellers shall sell, assign, transfer, and convey to Buyer (or a Buyer Designee), and Buyer (or a Buyer Designee) shall purchase and accept from Seller (or the applicable Seller Subsidiary), at Closing, all of Seller's (or the applicable Seller Subsidiary's) right, title and interest in, to and under all the Acquired Assets, free and clear of all Liens, Claims and Interests, other than Transferred Liens, to the extent provided by the Bankruptcy Code (including Sections 105 and 363(f) thereof) or by order of the Bankruptcy Court (including the Sale Order).  For purposes of this Agreement, *"Acquired Assets"* means all of the properties, assets, interests, goodwill and rights of Seller and the Seller Subsidiaries, and all assets used in the Business, including the following, but specifically excluding in all cases the Excluded Assets:

(a)    the real property owned by Seller and the Seller Subsidiaries, together with any Improvements erected thereon owned by Seller and the Seller Subsidiaries (collectively, the *"Owned Real Property"*) other than any Owned Real Property that is Excluded Real Property, if any (the *"Purchased Owned Real Property"*);

(b)    all of Seller's and the Seller Subsidiaries' rights under (i) leases of real property listed on <u>Schedule 1.1(b)</u>, if any (*"Real Property Leases"*), other than Real Property Leases that are Excluded Real Property (the *"Assumed Real Property Leases"*) and (ii) licenses of real property, easements and other executory agreements for the right to use, access or occupy real property listed on <u>Schedule 1.1(b)</u>, if any (*"Real Property Licenses"*) other than Real Property Licenses that are Excluded Real Property (the *"Assumed Real Property Licenses"*) (such real property in clauses (i) and (ii) collectively, the *"Assumed Leased Real Property,"* and, together with the Purchased Owned Real Property, the *"Transferred Real Property"*);

(c)    all of Seller's and the Seller Subsidiaries' (i) owned or leased machinery, furniture, fixtures, equipment (including without limitation printing presses, trucks and vehicles), including Seller's and the Seller Subsidiaries' interest in shared systems and facilities, wherever located or in the possession of third parties (the *"Equipment"*) and (ii) rights, to the extent transferable, to the warranties and licenses received from manufacturers and sellers of the Equipment;

(d)    the Computer Hardware owned by Seller and the Seller Subsidiaries or which Seller or the Seller Subsidiaries have a valid right to use;

(e)    the Computer Software owned by Seller and the Seller Subsidiaries or which Seller or the Seller Subsidiaries have a valid right to use;

(f)    all other tangible personal property and interests therein owned by Seller and the

-2-

Seller Subsidiaries (or which they have a legal right to use) (specifically excluding Equipment, Computer Hardware, Computer Software, and Inventory, which are the subject of Sections 1.1(c), 1.1(d), 1.1(e) and 1.1(k)), including all equipment, furniture and furnishings of Seller and the Seller Subsidiaries that are owned by Seller or any of the Seller Subsidiaries or that Seller or any of the Seller Subsidiaries have a valid leasehold interest in or other valid right to use;

(g)　　all of Seller's and the Seller Subsidiaries' rights under sales orders, subscription agreements, service agreements, advertising agreements or other similar Contracts entered into with customers, excluding in all cases the Excluded Contracts;

(h)　　all of Seller's and the Seller Subsidiaries' rights under outstanding purchase orders or other similar Contracts entered into with suppliers, excluding in all cases the Excluded Contracts;

(i)　　all of Seller's and the Seller Subsidiaries' rights under agreements or licenses related to the Intellectual Property, excluding in all cases the Excluded Contracts ("*Assumed IP Licenses*");

(j)　　all of Seller's and the Seller Subsidiaries' rights under any other Contracts, excluding in all cases the Excluded Contracts;

(k)　　all (i) newsprint, ink, supplies, materials, raw materials, spare parts and other inventory owned by Seller and the Seller Subsidiaries on the Closing Date (the "*Inventory*") and (ii) rights of Seller and the Seller Subsidiaries, to the extent transferable, to the warranties received from suppliers with respect to such Inventory;

(l)　　all short term notes receivable, accounts receivable, accounts receivable-barter and other receivables of Seller and the Seller Subsidiaries as of the Closing Date (including any receivables related to the ABC circulation litigation, to the extent assignable), other than Cash and long term notes receivable and other receivables referenced in Section 1.2(b) and Section 1.2(t) (the "*Receivables*");

(m)　　all Intellectual Property of Seller and the Seller Subsidiaries, and all rights of Seller and the Seller Subsidiaries to or to use any of the foregoing (together with Assumed IP Licenses, "*Transferred Intellectual Property*"), including all right, title and interest in and to the tradenames and related trademarks for "Chicago Sun-Times", "Pioneer Press", "Southtown Star", "Post-Tribune", "Herald News", "Courier News", "Beacon News", "Naperville Sun" and "Lake County News Sun" and all additional tradenames of Seller and the Seller Subsidiaries.

(n)　　all credits, prepaid expenses, deferred charges, advance payments and prepaid items of Seller and the Seller Subsidiaries, but excluding the same to the extent the same are or relate to Excluded Assets and, in any case, only to the extent assignable (the "*Prepaid Items*");

(o)　　all rights of Seller and the Seller Subsidiaries in and to products sold (including products returned after the Closing Date) in the operation of the Business;

(p)　　copies of all Business Records;

[K&E 14573112.33]

(q)     all of Sellers' libraries and collections, including all clippings, photographs (negatives and positives), videotapes, compact discs, files of back issues, and microfilm, microfiche and electronic reproductions of back issues (the "*Libraries*");

(r)     to the extent transferable, all rights of Seller's and the Seller Subsidiaries' rights under the Permits, but excluding Permits that are Excluded Assets (the "*Transferred Permits*");

(s)     all other properties, assets, goodwill and rights of whatever kind and nature, real or personal, tangible or intangible, that are owned by Seller and the Seller Subsidiaries as of the Closing Date;

(t)     all assets to be acquired by Buyer pursuant to Article 9 and all assets, if any, held under or with respect to any Employee Benefit Plan, if any, assumed by Buyer pursuant to Article 9;

(u)     all rights of Seller and Seller Subsidiaries under non-disclosure, confidentiality, non-compete, non-solicitation, works for hire and invention agreements with current employees, former employees, current or former directors, consultants, independent contractors, or third parties to the extent related to the Business or the Acquired Assets, in each case, only to the extent such agreement may be legally transferred to Buyer without the removal of any Legal Impediment or the obtaining of any Consent (it being acknowledged and agreed that, notwithstanding anything herein to the contrary, Sellers shall have no obligation to remove any such Legal Impediment or obtain any such Consent);

(v)     the insurance policies of Seller and/or the Seller Subsidiaries listed on Schedule 1.1(v) (the "*Assumed Insurance Policies*") and, to the extent relating to other Acquired Assets, all claims, refunds, security deposits, letters of credit, cash or cash collateral to obtain or maintain letters of credit, adjustment proceeds and other rights and benefits under such Assumed Insurance Policies;

(w)     cash or cash equivalents, but only in an amount (if any) by which the amount determined pursuant to Section 3.3(b) is less than $0 (the "*Acquired Cash*");

(x)     refunds, credits, and other Claims solely to the extent related to the Taxes assumed by Buyer pursuant to Section 1.3(e) of this Agreement (the "*Acquired Refunds*");

(y)     all rights to recovery of Seller and the Seller Subsidiaries to any security deposits (including security deposits relating to BCBS and Mid American), escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit, and cash drawn or paid on letters of credit ("*Restricted Cash*"), in each case delivered by Seller or any Seller Subsidiary pursuant to, or otherwise securing any of Seller's or any Seller Subsidiaries liabilities or obligations under, any of the Assigned Contracts to the extent such Assigned Contract is or becomes and remains in accordance with the terms hereof an Acquired Asset ("*Acquired Restricted Cash*");

(z)     all Bankruptcy Claims against any Transferred Employee or any supplier of Seller or any Seller Subsidiary relating to the Acquired Assets (the "*Acquired Bankruptcy Claims*"); and

-4-

(aa)    all lockbox accounts of Seller or any Seller Subsidiary.

Notwithstanding anything in this Agreement to the contrary, Sellers shall not be obligated to assign, transfer, or convey (or cause to be assigned, transferred, or conveyed) to Buyer (or any Buyer Designee) (i) any Delayed Acquired Asset or Delayed Assumed Liability until such time as all Legal Impediments are removed and/or all Consents necessary for the legal transfer and/or assumption thereof are obtained or delivered in respect of such Delayed Acquired Asset or Delayed Assumed Liability, as applicable or (ii) any Executory Contract unless and until such Executory Contract shall have been designated (or deemed designated) as an Assigned Contract pursuant to Section 1.5(b). Each of the Parties agrees that the Delayed Acquired Assets shall be assigned, transferred, and conveyed, and any Delayed Acquired Liabilities shall be assumed, in accordance with the provisions of Section 1.6. Following such assignment, transfer, and conveyance of any Delayed Acquired Asset, or the assumption of any Delayed Assumed Liability, the applicable Delayed Acquired Asset or Delayed Assumed Liability shall be treated for all purposes of this Agreement as an "Acquired Asset" or as an "Assumed Liability," as the case may be, and for all purposes hereof, unless otherwise waived in writing by Buyer or the applicable Buyer Designee, "Acquired Assets" shall not include any Delayed Acquired Asset and "Assumed Liabilities" shall not include any "Delayed Assumed Liability" until the Legal Impediments are removed and/or all Consents necessary for the legal transfer and/or assumption thereof are obtained or delivered in respect of such Delayed Acquired Asset or Delayed Assumed Liability.

1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement (including Section 1.1), the Acquired Assets do not include (i) any right, property, interest or asset whatsoever of any Non-Seller Subsidiary or (ii) any right, property, interest or asset of Seller or any Seller Subsidiary listed or described in this Section 1.2 (all such rights, properties, interests and assets not being acquired by Buyer are herein referred to as the "*Excluded Assets*"):

(a)    all cash and cash equivalents, marketable securities, commercial paper, checks in transit, deposited but uncleared checks, undeposited checks and Restricted Cash of Seller and the Seller Subsidiaries (including any of the foregoing held in any lockbox account included in the Acquired Assets as of the Adjustment Calculation Time), other than the Acquired Cash and the Acquired Restricted Cash ("*Cash*");

(b)    all long term notes receivables;

(c)    Prepaid Items related to any other Excluded Asset or any Excluded Liability, including prepaid legal;

(d)    the Owned Real Property, Real Property Leases and Real Property Licenses set forth on Schedule 1.2(d), which Schedule 1.2(d) shall be amended in accordance with Section 1.5 (the "*Excluded Real Property*");

(e)    all Retained Books and Records;

(f)    all assets to be retained by Seller or the Seller Subsidiaries pursuant to Article 9 and all assets, if any, held under or with respect to any Employee Benefit Plan not assumed by Buyer pursuant to Article 9;

(g)    all rights, Claims, interests and benefits of Seller and the Seller Subsidiaries under any divestiture, acquisition or settlement agreement or arising from or related to the transactions or disputes effectuated by or giving rise to such agreement;

(h)    all insurance policies of Seller and the Seller Subsidiaries and all Claims, refunds, adjustments, proceeds and recoveries, and any other rights and benefits, under such policies, other than the Assigned Insurance Policies and also other than insurance proceeds to which Buyer may be entitled pursuant to Section 6.7;

(i)    all Claims, refunds, adjustments, proceeds and recoveries, and any other rights of and benefits to, Seller and the Seller Subsidiaries under or with respect to (i) any Excluded Asset and (ii) any proceeding before any Government relating to the period prior to the Closing;

(j)    every asset (other than Owned Real Property) of Seller and the Seller Subsidiaries that would constitute an Acquired Asset (if owned by Seller and the Seller Subsidiaries immediately prior to the Closing) that is conveyed or otherwise disposed of during the period from the date hereof until the Closing Date either (i) in the Ordinary Course of Business or (ii) as otherwise permitted by the terms of this Agreement;

(k)    other than Acquired Refunds, all losses, loss carry forwards and rights to receive refunds, credits, Claims, refunds and credits from net operating loss carry backs, in all cases, with respect to any and all Taxes, of Seller and the Seller Subsidiaries incurred or accrued on or prior to the Closing Date (or for periods (including partial periods) ending on or prior to the Closing Date), including interest receivable with respect to any of the foregoing and including any tax allocations or tax sharing agreements or similar agreements (all of which shall be Excluded Contracts);

(l)    except for the Acquired Bankruptcy Claims, all Bankruptcy Claims and other Claims or other rights of, or benefits to, Seller and the Seller Subsidiaries arising out of or relating in any way to the Chapter 11 Case or any of the transactions contemplated thereby or entered into as a consequence thereof, including any claims (as defined in Section 101(5) of the Bankruptcy Code) filed, scheduled or otherwise arising in the Chapter 11 Case;

(m)    all shares of capital stock or other equity interests issued by Seller and the Seller Subsidiaries;

(n)    all Claims or other rights of, or benefits to, Seller and the Seller Subsidiaries arising under this Agreement and the Ancillary Agreements, including rights of Seller to the Deposit under and in accordance with this Agreement and the Escrow Agreement;

(o)    all Restricted Cash, other than Acquired Restricted Cash;

(p)    to the extent they relate to either Excluded Liabilities or Excluded Assets, all Claims or other rights of, or benefits to, Seller and the Seller Subsidiaries, whether arising out of events occurring prior to, on or after the Closing Date, including rights under or pursuant to all warranties, representations, indemnities, agreements to hold harmless and guarantees made by suppliers, manufacturers and contractors;

-6-

(q)      all Claims or other rights of, or benefits to, Seller and the Seller Subsidiaries relating to litigation or arbitration or other proceedings with directors, officers, stockholders or other Related Persons of Seller or any of its Subsidiaries or former directors, officers, stockholders or other Related Persons of Seller or any of its Subsidiaries, including those matters described in Item 3 of Part I of Seller's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 and any similar or related matters (whether or not asserted prior to the Closing Date), including all Claims and other rights of, and benefits to, Seller and the Seller Subsidiaries arising from or related to the Delaware Litigation Escrow;

(r)      all Claims or other rights of, or benefits to, Seller and the Seller Subsidiaries against or with respect to any director, officer, stockholder or other Related Person of, or any former director, officer, stockholder or other Related Person of, Seller or any of its Subsidiaries, including any Claims or other rights of, or benefits to, Seller and the Seller Subsidiaries against any such Person or any third party for indemnification, contribution, subrogation or reimbursement for expenses advanced or indemnification provided to any director, officer, stockholder or other Related Person of, or any former director, officer, stockholder or other Related Person of, Seller or any of its Subsidiaries;

(s)      all Claims or other rights of, or benefits to, Seller or the Seller Subsidiaries relating to any litigation, arbitration or other proceeding involving Seller or any of its Subsidiaries pending, threatened, adjudicated, settled or instituted prior to or as of the Closing Date, except to the extent related to any Acquired Assets;

(t)      all intercompany Receivables of Seller or any of its Subsidiaries from Seller or any Seller Subsidiary or its Affiliates;

(u)      all bank accounts (other than lockbox accounts) of Seller and its Affiliates;

(v)      all assets set forth on Schedule 1.2(v) (it being agreed that Sellers shall use their commercially reasonable efforts to transition the activities related to the Acquired Assets that are currently conducted on the Great Plains server described on Schedule 1.2(v) to an Oracle system prior to Closing).

(w)      the Contracts (including agreements or licenses related to Intellectual Property) and Permits set forth on Schedule 1.2(w), which Schedule 1.2(w) shall be amended in accordance with Section 1.5 (the "*Excluded Contracts*") and all rights under the Excluded Contracts; and

(x)      all rights of Seller or any Seller Subsidiary in the domain name www.thesuntimesgroup.com (it being agreed that Sellers shall use their commercially reasonable efforts to, as soon as practicable after Closing, change the name of such domain name so that it does not include any of the trademarks or trade names included in the Transferred Intellectual Property owned by Seller or the Seller Subsidiaries and to delete from such website information not relevant to the administration of the Chapter 11 Case and/or the wind-down of Sellers' business after the Closing).

1.3      Assumption of Assumed Liabilities.  At, and effective as of, the Closing, Seller shall assign, transfer, and convey (or shall cause the Seller Subsidiaries to assign, transfer, and

convey) to Buyer (or a Buyer Designee), and Buyer shall (or shall cause a Buyer Designee to) assume and, if applicable, comply with only the Assumed Liabilities in accordance with their respective terms. For the purposes of this Agreement, "*Assumed Liabilities*" shall mean only the following obligations, liabilities and commitments of Seller and the Seller Subsidiaries:

(a)    all liabilities and obligations of Seller and the Seller Subsidiaries under the Assigned Contracts, along with all Cure Costs related thereto (other than the Seller Cure Cost Obligations but only to the extent the same have not reduced the payment to Seller pursuant to Section 3.3(b));

(b)    all accounts payable-barter in effect on the Closing Date;

(c)    all liabilities and obligations of the Seller and Seller Subsidiaries under the Transferred Permits for periods arising on or after the Closing Date;

(d)    all liabilities and obligations assumed by Buyer pursuant to Article 9 and all liabilities and obligations under or with respect to any Employee Benefit Plan assumed by Buyer pursuant to Article 9;

(e)    (i) all liabilities and obligations of Seller and the Seller Subsidiaries for (A) personal and real property Taxes and assessments relating to the Transferred Real Property to the extent they are installments that otherwise first become due and payable on or after the Closing Date, (B) Taxes relating to the Acquired Assets for taxable periods beginning on or after the Closing or (C) sales and use Taxes with respect to the Acquired Assets for the taxable period in which the Closing Date occurs and (ii) 50% of Transaction Taxes as provided in Section 11.1;

(f)    all liabilities and obligations assumed by or agreed to be performed by Buyer or any of its Affiliates pursuant to this Agreement and the Ancillary Agreements;

(g)    all accrued liabilities and obligations of Seller or the applicable Seller Subsidiary related to (i) solicitors and (ii) newspapers in education;

(h)  .  all liabilities and obligations to the extent relating to or arising from the operation of the Business or the ownership of the Acquired Assets on and following the Closing Date;

(i)    all Deferred Revenue Obligations and long term subscription obligations;

(j)    liabilities for vacation pay for Transferred Employees to the extent arising from employment prior to the Petition Date, but in the case of this clause (j) only to the extent such liability for vacation pay would constitute a priority claim under Section 507 of the Bankruptcy Code if not assumed (the "*Pre-Petition Vacation Obligations*");

(k)    liabilities for vacation pay for Transferred Employees to the extent arising from employment on and after the Petition Date (the "*Post-Petition Vacation Obligations*" and together with the Pre-Petition Vacation Obligations, collectively the "*Vacation Obligations*");

(l)    accrued but unpaid salary, hourly pay, commissions and other payroll obligations, including payroll taxes with respect thereto, as of the Adjustment Calculation Time with respect

to Transferred Employees (the "**_Payroll Obligations_**"), but only to the extent included in the Closing Net Working Capital;

(m)    moving expenses incurred after the Closing with respect to the Plainfield Real Property, unless the Plainfield Real Property becomes Excluded Real Property;

(n)    [Reserved];

(o)    all liabilities and obligations of Seller and the Seller Subsidiaries in respect of the Transferred Liens; and

(p)    all liabilities and obligations under the Amended Union Contracts.

Notwithstanding anything to the contrary in this Agreement, the Parties hereby acknowledge and agree that, subject to applicable Law, Buyer (or the applicable Buyer Designee) may satisfy the Vacation Obligations assumed by it with respect to any Transferred Employee by providing such Transferred Employee with a bank of accrued vacation days equal to the number of days of unpaid vacation for such Transferred Employee comprising the Vacation Obligations.

1.4    Excluded Liabilities.    Seller and the Seller Subsidiaries shall retain (i) all obligations and liabilities whatsoever of the Non-Seller Subsidiaries and (ii) all obligations and liabilities of Seller and the Seller Subsidiaries to the extent arising out of or relating to the Acquired Assets, the Business or the operation of the Business prior to the Closing Date, including the following obligations and liabilities, but excluding only Assumed Liabilities (collectively, the "**_Excluded Liabilities_**"):

(a)    all obligations and liabilities relating to or arising, whether before, on or after the Closing Date, out of or in connection with or related to any of the Excluded Assets or Excluded Contracts or any Excluded Real Property;

(b)    except for obligations and liabilities under or with respect to the Assumed Benefit Plans and the Amended Union Contracts, all obligations and liabilities under or with respect to any collective bargaining agreements or other contracts with any Union of Seller or any Seller Subsidiary in existence on the date hereof or any former or prior Union agreements or other contracts, including without limitation any multi-employer pension benefit withdrawal liability, and all obligations and liabilities under or with respect to any Employee Benefit Plan of Seller or any Seller Subsidiary or maintained by, sponsored by, or contributed to by Seller or any Seller Subsidiary;

(c)    all obligations and liabilities of Seller and the Seller Subsidiaries under any divestiture, acquisition or settlement agreement, or arising from or related to the transactions or disputes effectuated by or giving rise to such agreement;

(d)    all obligations and liabilities agreed to be performed by Seller and the Seller Subsidiaries pursuant to this Agreement or any Ancillary Agreement;

(e)    all obligations and liabilities of Seller and the Seller Subsidiaries in respect of or

-9-

related to workers compensation claims or automobile claims pending or threatened or for injuries first occurring prior to the Closing;

(f)    all obligations and liabilities of Seller and the Seller Subsidiaries relating to litigation or arbitration or other proceedings with, or to indemnify or advance expenses to, directors, officers, stockholders or other Related Persons of Seller or any of its Subsidiaries or former directors, officers, stockholders or other Related Persons of Seller or any of its Subsidiaries, including those matters described in Item 3 of Part I of Seller's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 and any similar or related matters (whether or not asserted prior to the Closing Date or arising after the Closing date with respect to events occurring prior to the Closing);

(g)    all obligations and liabilities relating to any litigation, arbitration or other proceeding involving Seller and the Seller Subsidiaries pending, threatened, adjudicated, settled or instituted prior to or as of the Closing Date, except to the extent included as part of the Acquired Assets;

(h)    all accounts payable and accrued liabilities not referred to in Section 1.3;

(i)    except for Taxes specifically assumed in Section 1.3(e), all liabilities with respect to any (A) Taxes arising in connection with the Business, the Acquired Assets or the Assumed Liabilities and that are attributable to a pre-Closing Tax Period (including any liabilities to the Internal Revenue Service based upon audits of prior periods), and (B) other Taxes of Seller or any Seller Subsidiary, including as such Taxes may arise for Seller or any Seller Subsidiary as a result of being a member of a consolidated tax group;

(j)    all obligations and liabilities of Seller and the Seller Subsidiaries with respect to intercompany accounts payable or accrued liabilities to Seller or any Seller Subsidiary, or any of their respective Affiliates in the amounts in existence as of the Adjustment Calculation Time;

(k)    all obligations and liabilities of Seller and the Seller Subsidiaries in respect of indebtedness for borrowed money;

(l)    all obligations and liabilities of Seller and the Seller Subsidiaries in respect of management fees or similar fees payable to former stockholders of Seller or its Affiliates;

(m)    those liabilities of Seller and the Seller Subsidiaries listed on Schedule 1.4(m);

(n)    except as expressly provided in Section 1.3(j), Section 1.3(k), Section 1.3(l) and/or Article 9, liabilities for any salary, wages, bonuses, commissions, other compensation, payroll taxes, accrued vacation pay, final compensation, or the employee benefits accrued as of the Closing Date and any liabilities arising out of any pension, profit sharing or other employee retirement or benefit plan maintained or sponsored by or contributed to by Seller or any Seller Subsidiary or any of their Affiliates;

(o)    all liabilities of Sellers for libel claims pending, threatened or arising out of the operation of the Business prior to the Closing Date;

-10-

(p)    any liabilities arising from the operation of any successor liability laws or regulations, including without limitation under the NLRA or under "bulk sales" statutes, to the extent that noncompliance therewith or the failure to obtain the necessary clearances would subject Buyer or the Acquired Assets to the claims of any creditors of Sellers or would subject any of the Acquired Assets to any Liens, Claims or Interests or other restrictions, other than Transferred Liens, that are not released by the operation of the Bankruptcy Code (including Sections 105 and 363(f) thereof) or by order of the Bankruptcy Court (including the Sale Order);

(q)    all obligations and liabilities of Seller and the Seller Subsidiaries (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies) prior to the Closing; (B) arising out of or relating to the off-site transportation, off-site storage or off-site disposal, in each case prior to the Closing, of any Hazardous Materials generated or located at any Real Property owned or leased by Sellers, whether or not transferred to Buyer (or a Buyer Designee); (C) arising out of or relating to employee or third-party Claims for bodily injury or property damage, in each case occurring prior to the Closing, related to Hazardous Materials that were or are located at or that migrated to or may migrate from any Real Property owned or leased by Sellers, whether or not such Real Property is being transferred to Buyer (or a Buyer Designee); (D) arising under Environmental Laws related to the Excluded Real Property; or (E) for Environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (prior to the Closing);

(r)    all liabilities of Sellers for (A) costs and expenses relating to the preparation, negotiation and entry into this Agreement and the Ancillary Agreements (and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements), (B) administrative fees, professional fees and all other expenses under the Bankruptcy Code and (C) all other fees and expenses associated with the administration of the Bankruptcy Cases.

1.5    Assigned Contracts and Excluded Contracts.

(a)    Prior to the earlier of (i) October 27, 2009 and (ii) the date of the hearing by the Bankruptcy Court for entry of the Sale Order (the "*Sale Hearing*"), Buyer may designate in a writing delivered to Seller any Owned Real Property, Assumed Real Property Leases or Assumed Real Property Licenses otherwise included as Acquired Assets to be Excluded Real Property for all purposes of this Agreement and, upon such designation, Schedule 1.1(b) and Schedule 1.2(d) shall automatically be deemed amended, as applicable, to reflect such designation. To the extent Buyer designates any Assumed Real Property Leases or Assumed Real Property Licenses as Excluded Real Property, the Sale Order shall provide for rejection of such leases or licenses; provided that, at the time of such designation, Buyer may request, by written notice to Seller, that Seller delay the effective date of such rejection until October 27, 2009, or, if Buyer has delivered to Seller the consent of the applicable lessor or licensor to such Assumed Real Property Lease or Assumed Real Property License to extend the date for assumption or rejection of such Assumed Real Property Lease or Assumed Real Property License to a later date, such later date (the "*Rejection Period*"), and, during the Rejection Period, Buyer may, by delivering written notice thereof to Seller and with the consent of the counterparty to such Real Property Lease or Real Property License (or, at the sole expense of Buyer, further order of the Bankruptcy Court), re-designate such Real Property Lease or Real Property License as an Acquired Asset, in which case Schedule 1.1(b) and Schedule 1.2(d) shall

-11-

be deemed automatically amended to reflect such re-designation. Promptly after entry of the Bid Procedures Order, Seller shall provide written notice to the lessors and licensors party to the Assumed Real Property Leases and Assumed Real Property Licenses that such Assumed Real Property Leases and Assumed Real Property Licenses are Acquired Assets for purposes of this Agreement, but that Buyer has the option of designating such Assumed Real Property Leases and Assumed Real Property Licenses as Excluded Assets for purposes of this Agreement and, if such designation is made, such Assumed Real Property Leases and Assumed Real Property Licenses will be rejected by Seller and the Seller Subsidiaries. In the event that (x) any Assumed Real Property Lease or Assumed Real Property License is designated in writing by Buyer to be an Excluded Asset or (y) the Closing Date has not occurred prior to the expiration of the Rejection Period with respect to such Assumed Real Property Lease or Assumed Real Property License, Buyer agrees that Seller may, without breach of any representation, warranty, covenant or agreement in this Agreement and without giving rise to any Material Adverse Effect, reject such Assumed Real Property Lease or Assumed Real Property License or such lease or license may be rejected by operation of law. If the effective date of rejection of any Real Property Lease or Real Property License is delayed pursuant to the second sentence of this Section 1.5(a), then Buyer shall pay and be solely responsible for all liabilities and obligations under such Real Property Lease or Real Property License accruing from and after the Closing Date until the effective date of rejection of such Real Property Lease or Real Property License (or, if such Real Property Lease or Real Property License is re-designated as an Acquired Asset pursuant to this Section 1.5(a), until the effective date of the assumption and assignment thereof to Buyer (or a Buyer Designee)), but only to the extent such liabilities and obligations first arise on or after the Closing Date and would otherwise constitute administrative expenses in the Chapter 11 Case; provided that such performance by Buyer shall not be deemed to be an explicit or implicit assumption by Buyer of any executory contract. Buyer shall pay and be solely responsible for all liabilities and obligations relating to moving any Acquired Asset from the Real Property Leases and Real Property Licenses designated as Excluded Assets and for any damages caused by Buyer, its Affiliates or their respective agents or representatives to the real property or the improvements thereon in connection with such move.

(b)    Buyer shall inform Seller in writing as soon as possible, but in any event at least five (5) Business Days prior to the Closing Date, which of the Executory Contracts shall be designated as Assigned Contracts as of the Closing (the "*Closing Assigned Contracts*"). Any Executory Contract that is not so designated as a Closing Assigned Contract prior to the Closing Date is referred to herein as a "*Potentially Assigned Contract*". Buyer shall have a period of 60 days after the Closing Date (the "*Contract Option Period*") to designate, by written notice to Seller (which notice shall be irrevocable unless otherwise consented to by Seller), (i) any of the Potentially Assigned Contracts as Excluded Contracts (a "*Rejection Notice*") and upon Seller's receipt of such Rejection Notice, such Potentially Assigned Contract so designated shall automatically be deemed added to Schedule 1.2(w) or (ii) to designate any such Potentially Assigned Contract as an Assigned Contract (an "*Assumption Notice*"); provided that any Potentially Assigned Contract with respect to which Seller has not received either a Rejection Notice or an Assumption Notice prior to the end of the Contract Option Period shall automatically be deemed designated as an Assigned Contract. At all times (x) with respect to any Potentially Assigned Contract with respect to which a Rejection Notice is timely delivered pursuant to this Section 1.5, from the Closing until the date on which Buyer delivers a Rejection Notice with respect to such Potentially Assigned Contract, plus a period thereafter not to exceed

-12-

15 days until a rejection order is entered with respect to such Potentially Assigned Contract or (y) with respect to all other Potentially Assigned Contracts, from and after the Closing, Buyer shall pay and be solely responsible for all liabilities and obligations accruing during such period under Potentially Assigned Contracts to the extent such liabilities and obligations first arise on or after the Closing Date and would otherwise constitute administrative expenses in the Chapter 11 Case (and shall be entitled to the benefits accruing under such Potentially Assigned Contracts during such period); provided that such performance by Buyer shall not be deemed to be an explicit or implicit assumption by Buyer of any executory contract. Buyer agrees that Seller may, without breach of any representation, warranty, covenant or agreement in this Agreement and without giving rise to any Material Adverse Effect, reject any Executory Contract at any time after Seller's receipt of a Rejection Notice with respect to such Executory Contract.

(c)     The parties hereby acknowledge and agree that, except for the Assumed Benefit Plans and the Amended Union Contracts, the Assigned Contracts shall in no event include any collective bargaining agreement or other contract with any Union or any employment, pension, profit-sharing, deferred compensation or any other employee health or other benefit plan maintained or sponsored by or contributed to by Seller or any Seller Subsidiary.

(d)     To the extent set forth in the Sale Order, the Assigned Contracts shall be deemed part of the Acquired Assets transferred pursuant to Section 1.1 and Sections 363 and 365 of the Bankruptcy Code, and, pursuant to Section 365 of the Bankruptcy Code, Sellers shall assume and assign to Buyer (or a Buyer Designee), and Buyer (or a Buyer Designee) shall accept from Sellers, all of such Seller's rights, title and interest in (i) all Assumed Real Property Leases, Assumed Real Property Licenses and Closing Assigned Contracts at the Closing and (ii) all other Executory Contracts that are designated (or deemed designated) as Assigned Contracts pursuant to Section 1.5(b) promptly after such designation pursuant to an assignment and assumption agreement in substantially the same form as the General Contract Conveyance Document. Buyer (or Buyer's Designee) shall agree in writing to assume all liabilities of Seller under the Assigned Contracts as provided in the Sale Order.

(e)     Notwithstanding anything to the contrary herein, in the event that any of the Acquired Assets become Excluded Assets in accordance with this Section 1.5 or otherwise in accordance with this Agreement, then Buyer shall pay to Seller within five (5) Business Days thereafter an amount equal to the amount of Restricted Cash or Prepaid Items related to such Contract.

1.6     Delayed Conveyance of Certain Property.

(a)     To the extent permitted by Law and to the extent otherwise permissible in light of any Legal Impediment or required Consent (in each case, determined after giving effect to Sections 363 and 365 of the Bankruptcy Code), if the transfer, assignment or conveyance or assumption of any Delayed Acquired Asset or any Delayed Assumed Liability intended to be transferred, assigned or assumed hereunder is not consummated prior to or on the Closing Date, then Seller shall (or shall cause the Seller Subsidiaries to), unless otherwise agreed in writing by Seller, thereafter hold such Delayed Acquired Asset or such Delayed Assumed Liability for the use and benefit, insofar as commercially reasonably practicable and to the extent it may lawfully do so, of Buyer (at the expense of Buyer). In addition, to the extent permitted by Law and to the

-13-

extent otherwise permissible in light of any Legal Impediment or required Consent (in each case, determined after giving effect to Sections 363 and 365 of the Bankruptcy Code), Seller shall take (and shall cause the Seller Subsidiaries to take) such other actions in order to place Buyer, insofar as commercially reasonably practicable and to the extent it may lawfully do so, in the same position as if such Delayed Acquired Asset or such Delayed Assumed Liability had been transferred, assigned or conveyed or assumed as contemplated hereby and so that all the benefits and burdens relating to such Delayed Acquired Asset or such Delayed Assumed Liability, including possession, use, risk of loss, potential for gain, and dominion, control and command over such asset, are to inure, from and after the Closing Date, to Buyer. To the extent permitted by Law and to the extent otherwise permissible in light of any Legal Impediment or required Consent (in each case, determined after giving effect to Sections 363 and 365 of the Bankruptcy Code), Buyer shall be entitled to, and shall be responsible for, the management and the benefits and burdens of any Delayed Acquired Asset or any Delayed Assumed Liability not yet transferred to or assumed by it as a result of this Section 1.6, and, subject to the other provisions of this Agreement (including Sections 6.5, 6.6, 7.2 and 7.3), the Parties agree to use commercially reasonable efforts to cooperate and coordinate with respect to obtaining any Consent or removing any Legal Impediment, including by providing any financial information and pro forma financial information of the relevant Party and its Affiliates reasonably required by the Party from whom a Consent is sought to be obtained or from whom a Legal Impediment is sought to be removed. Except as specifically provided elsewhere herein, nothing herein shall require Buyer or Seller or its Related Persons to expend any money or commence any litigation to obtain the removal of any Legal Impediment or obtain any required Consent.

(b)    If and when the Legal Impediments and the Consents, the failure to remove or the absence of which caused the deferral of the transfer or assumption of any Acquired Asset or Assumed Liability pursuant to Section 1.6(a), are removed or obtained, as the case may be, the transfer and assumption of the applicable Acquired Asset or Assumed Liability shall be promptly effected in accordance with the terms of this Agreement and/or any other applicable Ancillary Agreements, without the payment of additional consideration.

(c)    In connection with Seller's or the Seller Subsidiaries' retention of an Acquired Asset or Assumed Liability due to the deferral of the transfer or assumption of such Acquired Asset or Assumed Liability pursuant to this Section 1.6, none of Seller or its Related Persons shall be obligated to expend any money, unless the necessary funds are advanced by Buyer.

(d)    In the event that at any time or from time to time, any Person shall receive or otherwise possess any asset that is acquired by, or retained by, any other Person pursuant to this Agreement, such Party shall promptly transfer, or cause to be transferred, such asset to the Person so entitled thereto. Prior to any such transfer, the Person receiving or possessing such asset shall hold such asset in trust for any such other Person.

### ARTICLE 2
### CONSIDERATION

2.1    Consideration. The aggregate consideration for the sale and transfer of the Acquired Assets is (i) the Closing Cash Purchase Price, which is payable and deliverable at the Closing in accordance with Section 3.3 and is subject to adjustment in accordance with

Section 2.3 and Section 3.4, plus (ii) the assumption by Buyer at the Closing of the Assumed Liabilities.

2.2     Deposit. On the date hereof, Buyer and Seller have executed and delivered the Escrow Agreement. Within one (1) Business Day after the date hereof, Buyer shall deposit with the Escrow Agent $500,000 in immediately available funds (the "*Deposit*"). The Deposit shall be held and disbursed pursuant to the terms of the Escrow Agreement and this Agreement. Notwithstanding anything to the contrary herein, if Buyer does not deposit with the Escrow Agent the Deposit within one (1) Business Day after the date hereof, Seller may, without any further liability on the part of any Party hereto, terminate this Agreement by written notice to Buyer and withdraw the Bid Procedures Motion, the Sale Motion and any other motion filed with the Bankruptcy Court with respect to the transactions contemplated hereby.

2.3     Physical Inventory. On the Business Day prior to the Closing Date, Seller shall conduct a physical inventory of the volume (in tons) of newsprint inventory of Seller and the Seller Subsidiaries (the "*Physical Inventory*"). Seller shall give Buyer at least two Business Days' prior written notice of the times that it is conducting the Physical Inventory and Buyer may attend, or cause one of its representatives to attend, the Physical Inventory. If, as a result of the Physical Inventory, (a) the volume (in tons) of such newsprint inventory is greater than 4,328 metric tons (such excess, the "*Excess Inventory Tonnage*"), at the Closing, Buyer shall pay to Seller at Closing an additional amount equal to the product of the Excess Inventory Tonnage multiplied by the average of the price per ton paid by Seller and the Seller Subsidiaries pursuant to their five (5) most recent purchase orders therefor prior to the date of the Physical Inventory (the "*Applicable Newsprint Price*") or (b) the volume (in tons) of such newsprint inventory is less than 4,328 metric tons (such deficit, the "*Deficit Inventory Tonnage*"), at the Closing, the amount paid to Seller pursuant to Section 3.3(b) shall be reduced by an amount equal to the Deficit Inventory Tonnage multiplied by the Applicable Newsprint Price.

## ARTICLE 3
## CLOSING AND DELIVERIES

3.1     Closing. The sale, transfer, assignment and delivery by Seller and the Seller Subsidiaries of the Acquired Assets to Buyer (or a Buyer Designee) and the assumption by Buyer (or a Buyer Designee) of the Assumed Liabilities, on the terms and subject to the conditions set forth in this Agreement and the Sale Order, will be effected on the Closing Date (the "*Closing*") and will take place at the offices of Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654 at 10:00 a.m. central prevailing time on the second Business Day following, or at Seller's election, on such later Business Day that is not more than ten (10) Business Days after, the satisfaction or waiver by the appropriate Party of all the conditions contained in Article 12 (other than conditions which by their terms or their nature are to be performed or measured as of the Closing Date (provided such conditions are satisfied at Closing or waived by the applicable Party)), or on such other date or at such other place and time as may be agreed to by the Parties (the "*Closing Date*"). The Closing will be deemed to be effective at the Adjustment Calculation Time. On the Business Day immediately prior to the Closing Date, Buyer and Seller shall conduct a pre-Closing at the same location as the Closing, commencing at 9:00 a.m. local time, at which each Party shall present for review by the other Parties copies in execution form of all documents required to be delivered by such party at or in connection with

K&E 14573112.33

the Closing. Each Party will, and will cause its Affiliates to, at the Closing execute and deliver the agreements, documents, certificates and other deliveries (including the Ancillary Agreements) required to be executed and/or delivered at the Closing by such Party and/or such Affiliates of such Party or for which such execution and/or delivery is a condition to another Party's obligations to consummate the Closing.

3.2   Seller's Deliveries.

(a)   At the Closing, Seller shall, or shall cause one of its Affiliates to, deliver the following documents consistent with the terms of this Agreement:

(i)   a bill of sale with respect to the Acquired Assets (other than the Assigned Contracts, Transferred Intellectual Property and Transferred Real Property and assets set forth in Sections 1.1(c)(ii) and 1.1(k)(ii)), duly executed by Seller and any applicable Seller Subsidiary, and in the form of Exhibit A hereto;

(ii)   an assignment and assumption agreement with respect to the Closing Assigned Contracts (other than any Assumed IP Licenses) and Assumed Liabilities, duly executed by Seller and any applicable Seller Subsidiary, and in the form of Exhibit B hereto (the "*General Contract Conveyance Document*");

(iii)   originals of the Business Records and Libraries in the possession or control of Seller or the Seller Subsidiaries (it being understood that any Business Records located at any Real Property need not be physically delivered, but will be deemed delivered at the Closing), provided that, for any Business Records not located at any such Real Property, Seller may deliver such Business Records to Buyer promptly after the Closing Date, but in no event later than thirty (30) days after the Closing Date;

(iv)   an assignment and assumption agreement with respect to the Transferred Intellectual Property (other than any Assumed IP Licenses that have not been designated as Assigned Contracts as of the Closing), duly executed by Seller and any applicable Seller Subsidiary, and in the form of Exhibit C-1 hereto and an assignment agreement with respect to trademark registrations and applications in the form of Exhibit C-2 hereto and an assignment agreement with respect to copyright registrations and applications in the form of Exhibit C-3 hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction (collectively, the "*IP Conveyance Documents*");

(v)   an assignment and assumption agreement with regard to the Assumed Real Property Leases, duly executed by Seller and any applicable Seller Subsidiary, and in the form of Exhibit D hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction (the "*Assumed Real Property Leases Conveyance Document*");

(vi)   an assignment and assumption agreement with regard to the Assumed Real Property Licenses duly executed by Seller and any applicable Seller Subsidiary, and in the form of Exhibit E hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction (the "*Assumed Real Property Licenses Conveyance Document*");

-16-

(vii)   with regard to each parcel of the Owned Real Property other than Excluded Real Property, (x) transfer tax declarations and quit-claim deeds (with all required transfer tax stamps affixed) duly executed by Seller or any applicable Seller Subsidiary and in the form of Exhibit F hereto, as modified as necessary to meet the filing requirements for each recording jurisdiction, (y) policies or commitments to issue policies of title insurance ("*Title Policies*") to Buyer (or a Buyer Designee), designating Buyer (or a Buyer Designee) as named insured, insuring an aggregate amount of not less than the fair market value of all of the Owned Real Property that is Transferred Real Property, full marketable title to all Owned Real Property that is Transferred Real Property, free and clear of all Liens, Claims and Interests, other than Transferred Liens, to the extent provided by the Bankruptcy Code (including Sections 105 and 363(f) thereof) or by order of the Bankruptcy Court (including the Sale Order), including the following endorsements to the extent reasonably available: extended coverage, zoning 3.1 with parking, survey, access, tax parcel and affirmative coverage over encroachments, all in form and substance reasonably satisfactory to Buyer, and (z) a survey dated after August 1, 2009 and in the name of STMG Investors, LLC, Buyer or any Affiliate of Buyer and Phase I environmental site assessment together with a reliance letter in favor of Buyer or a Buyer Designee;

(viii)   a secretary's certificate certifying as to the resolutions of the board of directors of Seller approving and authorizing this Agreement and the transactions contemplated by this Agreement, and in the form of Exhibit G hereto;

(ix)   certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent agreed by Buyer and Seller to be necessary to evidence the transfer, conveyance and assignment to Buyer of Seller's and the Seller Subsidiaries' right, title and interest in and to the Acquired Assets (collectively, the "*Additional Asset Conveyance Documents*");

(x)   such assignments of Contracts and other instruments of assumption as and to the extent necessary to evidence the valid and effective assumption by Buyer (or a Buyer Designee) of the Assumed Liabilities (collectively, the "*Additional Liabilities Assumption Documents*");

(xi)   an affidavit of non-foreign status that complies with Section 1445 of the Code, duly executed by Seller or Seller's Affiliate, as applicable, and in the form of Exhibit H hereto;

(xii)   such other documents and instruments, in form and substance reasonably satisfactory to Seller and Buyer, as may be required or customary in order to accomplish the transaction on the terms and conditions and in the manner prescribed under this Agreement, including without limitation owner's affidavits, IRS Form 1099 statements, gap indemnitees and evidence of authority that may be requested by the title insurance company; and

(xiii)   a transition services agreement in the form attached hereto as Exhibit N (the "*Transition Agreement*"), duly executed by Sellers.

(b)   Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, Sellers' obligation to convey to Buyer (or the applicable Buyer Designee) all rights of

-17-

Sellers under the Permits consists solely of providing: (i) if required by Law, notices of intent to transfer the Permit to Buyer in accordance with the Government regulations governing such Permit transfer, and (ii) information as required by the Government regulations governing such Permit transfer. Furthermore, in no event shall Seller, any of its Related Persons (including the Seller Subsidiaries), or any of their Related Persons be required to deliver any Ancillary Agreement or other agreement, document or instrument that (i) requires Seller, any of its Related Persons (including any Seller Subsidiary) or any of their Related Persons to make any additional material representations, warranties or covenants, express or implied, not contained in this Agreement or (ii) otherwise expands the liabilities or obligations of, or requires any payments to be made or expenses to be incurred by, Seller, any of its Affiliates or any of their respective Related Persons related to the transactions contemplated hereby.

     3.3   <u>Buyer's Deliveries</u>.

     (a)   At Closing, the Escrow Agent shall pay to Seller the Deposit in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds to a bank account designated by Seller in writing (the "*Seller's Account*"), and each of Buyer and Seller shall take all action required to cause such delivery of the Deposit to Seller to occur;

     (b)   At Closing, Buyer (or, subject to <u>Section 15.1</u>, the applicable Buyer Designee) shall pay to Seller an amount equal to (i) the Closing Cash Purchase Price, <u>minus</u> (ii) the amount of the Deposit paid pursuant to <u>Section 3.3(a)</u>, <u>minus</u> (iii) to the extent not paid (or provision therefor not made) by Seller or one of the Seller Subsidiaries prior thereto, (A) the Seller Cure Cost Obligations and (B) 50% of the Transaction Taxes, <u>plus</u> (iv) any amount determined to be payable to Seller in accordance with <u>Section 2.3</u>, <u>minus</u> (v) any amount determined to be payable to Buyer in accordance with <u>Section 2.3</u>. Notwithstanding anything to the contrary herein, to the extent any amount are subtracted from the Closing Cash Purchase Price in respect of Seller Cure Cost Obligations or Transaction Taxes pursuant to clause (iii) of the preceding sentence, such Seller Cure Cost Obligations or Transaction Taxes shall be Assumed Liabilities hereunder and Buyer shall be solely responsible therefor.

     (c)   At or prior to Closing, Buyer shall deliver the following documents consistent with the terms of this Agreement:

         (i)   the General Contract Conveyance Document, duly executed by Buyer or the applicable Buyer Designee;

         (ii)   the Assumed Real Property Leases Conveyance Documents, duly executed by Buyer or the applicable Buyer Designee;

         (iii)   the Assumed Real Property License Conveyance Documents, duly executed by Buyer or the applicable Buyer Designee;

         (iv)   the Assumed IP Conveyance Documents, duly executed by Buyer or the applicable Buyer Designee;

(v)    a secretary's certificate certifying as to the resolutions of Buyer approving and authorizing this Agreement and the transactions contemplated by this Agreement and in the form of Exhibit I hereto;

(vi)    each of the Additional Asset Conveyance Documents and Additional Liabilities Assumption Documents;

(vii)    the Transition Agreement, duly executed by Buyer (and any applicable Buyer Designees); and

(viii)    subject to Section 3.2(b), such other documents and instruments, in form and substance reasonably satisfactory to Buyer and Seller, as may be required or customary in order to accomplish the transaction on the terms and conditions and in the manner prescribed under this Agreement.

3.4    Purchase Price Adjustment.

(a)    Within sixty (60) days following the Closing Date, Buyer shall prepare and deliver to Seller (i) a balance sheet of the Business as of the Adjustment Calculation Time (the "*Closing Balance Sheet*"), and (ii) a statement (the "*Closing Statement*") setting forth Buyer's calculation of Closing Net Working Capital and the resulting Final Cash Purchase Price as calculated with reference to such amounts and any other components thereof in accordance with the definition thereof. The Closing Balance Sheet shall be prepared in accordance with the Accounting Principles (except as otherwise provided in the definition of Closing Net Working Capital and without regard to any purchase accounting adjustments arising out of the transactions contemplated hereby).

(b)    During the thirty (30) days immediately following Seller's receipt of the Closing Balance Sheet and the Closing Statement, Buyer shall provide Seller with full access to the books and records (including working papers, schedules, memoranda, supporting data and other documents) relating to the Closing Balance Sheet and the Closing Statement. The Closing Balance Sheet, the Closing Statement and the resulting calculation of Final Cash Purchase Price shall become final and binding upon the parties thirty (30) days following Seller's receipt thereof unless Seller gives written notice of its disagreement (the "*Notice of Disagreement*") to Buyer prior to such date. Any Notice of Disagreement shall (i) specify in reasonable detail the nature and amount of any disagreement so asserted and (ii) only include disagreements based on mathematical errors or based on the Closing Balance Sheet or the Closing Statement not being prepared in accordance with this Agreement. If a timely Notice of Disagreement is received by Buyer, then the Closing Balance Sheet, the Closing Statement and the resulting calculation of Closing Cash Purchase Price (as revised in accordance with clause (x) or (y) below) shall become final and binding upon the Parties on the earlier of (x) the date Seller and Buyer resolve in writing any and all differences they have with respect to any matter specified in the Notice of Disagreement and (y) the date any and all matters properly in dispute are finally resolved in writing by the Accounting Firm. During the thirty (30) days immediately following the delivery of a Notice of Disagreement, Seller and Buyer shall seek in good faith to resolve in writing any differences which they may have with respect to any matter specified in the Notice of Disagreement, and all such discussions related thereto shall (unless otherwise agreed by Buyer

-19-

and Seller in writing) be governed by Rule 408 of the Federal Rules of Evidence and any applicable similar state rule. During any period of dispute, Buyer shall have full access to the working papers of Seller and its representatives relating to the Notice of Disagreement. At the end of such thirty (30) day period, Seller and Buyer shall submit to the Chicago office of Grant Thornton (the "*Accounting Firm*") for review and resolution of any and all matters (but only such matters) which remain in dispute and which were properly included in the Notice of Disagreement. Buyer and Seller shall instruct the Accounting Firm to, and the Accounting Firm shall, make a final determination of the items included in the Closing Statement (to the extent such amounts are in dispute) in accordance with the guidelines and procedures set forth in this Agreement. Buyer and Seller shall cooperate with the Accounting Firm during the term of its engagement. Buyer and Seller shall instruct the Accounting Firm not to, and the Accounting Firm shall not, assign a value to any item in dispute greater than the greatest value for such item assigned by Buyer, on the one hand, or Seller, on the other hand, or less than the smallest value for such item assigned by Buyer, on the one hand, or Seller, on the other hand. Buyer and Seller shall also instruct the Accounting Firm to make its determination based solely on presentations by Buyer and Seller which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review). The Closing Balance Sheet, the Closing Statement and the resulting calculation of Final Cash Purchase Price shall become final and binding on the Parties on the date the Accounting Firm delivers its final resolution in writing to Buyer and Seller (which final resolution shall be requested by the parties to be delivered not more than forty-five (45) days following submission of such disputed matters), and such resolution by the Accounting Firm shall not be subject to court review or otherwise subject to objection or appeal. The fees and expenses of the Accounting Firm pursuant to this Section 3.4(b) shall be paid 50% by Seller and 50% by Buyer.

(c) If the Closing Cash Purchase Price is less than the Final Cash Purchase Price (such shortfall, the "*Adjustment Amount*"), Buyer shall, within five (5) Business Days after the Closing Statement becomes final and binding on the Parties, make payment to Seller by wire transfer in immediately available funds in an aggregate amount equal to the Adjustment Amount. If the Closing Cash Purchase Price is greater than the Final Cash Purchase Price (such excess, the "*Excess Amount*"), within five (5) Business Days after the Closing Statement becomes final and binding on the Parties, Seller shall within five (5) Business Days after the Closing Statement becomes final and binding on the Parties, make payment to Buyer of the Excess Amount by wire transfer in immediately available funds. Any claims for the Excess Amount shall be superpriority administrative claims under Section 507(b) of the Bankruptcy Code. Any payment pursuant to this Section 3.4(c) shall be made together with interest thereon at the rate per annum equal to the rate of interest published by the *Wall Street Journal* as the "prime rate" at large U.S. money center banks on the Closing Date (the "*Applicable Rate*"), calculated on the basis of a 365-day year and the number of days elapsed from the Closing Date to the date of payment.

(d) Buyer agrees that following the Closing it will not take any actions with respect to the accounting books, records, policies and procedures of the Business that would obstruct or prevent the preparation of the Closing Statement as provided in this Section 3.4. The Parties agree that, from and after the Closing, the provisions of this Section 3.4 and the arbitration provisions contemplated hereby shall be the exclusive remedy and exclusive forum of the Parties with respect to the matters that are specifically addressed through the working capital adjustment contemplated hereby.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER
### AND SELLER SUBSIDIARIES

Seller and the Seller Subsidiaries, jointly and severally, hereby represent and warrant to Buyer on the date hereof and as of the Closing Date, as follows, except in all cases as disclosed in the Disclosure Schedules, as the same may be amended or modified in accordance with Section 15.3(a):

4.1    Corporate Organization. Seller and each Seller Subsidiary is duly incorporated and validly existing and in good standing under the Laws of the State of its formation and is qualified or licensed to do business in each jurisdiction where the character of its business or the nature of its properties, makes such qualification or licensing necessary, except where the failure to be so qualified would not have a Material Adverse Effect. Subject to any necessary authority from the Bankruptcy Court, Seller and the Seller Subsidiaries have all requisite corporate or other power and authority to own their respective properties and assets and to conduct their respective businesses as now conducted.

4.2    Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order and the receipt of the Consents set forth on Schedule 4.4 and Schedule 4.9(c), Seller has all requisite corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is or will be a party and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby. Subject to the Bankruptcy Court's entry of the Sale Order and the receipt of the Consents set forth on Schedule 4.4 and Schedule 4.9(c), each Seller Subsidiary has all requisite corporate, limited liability company or other power and authority to enter into the Ancillary Agreements to which it is a party and to carry out its obligations thereunder and to consummate the transactions contemplated hereby. Subject to the Bankruptcy Court's entry of the Sale Order, the execution and delivery of this Agreement by Seller and the Seller Subsidiaries and the Ancillary Agreements by Seller and the Seller Subsidiaries party thereto and the performance by Seller and the Seller Subsidiaries of their obligations hereunder and under the Ancillary Agreements, have been duly authorized by all necessary action by the board of directors or equivalent governing body of Seller and the Seller Subsidiaries, as applicable, and no other organizational proceedings on the part of Seller or the Seller Subsidiaries are necessary to authorize such execution, delivery and performance. This Agreement has been duly executed by Seller and the Seller Subsidiaries, and the Ancillary Agreements when delivered will be, duly executed by Seller and the Seller Subsidiaries party thereto and, subject to the Bankruptcy Court's entry of the Sale Order, constitute or will constitute its or their, as applicable, valid and binding obligation, enforceable against it or them, as applicable, in accordance with the terms herein and therein, except that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting or relating to the enforcement of creditors' rights generally, and is subject to general principles of equity.

4.3    No Conflict or Violation. Subject to (a) the receipt of all Consents set forth on Schedule 4.4 and Schedule 4.9(c), and (b) the Bankruptcy Court's entry of the Sale Order, the execution, delivery and performance by Seller and the Seller Subsidiaries of this Agreement and by Seller and the Seller Subsidiaries party thereto of the Ancillary Agreements do not and will

-21-

not in each case, except as has been obtained or contemplated in this Agreement or the Ancillary Agreements (x) violate or conflict with any provision of the certificate of incorporation, certificate of formation, operating agreement or bylaws (or equivalent formation or organizational documents) (collectively, the "*Organizational Documents*") of Seller or the applicable Seller Subsidiaries, (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("*Law*") or any order, judgment or decree of any court or Government ("*Order*") applicable to Seller or the applicable Seller Subsidiaries, the Acquired Assets or the Business or (z) violate, result in a breach of or constitute (with due notice or lapse of time, or both) a default under any Assigned Contract, which violation, conflict, breach or default in any such case would reasonably be expected to have a Material Adverse Effect.

4.4   Consents and Approvals. Other than Consents relating to and as may result from the Chapter 11 Case, Schedule 4.4 sets forth a true and correct list of each Consent and each declaration to, or filing or registration with, any Government that is required in connection with the execution and delivery of this Agreement by Seller and the Seller Subsidiaries and the Ancillary Agreements by Seller and the Seller Subsidiaries party thereto, or the performance by Seller of its obligations hereunder or by Seller or the applicable Seller Subsidiaries party thereto under the Ancillary Agreements, in any such case the failure of which to obtain would reasonably be expected to have a Material Adverse Effect.

4.5   Compliance with Law.  Except as set forth on Schedule 4.5, the operation of the Business and the use of the Acquired Assets by Seller and the Seller Subsidiaries are and have been in material compliance with all applicable statutes, laws, ordinances, rules, orders and regulations of any Government, except to the extent any instances of non-compliance would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 4.5 and as may result from the Chapter 11 Case, since January 1, 2008, neither Seller nor any Seller Subsidiary has received written notice of any violation of any Law (other than with respect to Environmental Law, as to which the only representations and warranties made by Seller and the Seller Subsidiaries are those contained in Section 4.11), nor is Seller or any of the Seller Subsidiaries in default with respect to any Order applicable to the Acquired Assets or operation of the Business, other than violations and defaults the consequences of which would not reasonably be expected to have a Material Adverse Effect. Notwithstanding the foregoing, no representation is being made by Seller or the Seller Subsidiaries under this Section 4.5 with respect to Taxes.

4.6   Litigation.   Except as set forth on Schedules 4.6 or 4.11 and except for the Chapter 11 Case and any Claims, suits, arbitrations, investigations or proceedings filed on the docket in the Chapter 11 Case, there are no Claims, suits, arbitrations, investigations or proceedings pending or, to the Knowledge of Seller, threatened, before any Government, brought by or against Seller or any of the Seller Subsidiaries, which if determined adversely to Seller or the applicable Seller Subsidiaries would reasonably be expected to have a Material Adverse Effect or which seek to enjoin, prohibit or interfere with, in any material respect, the transactions contemplated hereby or materially impair the ability of Seller or the applicable Seller Subsidiaries to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

4.7   Financial Statements.

(a)    Set forth on Schedule 4.7(a), are the following financial statements for Seller and its Subsidiaries (collectively, the "*Financial Statements*"): (i) the audited consolidated balance sheet as of December 31, 2008, and the audited consolidated statements of operations, stockholders equity (deficit) and cash flows for the year ended December 31, 2008; and (ii) the unaudited consolidated balance sheet as of June 30, 2009 (the "*Latest Balance Sheet*") and the unaudited consolidated statements of operations, stockholders equity (deficit) and cash flows for the six (6) month period ended June 30, 2009 (together, with the Latest Balance Sheet, the "*Most Recent Financial Statements*"). Except (a) that the Most Recent Financial Statements are subject to normal year-end adjustments and lack footnotes and other presentation items, (b) that the Financial Statements do not fully take into account the effects of the Chapter 11 Case (including the possibility that the Seller and its Subsidiaries may not realize assets or settle liabilities in Ordinary Course of Business), and (c) as otherwise set forth on Schedule 4.7(a), the Financial Statements have been prepared from the books and records of Seller and its Subsidiaries, present fairly, in all material respects, in conformity with GAAP the financial condition of Seller and its Subsidiaries as of such dates and the results of operations of Seller and its Subsidiaries for such periods.

(b)    Except as set forth on Schedule 4.7(b), Seller and Seller Subsidiaries have no material liabilities of the type required to be recognized on a balance sheet prepared in accordance with GAAP, except (i) liabilities disclosed in or reserved against in the Financial Statements or the notes thereto, (ii) liabilities incurred or arising since the date of Latest Balance Sheet in the Ordinary Course of Business or in connection with the Chapter 11 Case, (iii) liabilities arising after the date of this Agreement in connection with the transactions contemplated hereby, (iv) liabilities disclosed on the Disclosure Schedules and (v) Excluded Liabilities.

4.8    Absence of Certain Developments. Except as set forth on Schedule 4.8 or as otherwise contemplated by this Agreement or as otherwise approved or required by the Bankruptcy Court, since May 31, 2009 until the date of this Agreement, (i) Seller and the Seller Subsidiaries have operated the Business in the Ordinary Course of Business in all material respects, taking into account status as a filer under Chapter 11 of the Bankruptcy Code, and (ii) neither Seller nor any of the Seller Subsidiaries have:

(a)    created, assumed or guaranteed any indebtedness for borrowed money (other than intercompany indebtedness which are Excluded Liabilities) or subjected to any material Lien any portion of their assets or properties, except as permitted hereunder;

(b)    sold, assigned or transferred any material portion of their tangible assets, except in the Ordinary Course of Business;

(c)    sold, assigned or transferred any Real Property or Intellectual Property, except in the Ordinary Course of Business;

(d)    made or granted any bonus or any compensation or salary increase to any Business Employee (except in the Ordinary Course of Business or as required by Law or contractual obligations or other agreement existing on the date thereof), or made or granted any increase in any employee benefit plan or arrangement, or amended or terminated any existing

-23-

employee benefit plan or arrangement or severance agreement or employment contract or adopted any new employee benefit plan or arrangement or severance agreement or employment contract for any Business Employee;

(e)      made any loans or advances to, or guarantees for the benefit of, any Persons, other than (i) in the Ordinary Course of Business consistent with past practices and (ii) intercompany loans and advances among or between Seller and its Subsidiaries; or

(f)      suffered any material damage, destruction or other casualty loss with respect to the material property owned by Seller and the Seller Subsidiaries that is not covered by insurance.

(g)      made any commitment for any capital expenditure that constitutes any Assumed Liability in excess of $100,000.

(h)      made any change in its cash management practices or in any method of account collection or inventory buying or of accounting or accounting policies or made any mark-down in the value of its Inventory, in any case, that is material and not in the Ordinary Course of Business.

(i)      solely with respect to any Taxes that are Assumed Liabilities, (a) made or changed any Tax elections, (b) changed any Tax accounting period, (c) adopted or changed any material method of Tax accounting, (d) consented to any extension or waiver of the limitation period applicable to any material Tax claim or assessment, (e) entered into any material closing agreement, settled any material Tax claim, assessment, (f) surrendered any right to claim a refund of Taxes, (g) failed to timely pay any Tax imposed on it or the Acquired Assets then due under applicable Law, or (h) failed to file any Tax Return then due under applicable Law.

4.9      Material Contracts.

(a)      Schedule 4.9(a) sets forth a complete and correct list of each of the contracts of Seller and the Seller Subsidiaries that:

(i)      relates to the acquisition of goods (other than Inventory in the Ordinary Course of Business) or Equipment, the purchase, sale or lease of real property, the lease of Equipment or other personal property, or the provision of any services, in each case which requires any future payment in excess of $100,000 in the aggregate during any 12 month period;

(ii)      relates to any employment agreement with any Business Employee that has future required scheduled payments (absent a material breach thereof) in excess of $100,000 per annum and is not terminable by Seller or any of the Seller Subsidiaries, as applicable, upon notice of sixty (60) days or less for a cost of less than $100,000;

(iii)      relates to any other agreement, contract, lease, license (including Intellectual Property licenses) or instrument, in each case not included in clauses (i) through (ii) above or set forth on any of the other sections of the Disclosure Schedules, which Seller or any of the Seller Subsidiaries is a party or by or to which any of their assets are bound or subject, in each case which has future required scheduled payments (absent a material breach thereof) to or

by Seller or any of the Seller Subsidiaries in excess of $100,000 per annum and is not terminable by Seller or any of the Seller Subsidiaries, as applicable, upon notice of sixty (60) days or less for a cost of less than $100,000;

(iv)    any agreement containing a covenant not to compete granted in favor of a third party that materially impairs the Business as currently conducted;

(v)    any Contract which is critical to the operation of the Business as currently operated and (A) is with any vendor with respect to which Sellers filed a critical vendor motion with the Bankruptcy Court or (B) with respect to which the Cure Costs are estimated by Seller as of the date hereof to be in excess of $10,000; or

(vi)    the consequences of a default under or termination of such Contract would reasonably be expected to have a Material Adverse Effect (the agreements described in clauses (i) and (iv) collectively, the "*Material Contracts*").

(b)    Other than as set forth on Schedule 4.9(b) or in motions, other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor the Seller Subsidiaries, nor, to Seller's Knowledge, any other party to any of the Material Contracts has commenced any action against any of the parties to such Material Contracts or given or received any written notice of any material default or violation under any Material Contract that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assigned Contracts). To Seller's Knowledge, each of the Material Contracts is, or will be at the Closing, valid, binding and in full force and effect against Seller or the applicable Seller Subsidiaries, except as otherwise set forth on Schedule 4.9(b).

(c)    Except as set forth on Schedule 4.9(c), after giving effect to Section 365 of the Bankruptcy Code, no Consent or waiver under any of the Material Contracts is required to be obtained by Seller or any of the Seller Subsidiaries in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(d)    Except as set forth on Schedule 4.9(d), none of the other parties under any of the Material Contracts has provided Seller or any of the Seller Subsidiaries with any written notice that it currently plans or intends to terminate any such Contract, or otherwise cease its performance thereunder related to such Contracts or the Business, except for such notices of termination or cessations that would not reasonably be expected to have a Material Adverse Effect.

(e)    Seller has delivered to, or made available for inspection by, Buyer a copy of each Material Contract. Except as disclosed on Schedule 4.9(e) or in any motions, other pleading or similar items filed with the Bankruptcy Court, Seller or the applicable Seller Subsidiaries have performed all material obligations required to be performed by it or them to date under the Material Contracts and is not or are not (with or without the lapse of time or the giving of notice, or both) in breach or default thereunder, except for any failures to perform or any such breach or default that would not result in a Material Adverse Effect.

-25-

4.10    Permits.    Schedule 4.10 sets forth a complete and correct list of all material Permits and all pending applications therefor obtained by Seller or any of the Seller Subsidiaries necessary to the operation of the Business (other than the Environmental Permits, as to which the only representations and warranties made by Seller are those contained in Section 4.11). As of the date of this Agreement, except as set forth on Schedule 4.10 or in any motions, other pleadings or similar items filed with the Bankruptcy Court, or as would not reasonably be expected to have a Material Adverse Effect, each such Permit is valid and in full force and effect, and is not subject to any pending or, to Seller's Knowledge, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect and is not subject to any pending or to Seller's Knowledge threatened breach or violation of the terms thereof or fine for violation thereof.    To Seller's Knowledge, except as set forth on Schedule 4.10, the consummation of the transactions contemplated hereby will not result, solely by the terms of such Permit listed on Schedule 4.10, in the revocation, cancellation, or determination of or any adverse amendment or modification to any Permit listed on Schedule 4.10.

4.11    Environmental Matters.    Except as set forth on Schedule 4.11, or as described in the Environmental Reports referred to in Section 4.11(h), to Seller's Knowledge:

(a)    Seller and the Seller Subsidiaries, as applicable, are in compliance with and, since January 1, 2008, have complied with all applicable Environmental Laws, except for such non-compliance that would not reasonably be expected to have a Material Adverse Effect.

(b)    Seller and the Seller Subsidiaries, as applicable, have obtained, and, since January 1, 2008, have complied with, all Environmental Permits required under Environmental Laws for them to conduct the Business in the Ordinary Course of Business, except where the failure to obtain or comply with Environmental Permits would not reasonably be expected to have a Material Adverse Effect; a list of such Environmental Permits is set forth on Schedule 4.11. All such Environmental Permits are in full force and effect, and no suspension or cancellation of any such Environmental Permits is pending or, to the Seller's Knowledge, threatened, except where the failure to be in full force and effect or such suspension or cancellation would not reasonably be expected to have a Material Adverse Effect.    To Seller's Knowledge, except as set forth on Schedule 4.11, the consummation of the transactions contemplated hereby will not result, solely with the terms of such Environmental Permit listed on Schedule 4.11, in the revocation, cancellation, or determination of or any adverse amendment or modification to any Environmental Permit listed on Schedule 4.11.

(c)    Seller's and the Seller Subsidiaries' operation of the Business is not subject to any Order issued pursuant to Environmental Law, except for such Orders that would not reasonably be expected to have a Material Adverse Effect.

(d)    Since January 1, 2008, neither Seller nor the Seller Subsidiaries have received a written complaint, Order, directive, Claim, citation or notice of violation, suit or proceeding from any Government or any other Person with respect to any violation of Environmental Laws or any release, spill, leak, discharge or emission of any Hazardous Materials, except for such matters that would not reasonably be expected to have a Material Adverse Effect.

K&E 14573111233

(e)    Except as set forth on Schedule 4.11, to the Seller's Knowledge, no Seller or Seller Subsidiary is currently required to undertake any corrective or remedial obligation under any Environmental Law with respect to the Business, the Acquired Assets or any of the Transferred Real Property, except for such obligations that would not reasonably be expected to have a Material Adverse Effect.

(f)    Except as set forth on Schedule 4.11, no Seller or Seller Subsidiary nor any predecessor or Affiliate of any Seller or Seller Subsidiary has received any written notice regarding any unresolved actual or alleged violation of Environmental Laws, or any current material liabilities or potential material liabilities, including any investigatory, remedial or corrective obligations, relating to any of Seller or the Seller Subsidiaries, the Acquired Assets, the Business or the Transferred Real Property arising under Environmental Laws, except for such violations, liabilities or obligations that would not reasonably be expected to have a Material Adverse Effect.

(g)    Except as set forth on Schedule 4.11, neither Seller nor any Seller Subsidiary nor any predecessor or Affiliate of Seller or any Seller Subsidiary has (i) treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, exposed any person to any Hazardous Materials that has resulted in a Claim against any Seller, any Seller Subsidiary, the Business or the Acquired Assets, except for such Claims that would not reasonably be expected to have a Material Adverse Effect or (ii) released any Hazardous Materials, or owned or operated any property or facility that has been or is contaminated by any Hazardous Materials, in each case as has given rise to any material liability for response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees, or any investigatory, corrective or remedial obligations, pursuant to CERCLA or any other Environmental Laws, except for such liabilities or obligations that would not reasonably be expected to have a Material Adverse Effect.

(h)    Seller has made available to Buyer copies of all Environmental Reports that are in the possession or within the reasonable control of Seller or the Seller Subsidiaries.

(i)    Except as otherwise disclosed on Schedule 4.11, to the Seller's Knowledge, none of the following exists at any of the Transferred Real Property, except as would not reasonably be expected to have a Material Adverse Effect:   (1) leaking underground storage tanks, (2) asbestos-containing material which in its present condition requires abatement under Environmental Laws, (3) materials or equipment containing polychlorinated biphenyls, (4) landfills, surface impoundments, or disposal areas or (5) any other contamination by Hazardous Materials of the Transferred Real Property.

(j)    The representations and warranties contained in this Section 4.11 are the only representations and warranties made by Seller with respect to matters arising under Environmental Laws or relating to Hazardous Materials.

4.12    Employee Benefits.

(a)    Set forth on Schedule 4.12(a) is a list of all Employee Benefit Plans that Seller and the Seller Subsidiaries maintain, administer, sponsor, or to which Seller or any of the Seller

Subsidiaries contribute (including any Employee Benefit Plans which are in existence but to which Seller or Seller Subsidiaries are not currently contributing).

(b)     To Seller's Knowledge, except as set forth on Schedule 4.12(b), each Employee Benefit Plan has been maintained, funded and administered in accordance with the material terms of such Employee Benefit Plan and complies in form and in operation in all respects with the applicable requirements of ERISA and the Code, except where the failure to comply would not have a Material Adverse Effect.

(c)     Each Employee Benefit Plan that is an Assumed Benefit Plan and that is intended to be a tax-qualified plan under Section 401(a) of the Code has received a favorable determination letter or opinion letter from the Internal Revenue Service to the effect that it meets the requirements of Section 401(a) of the Code.

(d)     Neither Seller nor any Selling Subsidiary has any obligation to make a payment to any Person that would constitute an "excess parachute payment" within the meaning of Code Section 280G(b).

4.13   Owned Real Property.

(a)     Schedule 4.13 lists the street address, legal description where appropriate and the current owner of each parcel of real property in which any of the Sellers has fee title (or equivalent) interest.  Seller has made available to Buyer all material existing surveys or topographical maps for the Transferred Owned Real Property, and title policies in Seller's or the Seller Subsidiaries' possession or reasonably under its control.

(b)     Except as described in Schedule 4.13, each Seller or Seller Subsidiary listed in Section 4.13 as the owner of a parcel of Transferred Owned Real Property has good and valid title in fee simple to such parcel free of all Liens, Claims and Interests, other than Permitted Liens and Liens, Claims and Interests to be released by operation of the Bankruptcy Code (including Sections 105 and 363(f) of thereof) or by order of the Bankruptcy Code (including the Sale Order).  No Seller or Seller Subsidiary has received written notice of any pending condemnation proceeding or any threatened condemnation that would materially preclude or impair the use of any Transferred Owned Real Property by the Business for the purposes for which it is currently used.  No Seller or Seller Subsidiary has received written notice of the applicable Government altering its zoning Laws so as to materially preclude or impair the use of any Owned Real Property by the Business for the purposes for which it is currently used.

(c)     Except as set forth on Schedule 4.13, to Seller's Knowledge, the Transferred Owned Real Property (including all structures and Improvements located thereon), and the present uses of the Transferred Owned Real Property by Sellers, are in compliance, in all material respects, with, or not in material default under or in material violation of, any building, zoning, land use, development, fire code, insurance regulation, public health, public safety, sewage, water, sanitation or any other legal requirement or law.

(d)     To Seller's Knowledge, the Improvements and Equipment located on the Owned Real Property are, in all material respects, structurally sound and in good condition, order and repair, taking into account their current use, age, ordinary wear and tear and normal maintenance.

-28-

4.14    Real Property Leases and Licenses.    Schedule 4.14 lists the street address of each parcel of real property leased or subleased by Seller or any Seller Subsidiary as tenant or subtenant, as the case may be, which is used in or held for use in the conduct of the Business, and the identity of the lessor and the lessee of each such parcel of real property. Except as set forth on Schedule 4.14, there has not been a sublease or assignment entered into by any of the Sellers in respect of the Assumed Real Property Leases. To Sellers' Knowledge, each Assumed Real Property Lease is a valid lease or sublease free and clear of all Liens, Claims and Interests, other than Permitted Liens and Liens, Claims and Interests to be released by operation of the Bankruptcy Code (including Sections 105 and 363(f) of thereof) or by order of the Bankruptcy Code (including the Sale Order) and Sellers have received no written notice of default under such Assumed Real Property Lease, except as disclosed in Schedule 4.14.    To Sellers' Knowledge, the security deposit required pursuant to each Assumed Real Property Lease has not been drawn upon by the relevant landlord or sublandlord, as applicable, and no additional monies are required to bring the security deposits into compliance with respect to such Assumed Real Property Lease. No Seller or Seller Subsidiary has received written notice of any pending condemnation proceeding or any threatened condemnation that would materially preclude or impair the use of any real property leased by the Business pursuant to any Assumed Leased Real Property for the purposes for which it is currently used. No Seller or Seller Subsidiary has received written notice of the applicable Government altering its zoning Laws so as to materially preclude or impair the use of any real property leased by the Business pursuant to any Assumed Real Property Lease for the purposes for which it is currently used.

4.15    Title to Assets; Sufficiency.

(a)    Except as set forth on Schedule 4.15, one or more Sellers have title to, or a valid leasehold interest in or valid right to use, the tangible Acquired Assets, subject to Permitted Liens and other Liens, Claims and Interests to be released by operation of the Bankruptcy Code (including Sections 105 and 363(f) of thereof) or by order of the Bankruptcy Code (including the Sale Order). Subject to entry of the Sale Order and the terms and conditions of this Agreement, and except for Delayed Acquired Assets and as otherwise disclosed in this Agreement or the Disclosure Schedules, Sellers have the power and the right to sell, assign and transfer title to, or a valid leasehold interest in, the tangible Acquired Assets to Buyer.

(b)    To Seller's Knowledge, the tangible Acquired Assets are in the aggregate in good condition and repair (taking into account their current use, age, ordinary wear and tear and normal maintenance).

(c)    Sellers own or lease all buildings, machinery, Equipment and other tangible assets necessary for the conduct of the Business as presently conducted. The Acquired Assets constitute all of the assets, agreements, licenses and properties owned by Sellers (other than the Excluded Assets) and, except for Excluded Assets, are all of the assets (tangible and intangible), agreements, licenses and properties necessary to conduct the Business as presently conducted.

4.16    Business Records. Seller has made, or will make, available to Buyer originals of Business Records that are in Seller's or the Seller Subsidiaries' possession or control.

4.17    Intellectual Property.

(a)    Schedule 4.17 sets forth a true and complete list of (i) all of the following owned by Seller or the Seller Subsidiaries (x) issued patents or patent applications; (y) trademark registrations, trademark applications, service mark registrations and service mark applications; and (z) Internet domain names; and (ii) all agreements for Intellectual Property licensed by Seller or the Seller Subsidiaries (excluding licenses for commercially available off-the-shelf Computer Software), the consequences of a default under or termination of which would reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth in Schedule 4.17 and to Sellers' Knowledge:

(i)    All Transferred Intellectual Property owned by Seller or the Seller Subsidiaries is valid, subsisting and enforceable, and is not subject to any outstanding order, judgment or decree restricting its use or adversely affecting Seller's or Seller Subsidiaries' rights thereto.

(ii)    Except as would not have a Material Adverse Effect, (x) none of the Sellers is violating, nor has Seller or any of the Seller Subsidiaries, since January 1, 2008, violated any third party Intellectual Property rights; and (y) there are no actions, reissues, reexaminations, public protests, interferences, arbitrations, mediations, oppositions, cancellations, Internet domain name dispute resolutions or other proceedings (collectively, "*Suits*") pending or threatened in writing concerning any claim or position that any Seller, Seller Subsidiary or any of their Affiliates has violated any third party Intellectual Property rights.

(iii)    There are no material Suits pending or threatened in writing concerning any Transferred Intellectual Property owned by Seller or the Seller Subsidiaries.

(iv)    Seller and the Seller Subsidiaries own or otherwise hold valid rights to use all Transferred Intellectual Property. No Person is violating any Transferred Intellectual Property owned by Seller or the Seller Subsidiaries.

(v)    No Person other than a Seller or any Seller Subsidiary has any ownership interest in, or a right to receive royalty or similar payment with respect to, any of the Intellectual Property owned by Seller or any Seller Subsidiary (the "*Owned Intellectual Property*") that is Transferred Intellectual Property. None of the Sellers have granted any options, licenses, assignments or agreements relating to (i) the ownership of any rights in any material Owned Intellectual Property that is Transferred Intellectual Property or (ii) the marketing or distribution of any material Owned Intellectual Property that is Transferred Intellectual Property.

4.18    Employees.

(a)    Except as set forth on Schedule 4.18, to the knowledge of Seller, Seller and the Seller Subsidiaries are in compliance with all currently applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and are

-30-

not engaged in any violation of applicable employment law, regulation, or unfair labor practice, failure to comply with which or engagement in which, as the case may be, would result in a Material Adverse Effect. Except as set forth on Schedule 4.18, there is no employment charge, claim, or complaint or unfair labor practice charge or complaint (each, an "*Employment Claim*") pending or, to the knowledge of Seller, threatened in writing against Seller or any of the Seller Subsidiaries, in any court, administrative agency, or other tribunal, including without limitation before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Department of Labor, or any other state or local administrative agency, other than any Employment Claim which would not result in a Material Adverse Effect.

(b)    To Seller's Knowledge, each Seller and Seller Subsidiary is, and for the past three (3) years has remained, in compliance in all material respects with all applicable laws, rules and regulations relating to employment, employment practices, or the employment of labor (including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, immigration, workplace safety, workers' compensation and the payment of social security and other Taxes).

4.19    Insurance.    Schedule 4.19 lists all insurance policies (other than title insurance policies and insurance policies in respect of Seller's or the Seller Subsidiaries' obligations under Employee Benefit Plans) maintained by Seller or any of the Seller Subsidiaries as of the date hereof that provide coverage, subject to applicable deductibles, self-insured retention requirements, coverage limits and exclusions from coverage, with respect, in whole or in part, to the Business for the policy year that includes the date of this Agreement. To the Knowledge of Seller, except as would not reasonably be expected to result in a Material Adverse Effect, all such insurance policies of Seller and the Seller Subsidiaries are in full force and effect, and, except as a result of the Chapter 11 Case, neither Seller nor any of the Seller Subsidiaries is in default in any material respect regarding its obligations under any of such insurance policies.

4.20    Brokerage.    Except as set forth on Schedule 4.20, there are no claims for brokerage commissions, finders fees, or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Seller or any of the Seller Subsidiaries.

4.21    Taxes.

(a)    Seller and the Seller Subsidiaries have filed all employment, payroll, real and personal property, sales and use Tax Returns required to be filed by them and have paid all employment, payroll, real property and sales and use Taxes due and owing (whether or not shown on any filed tax return).

(b)    Seller and the Seller Subsidiaries have (i) accurately reported, withheld and paid all Taxes required to have been withheld and paid by Sellers in connection with amounts paid or owing by Seller and the Seller Subsidiaries to any employee, independent contractor, creditor, stockholder or other third party, (ii) timely and accurately filed all informational Tax Returns required by applicable Law with respect to its service providers and (iii) have no liability for any withholding Tax or employment Tax previously due.

-31-

(c)    Seller and the Seller Subsidiaries have paid all property Taxes with respect to the Transferred Real Property and other Acquired Assets required to have been paid by Seller and the Seller Subsidiaries in full and, to Seller's Knowledge, none of the property Taxes related to the Transferred Real Property or other Acquired Assets are subject to temporary abatement or reduction or any ongoing protest or dispute.

4.22    Inventory.    Except as may otherwise be reasonably expected in the Ordinary Course of Business, the Inventory included in the Acquired Assets (i) consists solely of materials and goods of a quality acquired or useable or saleable in the Ordinary Course of Business, (ii) is not defective, obsolete or damaged in any material respect and (iii) is fit and merchantable, in all material respects, for their particular use. The amount of Inventory shown on the Latest Balance Sheet was determined in accordance with the Accounting Principles. None of the Inventory is subject to any material consignment, bailment, warehousing or similar agreement, except as set forth on Schedule 4.22.

4.23    Non-Seller Subsidiaries.    Except for the Excluded Assets, no Affiliate of Seller other than the Seller Subsidiaries owns any property, assets, rights, title or interest of any kind or nature that are part of the Acquired Assets or are used in the Business.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller and Seller Subsidiary on the date hereof and as of the Closing Date, as follows:

5.1    Corporate Organization.    Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation, and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

5.2    Authorization and Validity.

(a)    Buyer has all requisite power and authority to enter into this Agreement and to execute and deliver any Ancillary Agreement to which it is or will be a party and to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action by the board of managers of Buyer, and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance.  This Agreement has been, and the Ancillary Agreements when delivered will be, duly executed by Buyer and do and will constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein, except that such enforceability (a) may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity.

(b)    Each Buyer Designee that executes or delivers an Ancillary Agreement shall as of the Closing Date (i) be duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation, and have all requisite corporate or limited liability company

-32-

power and authority to own its properties and assets and to conduct its business as then conducted and (ii) have all requite power and authority to execute and deliver the Ancillary Agreements to which it is a party and to carry out its obligations thereunder. The execution and delivery of any Ancillary Agreement to which any Buyer Designee is a party and the performance by any Buyer Designee of its obligations thereunder will have been duly authorized by all necessary actions of its board of directors or board of managers and no other proceedings on the part of such Buyer Designee shall be necessary to authorize such execution, delivery and performance. The Ancillary Agreements, when delivered by a Buyer Designee, will be duly executed by such Buyer Designee and will constitute its valid and binding obligation, enforceable against it in accordance with the terms therein, except that such enforceability (a) may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity.

5.3    No Conflict or Violation.    Neither the execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements nor the execution, delivery and performance by any Buyer Designee of any Ancillary Agreement, and the operation of the Business by Buyer or any Buyer Designee as it is constituted as of the Closing Date will (a) violate or conflict with any provision of the Organizational Documents of Buyer or the applicable Buyer Designee or (b) violate any provision of Law, or any Order applicable to Buyer or any Buyer Designee, nor will they result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contract to which Buyer or any Buyer Designee is a party, by which it is bound or to which any of its properties or assets is subject.

K&E 14573112.33

5.4    Consents, Approvals and Notifications.  The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements and the execution, delivery and performance by any Buyer Designee of any Ancillary Agreement, and the operation of the Business by Buyer or the applicable Buyer Designee as it is constituted as of the Closing Date do not require the Consent of, or filing with or notification of, any Government or any other Person except as required: (a) for entry of the Sale Order by the Bankruptcy Court; or (b) for such Consents and filings, the failure to obtain or make would not reasonably be expected to have a material adverse effect on the ability of Buyer or the applicable Buyer Designee to consummate the transactions contemplated hereby.

5.5    Availability of Funds.  Buyer has (and Buyer and each Buyer Designee, on and after the Closing Date, will have) sufficient funds available to finance and consummate the transactions contemplated by this Agreement and the Ancillary Agreements and to perform its obligations hereunder or thereunder.    Immediately after giving effect to the transactions contemplated hereby, Buyer and each applicable Buyer Designee shall be able to pay its debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities).  Immediately after giving effect to the transactions contemplated hereby, Buyer and each applicable Buyer Designee will have adequate capital to carry on its businesses.

5.6    Adequate Assurances Regarding Assigned Contracts.  Buyer or any applicable Buyer Designee will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

5.7    Licenses, Permits, etc.  Buyer and each Buyer Designee has, or will have as of the Closing Date, all licenses, permits, franchises and authority, whether from a Government or otherwise, necessary to purchase the Acquired Assets.

5.8    Litigation.  There are no material actions, suits, proceedings or orders pending or, to Buyer's knowledge, threatened against Buyer at law or in equity, or before or by any Government.

5.9    Brokerage.  Except for fees and expenses owed to Mesirow Financial, Inc. and its Affiliates, there are no claims for brokerage commissions, finders fees, expenses or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Buyer or any of its Affiliates.

### ARTICLE 6
### COVENANTS OF SELLER AND SELLER SUBSIDIARIES

Seller hereby covenants to Buyer as follows:

6.1    Conduct of Business Before the Closing Date.

(a)    Without the prior written consent of Buyer or the authorization of the Bankruptcy Court after notice and a hearing, between the date hereof through the earlier of the Closing Date or the date this Agreement is terminated in accordance with its terms, Seller and Seller Subsidiary (a) shall not, except as required or expressly permitted pursuant to the terms hereof or

of any Ancillary Agreement (i) make any material change in the conduct of the Business, except for changes that are in the Ordinary Course of Business, taking into account business exigencies arising as a result of Seller's financial condition and status as a filer under Chapter 11 of the Bankruptcy Code, or not inconsistent in material respects with past practice, (ii) except in the Ordinary Course of Business or in an Alternative Transaction, sell, lease, sublease, mortgage, pledge or otherwise encumber or dispose of any of the material properties, assets or equipment of the Business (other than any of the foregoing within or to the Business) or enter into any agreement regarding the foregoing, (iii) except in the Ordinary Course of Business or as required by Law or contractual obligations or other agreements existing on the date hereof, increase in any manner the compensation of, or enter into any new bonus, incentive, employee benefits, severance or termination agreement or arrangement with, any of the Business Employees, (iv) acquire by merging or consolidating with, or agreeing to merge or consolidate with, or purchase substantially all the assets of, or otherwise acquire any business or any corporation, partnership, association or other business organization or division thereof, (v) subject to the entry of the Sale Order, take any actions inconsistent with the transactions contemplated hereby, (vi) enter into any license, sublicense or similar agreement with respect to any material Transferred Intellectual Property outside of the Ordinary Course of Business, (vii) fail to pay when due any Taxes that would otherwise constitute Assumed Liabilities, (viii) sell any Real Property or (ix) sell, transfer, convey or remove anything that constitutes any part of the Libraries. Without limiting the generality of the foregoing, except as may be required by the Bankruptcy Court or Law, from the date hereof until the earlier to occur of the Closing and the date this Agreement is terminated in accordance with its terms, Seller shall use commercially reasonable efforts to, and to cause the Seller Subsidiaries to, subject to any order of the Bankruptcy Court, conduct the Business in substantially the same manner as conducted by Seller and the Seller Subsidiaries in the Ordinary Course of Business (including (i) maintaining current practices with respect to collecting accounts receivable, and discounting the same, (ii) buying and maintaining levels of inventory consistent with past practices, (iii) keeping in effect and paying all premiums and other amounts due under all insurance policies, and (iv) maintaining all machinery and equipment in good operating condition (normal wear and tear excepted)), but in all cases, taking into account business exigencies arising as a result of Seller's financial condition and status as a filer under Chapter 11 of the Bankruptcy Code.

(b)    Buyer shall have the right to consult with and make specific recommendations to Seller regarding all aspects of management and operation of Seller, Seller Subsidiaries and the Business and potential cost cutting measures that may be implemented prior to the Closing Date. Seller and Seller Subsidiaries agree to consider any such recommendations in good faith, to discuss such recommendations and, where appropriate, explain the reasons for not accepting them. Notwithstanding the foregoing, nothing in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the management of Seller, or any Seller Subsidiary or the operations of the Business prior to the Closing Date. Prior to the Closing Date, Seller and Seller Subsidiaries shall exercise, consistent with the terms of this Agreement, complete control, supervision and decision-making authority of the management and operations of the Business.

6.2    Exclusivity; No Solicitation of Transactions.    Sellers jointly and severally represent that, other than the transactions contemplated by this Agreement, no Seller or Seller Subsidiary is a party to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or any material part of the Business or the

-35-

Acquired Assets (an "*Acquisition Transaction*"). From the date hereof until the earlier of entry of the Bidding Procedures Order and termination of this Agreement, no Seller or Seller Subsidiary shall, directly or indirectly, solicit negotiations regarding or enter into any purchase and sale agreement regarding any Acquisition Transaction other than with Buyer and Buyer Designees in accordance with this Agreement; provided that nothing herein shall prohibit Seller or any Seller Subsidiary from continuing to provide access to any information with respect to the Business and/or the Acquired Assets to any Person that had access to information with respect to the Business and/or the Acquired Assets on the date hereof.

6.3     Obligations of Seller after Entry of Sale Order. From and after the date that the Sale Order is entered, Seller and Seller Subsidiaries shall use reasonable best efforts to cause the Closing to occur as promptly as practicable, and Seller shall not, and shall not permit any of its Affiliates to, intentionally take any action that would make any representation or warranty of Seller or any Seller Subsidiary herein untrue in any material respect at any time prior to the Closing or that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby unless otherwise required by the Bankruptcy Court or Law. When used in this Agreement, the "reasonable best efforts" of Seller shall not require Seller and Seller Subsidiary or any of its Related Persons to expend any money to remedy any breach of any representation or warranty hereunder, to commence any litigation or arbitration proceeding, to offer or grant any accommodation (financial or otherwise) to any third party, to obtain any Consent required for the consummation of the transactions contemplated hereby or to provide financing to Buyer for the consummation of the transactions contemplated hereby; provided that, if Seller, any Seller Subsidiary or any of its Affiliates elects to remedy such breach, Seller shall not be deemed to be in breach of such representation or warranty, or in violation of any covenant, for purposes of determining Buyer's obligations to consummate the transactions contemplated by this Agreement.

6.4     Access to Properties and Records; Confidentiality. Prior to the earlier to occur of the Closing Date or the date on which this Agreement is terminated in accordance with its terms, unless an Alternative Transaction is approved in accordance with the Bidding Procedures, Seller and Seller Subsidiaries shall afford to Buyer and to the accountants, counsel, consultants to, investors, lenders, and representatives of Buyer, reasonable access during normal business hours and upon reasonable notice to all books and records of Seller and the Seller Subsidiaries relating to the Business if (a) permitted under Law, (b) such books and records are not subject to confidentiality agreements, and (c) disclosing such books and records would not adversely affect any attorney client privilege, work product or similar privilege. Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, during normal business hours, to the Business, to all operations of the Business and to all Acquired Assets throughout the period prior to the Closing Date for purposes of assisting in the transition of the Acquired Assets and the Assumed Liabilities to Buyer at the Closing. The rights of access contained in this Section 6.4 are granted subject to, and on, the following terms and conditions: (t) nothing herein shall require Seller or any of the Seller Subsidiaries to provide access to or disclose any information to any other party if such access or disclosure would be in violation of applicable Laws or regulations of any Government (including the HSR Act and other Antitrust Laws or Laws regarding employee rights of privacy) or the provisions of any agreement to which such party is a party; (u) all requests for access shall be directed to James D. McDonough or Joseph H. Greenberg (the "*Seller Designated Contacts*"); (v) such access shall be exercised in such a manner as not to

-36-

interfere unreasonably with the operation of the Business; (w) all information provided to Buyer or its agents or representatives by or on behalf of Seller or their agents or representatives (whether pursuant to this Section 6.4 or otherwise) is governed by and subject to the Confidentiality Agreement, dated as of April 6, 2009, by and between Seller and Buyer or an Affiliate of Buyer (the "*Confidentiality Agreement*") and such access shall occur in such a manner as the Seller reasonably determines to be appropriate to protect the confidentiality of such information sought; (x) such rights of access (including that provided by the last sentence of this Section 6.4 shall not affect or modify the conditions set forth in Article 12 in any way; and (y) all such rights of access are at Buyer's sole cost, expense and risk. Other than the Seller Designated Contacts or as expressly provided in the preceding sentence, Buyer is not authorized to and shall not (and shall cause its Affiliates, employees, agents, representatives and Related Persons not to) contact any officer, director, employee, supplier, lessee, lessor, licensee, licensor, distributor, lender, advertiser, customer or other material business relation of Seller or any of its Subsidiaries prior to the Closing without the prior written consent of Seller, which consent shall not be unreasonably withheld. In no event shall any Phase II or invasive soil testing be permitted without the prior written consent of the Seller. In addition to the foregoing, Sellers agree to provide Buyer such additional due diligence information, to the extent in Seller's possession, as Buyer may reasonably request.

6.5    Consents and Approvals. Subject to the terms and conditions hereof, Sellers shall use reasonable best efforts to (i) obtain all consents and approvals, as reasonably requested by Buyer, to the extent necessary to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Liabilities and to consummate the other transactions contemplated hereby, including, without limitation, obtaining the Bidding Procedures Order and, subject to an Alternative Transaction not being approved, the Sale Order in the form and on the timetable provided for herein, and (ii) to make, as reasonably requested by Buyer, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Sellers or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby; in no event shall receipt of any such consent or approval be deemed a condition to Closing unless specifically designated as such in Article 12 hereof.

6.6    Rejection of Assigned Contracts. Except as provided in Section 1.5, Seller and Seller Subsidiaries shall not reject any Assigned Contracts pursuant to the Chapter 11 Case without the prior written consent of Buyer.

6.7    Casualty Loss. Notwithstanding any provision in this Agreement to the contrary, if, before the Closing (a) all or any portion of the Acquired Assets is condemned or taken by eminent domain, or (b) a material portion is damaged or destroyed by fire or other casualty, Seller shall notify Buyer promptly in writing of such fact. In the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and in the case of fire or other casualty, Seller shall either restore such damage or assign the insurance proceeds therefrom to Buyer at Closing. If Seller chooses to assign the insurance proceeds to Buyer, Seller agrees that the Base Cash Purchase Price shall be reduced by the amount of the deductible for the insurance policy paying proceeds to Seller for such loss (with Buyer being responsible for payment of such deductible). Notwithstanding the foregoing, the provisions of this Section 6.7 do not in any way modify Buyer's other rights under this

Agreement, subject to any applicable right to terminate this Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

6.8    Provision of Data; Transfer of Software.  Subject to applicable Law, Seller and Seller Subsidiary agree to cooperate with such reasonable requests during normal business hours as Buyer may make prior to and following the Closing (which requests shall not interfere in any material respect with the responsibilities of the Business' employees), so as to assist Buyer, at Buyer's sole cost and expense, with the integration, from and after the Closing, of the existing operational data, software and systems relating to the Business into Buyer's software and systems.  Notwithstanding the foregoing, the Parties acknowledge and agree that Buyer is not acquiring any software or any computer or other electronic equipment that is otherwise to be transferred to Buyer as part of the Acquired Assets, unless and only to the extent that Buyer or Seller have obtained prior to the Closing any necessary licenses or Consents to use such software from and after the Closing; provided that any such licenses shall be deemed Delayed Acquired Assets and shall be subject to Section 1.6 hereof.  Seller and Seller Subsidiaries also agree to cooperate with such reasonable requests during normal business hours as Buyer may make in order to facilitate Buyer's acquisition of such licenses or rights, at no cost to Seller or the Seller Subsidiaries.

6.9    Litigation Support.  With respect to any litigation and Claims that are Assumed Liabilities, after the Closing, Seller and Seller Subsidiaries shall, at Buyer's cost and expense, (i) render all reasonable assistance that Buyer may request in transitioning the defense of such litigation or Claim to Buyer and (ii) make available to Buyer, its counsel and its other agents, advisors and representatives, Seller's and Seller Subsidiaries' personnel, if any, most knowledgeable about the matter in question in connection with such transition assistance.  If after the Closing, Seller, any Seller Subsidiary (or any Affiliate) receives any payment or revenue that belongs to Buyer pursuant to this Agreement or any Ancillary Agreement, Seller or such Seller Subsidiary shall promptly remit or cause to be remitted the same to Buyer without setoff or deduction of any kind or nature.

6.10    Further Assurances.  Subject to Section 3.2(b), upon the request and at the sole expense of Buyer at any time after the Closing Date (but without additional consideration), Seller and Seller Subsidiaries shall execute and deliver such documents, including Intellectual Property and Internet domain name conveyance documents, as Buyer or its counsel may reasonably request to effectuate the transactions contemplated by this Agreement.  Without limiting the foregoing, if at any time after the Closing, Seller, any Seller Subsidiary or any of their Affiliates or any of their Related Persons comes into possession or control or discovers that it has possession or control over any Acquired Asset, including Receivables included in the Acquired Assets and Acquired Refunds, Seller shall promptly, but in no event later than three (3) Business Days after coming into possession or control or discovering such possession or control, deliver (or cause to be delivered) such Acquired Assets to Buyer, for no additional consideration.

## ARTICLE 7
## COVENANTS OF BUYER

Buyer hereby covenants to Seller as follows:

-38-

7.1    Actions Before Closing Date.   Buyer shall use reasonable best efforts (a) to perform and satisfy all conditions to each of Buyer's and Seller's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Buyer under this Agreement, including specifically negotiating the Amended Union Contracts described in Section 12.3(e), and (b) to cause the Closing to occur as promptly as practicable and Buyer shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby.

7.2    Adequate Assurances Regarding Assigned Contracts.   With respect to each Assigned Contract, to the extent requested by the Bankruptcy Court, Seller, any applicable Seller Subsidiary or the counterparty to such Contract, Buyer shall provide the Bankruptcy Court, Seller, any applicable Seller Subsidiary or such counterparty, as the case may be, adequate assurance of the future performance of such Assigned Contract by Buyer.

7.3    Cure of Defaults.   Without limiting or amending the provisions of Section 3.3(b) with respect to the treatment of Seller Cure Cost Obligations, Buyer shall, on or prior to the assumption by Buyer of any Assigned Contract, cure any and all defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code, so that such Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code ("*Cure Costs*").   Nothing herein shall prevent Seller or Buyer from agreeing with the counterparty to any such Contract to reduce Cure Costs as long as, in connection therewith, no rights or obligations of Seller, any Seller Subsidiary, Buyer or Buyer Designee under this Agreement or such Contract are adversely affected.

7.4    Availability of Business Records.   After the Closing Date, Buyer shall provide to Seller, Seller Subsidiaries and their Affiliates and their Related Persons (after reasonable notice and during normal business hours and without charge to Seller, Seller Subsidiaries, their Affiliates or their Related Persons) access to all Business Records of the Business or the Acquired Assets or Assumed Liabilities for periods prior to the Closing and shall preserve such Business Records until the later of (a) two (2) years after the Closing Date and (b) the required retention period for all Government contact information, records or documents, if permitted under Law.   Such access includes access to any information in electronic or digital form to the extent reasonably available.   Buyer acknowledges that Seller and its Affiliates have the right to retain copies of Business Records for periods prior to the Closing.   Prior to destroying any Business Records for periods prior to the Closing, Buyer shall notify Seller thirty (30) days in advance of any such proposed destruction of its intent to destroy such Business Records, and Buyer will permit Seller (or its designee) to retain such Business Records.   If, after the Closing, Buyer (or any Affiliate or creditor of Buyer) receives any payment or revenue that belongs to Seller or any of its Subsidiaries pursuant to this Agreement or any Ancillary Agreement, Buyer shall promptly remit or cause to be remitted the same to Seller without set-off or deduction of any kind or nature.

7.5    Further Assurances.   Upon the request and at the sole expense of Seller at any time after the Closing Date (but without additional consideration), Buyer shall execute and deliver such documents as Seller, any Seller Subsidiary or its counsel may reasonably request to effectuate the transactions contemplated by this Agreement.   Without limiting the foregoing, if at any time on or after the Closing Buyer, its Affiliates or any of its or their Related Persons comes

-39-

into possession or control of any Excluded Assets, Buyer shall promptly but in no event later than three (3) Business Days after coming into possession or control, return (or cause to be returned) such Excluded Assets to Seller for no additional consideration.

7.6     Operation of the Business Post-Closing.  Buyer shall, and shall cause each Buyer Designee to, operate the Business as a going concern during the period beginning on the Closing and ending not less than 180 days after the Closing.  On the Closing Date, Buyer and the Buyer Designees shall be capitalized with not less than $15,000,000 of equity capital for payment of Buyer's obligations under Section 3.3(b) and for operation of the Business from and after the Closing.

### ARTICLE 8
### BANKRUPTCY PROCEDURES

8.1     Bankruptcy Actions.  Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of (a) an Order in the form of Exhibit J attached hereto (the "**Bidding Procedures Order**") and (b) upon completion of the Auction and subject to an Alternative Transaction not being approved in accordance with the Bidding Procedures, an Order in the form of Exhibit K attached hereto (the "**Sale Order**") on the timeframes described in Sections 12.3(g) and 12.3(h).  Seller shall (x) file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Bidding Procedures Order and, upon completion of the Auction and subject to an Alternative Transaction not being approved in accordance with the Bidding Procedures, the Sale Order, and (y) serve all parties known to Seller to be entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and Rules, including all parties to the Assigned Contracts and all Governments having or asserting jurisdiction over Seller, the Seller Subsidiaries or the Acquired Assets, the Internal Revenue Service and all taxing authorities, all Unions that are parties to agreements with Seller or any Seller Subsidiary and all pension plans Seller or any Seller Subsidiary sponsors or contributes to and shall diligently pursue obtaining such orders.  Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Bidding Procedures Order and, as applicable, the Sale Order or any other Order reasonably necessary in connection and consistent with the transactions contemplated by this Agreement and the Ancillary Agreements, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.  Furthermore, Buyer covenants and agrees that it shall cooperate with Seller's reasonable requests in connection with furnishing information or documents to Seller to satisfy the requirements of adequate assurance of future performance under Section 365(f)(2)(B) of the Bankruptcy Code.

8.2     Bidding Procedures.  The bidding procedures (the "**Bidding Procedures**") to be employed with respect to this Agreement are those reflected in the Bidding Procedures Order. The Bidding Procedures may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth herein and the terms of this Agreement only with the prior written consent of Buyer.  There shall be no breach of this Agreement by Sellers for compliance with, or actions or inactions in accordance with, the Bidding Procedures Order.

## ARTICLE 9
## EMPLOYEE AND BENEFITS MATTERS

This <u>ARTICLE 9</u> sets forth Buyer's and Seller's acknowledgements, covenants and undertakings with respect to certain matters related to employees of the Business.

9.1    <u>Business Employees</u>.  Seller shall provide Buyer within a reasonable period prior to the Closing Date a list of all employees of the Business, including with respect to any inactive employee, the anticipated date of return to active employment (the "*Business Employees*"). Those Business Employees who accept such offers of employment and become employees of Buyer are referred to herein as the "*Transferred Employees*".

9.2    <u>Offers of Employment</u>.

(a)    At least five business days prior to the Closing, Buyer shall notify Seller in writing of any of the top eleven executive level Business Employees to which Buyer will not make an offer of employment (the "*Specified Business Employees*").  Immediately prior to the Closing, the employment of all Business Employees, other than the Specified Business Employees, shall be terminated by the applicable Seller or Seller Subsidiary, and all such employees shall have the right to apply for employment with Buyer.  Buyer hereby informs Seller that it intends to make offers of employment to certain Business Employees (other than the Specified Business Employees) and that such offers shall be on terms and conditions of employment different from those provided by Seller and the Seller Subsidiaries, and therefore that it is uncertain how many such Business Employees will accept employment with Buyer. The number of offers of employment made by Buyer, and the terms and conditions of such offers, shall be determined by Buyer in its sole discretion subject to the requirements of the Amended Union Contracts, the Buyer Assumed Plans and applicable Law.  Notwithstanding the foregoing, Buyer agrees that it shall (and shall cause each Buyer Designee) use its commercially reasonable efforts to require, as a condition to any Transferred Employee's employment with Buyer (or such Buyer Designee), that such Transferred Employee irrevocably waive and release any Claims such Business Employee may have against Sellers or their Affiliates or Related Persons relating to Vacation Obligations.  Except to the extent any of the same are Assumed Liabilities in accordance with this Agreement, Seller and the Seller Subsidiaries shall be responsible for any and all wages, bonuses, commissions, employee benefits, retention or stay bonus arrangements, and other compensation (including all obligations under any Employee Benefit Plans) due to the employees of Sellers arising out of their employment with Sellers prior to and as of the Closing.

(b)    Buyer and Sellers acknowledge and agree that nothing contained in this Agreement shall confer upon any Transferred Employee any right with respect to continuance of employment by Buyer (or any applicable Buyer Designee), nor shall anything herein interfere with the right of Buyer (or any applicable Buyer Designee) to terminate the employment of any Transferred Employees at any time, with or without notice, or restrict Buyer (or any applicable Buyer Designee), in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Transferring Employees after the Closing.

-41-

9.3    Sellers' Employee Benefit Plans.

(a)    Seller shall, or shall cause one of its Affiliate to, assign to Buyer, and Buyer shall assume, only the Employee Benefit Plans set forth on Schedule 9.3 (the "*Assumed Benefit Plans*") and all assets and liabilities of Seller and the Seller Subsidiaries related thereto.

(b)    Other than the Assumed Benefit Plans (and liabilities and obligations thereunder) or except to the extent the same constitute Assumed Liabilities in accordance with this Agreement, neither Buyer nor any Buyer Designee shall assume any Employee Benefit Plans or any obligation or liability thereunder (all of which shall be Excluded Liabilities for all purposes of this Agreement) and Buyer shall provide benefits to those Transferred Employees as of or after the Closing as Buyer, in its sole discretion, shall determine.

(c)    Other than the Assumed Benefit Plans (and liabilities and obligations thereunder) or except to the extent the same constitute Assumed Liabilities in accordance with this Agreement, all health and welfare claims incurred at any time under any Employee Benefit Plan and any other health and welfare plan maintained by Sellers and their ERISA Affiliates, regardless of when such claim was incurred, shall be Excluded Liabilities. All COBRA notice and continuation coverage requirements for all current and former employees (and their eligible dependents) who are entitled to elect COBRA coverage on account of a qualifying event occurring at any time (i.e., prior to, on or after Closing) shall be Excluded Liabilities for purposes of this Agreement; provided that Buyer or the applicable Buyer Designee shall be responsible for satisfying the COBRA notice and continuation coverage requirements for Transferred Employees (and their eligible dependents) who are entitled to elect COBRA coverage on account of a qualifying event occurring after the Closing Date.

(d)    Notwithstanding anything set forth in this Article 9, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any employee benefit plan maintained by Buyer or its Affiliates, or (ii) shall limit the right of Buyer or any Buyer Designee or its Affiliates to amend, terminate or otherwise modify any employee benefit plan following the Closing.

9.4    Sellers' Cooperation in Transferring Employees.    Subject in all cases to the requirements of applicable Law, Seller and the Seller Subsidiaries shall cooperate with Buyer and shall permit Buyer a reasonable period prior to the Closing Date (i) to meet with employees of Seller and the Seller Subsidiaries (including managers and supervisors) at such times as Buyer shall reasonably request, (ii) to speak with such employees' managers and supervisors (in each case with appropriate authorizations and releases from such employees) who are being considered for employment by Buyer or a Buyer Designee, (iii) to distribute to such employees of Seller and Seller Subsidiaries such forms and other documents relating to potential employment by Buyer after the Closing as Buyer may reasonably request, and (iv) to permit Buyer's counsel, upon request, to review personnel files and other relevant employment information regarding employees of Sellers.

9.5    Buyer Benefit Plans.    To the extent Buyer or a Buyer Designee establishes new employee benefit plans for Transferred Employees, Buyer or such Buyer Designee shall use commercially reasonable efforts to (a) waive pre-existing condition requirements (except with

-42-

respect to any pre-existing condition for which coverage was denied under any welfare benefit plan of Seller or its Affiliates), evidence of insurability provisions, waiting period requirements or any similar provisions under any welfare benefit plans maintained by Buyer or such Buyer Designee for Transferred Employees on and after the Closing Date, and (b) apply toward any deductible requirements and out-of-pocket maximum limits under its employee welfare benefit plans any amounts paid (or accrued) by each Transferred Employee under Seller's or its Affiliates' welfare benefit plans during the applicable plan year in which the Closing Date occurs. Buyer or such Buyer Designee shall recognize for purposes of eligibility and vesting under its policies and employee benefit plans, including pension or retirement plans, the service of any Transferred Employee with Seller or any of its Affiliates prior to the Closing Date.

9.6   Collective Bargaining Agreements.   Notwithstanding anything herein to the contrary, Seller and the Seller Subsidiaries shall assign to Buyer or a Buyer Designee, and Buyer or such Buyer Designee shall assume from Seller and the Seller Subsidiaries, the Amended Union Contracts to the extent such Amended Union Contracts are executed and delivered by or on behalf of Seller or the applicable Seller Subsidiary, on the one hand, and the applicable Union on the other hand, prior to the Closing and, from and the after the Closing, Buyer or such Buyer Designee shall comply with the terms thereof.

9.7   No Third-Party Beneficiary.   Except for the Assumed Benefit Plans and the Assumed Liabilities and as otherwise expressly provided in this Agreement, nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of any Seller or Seller Subsidiary or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

## ARTICLE 10
## REGULATORY MATTERS

10.1   No Required Antitrust And Other Filings and Notices.   The parties acknowledge and agree that there is no obligation to file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby.

## ARTICLE 11
## TAXES AND FEES

11.1   Taxes Related to Purchase of Assets.   Each of Buyer and Seller shall pay one-half of all state, county and local sales, use, transfer, value-added or other similar Taxes solely incurred in connection with the transfer of the Acquired Assets and the assumption of the Assumed Liabilities, and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets and the assumption of the Assumed Liabilities (collectively, "*Transaction Taxes*"), in each case regardless of the party upon whom such Transaction Taxes are initially imposed, and the party required by applicable Law will file all necessary Tax Returns and other documentation with respect to all such Transaction Taxes

-43-

and, if required by applicable Law, the other party will join in the execution of such Tax Returns and other documentation. Buyer and Seller shall cooperate in providing each other with transfer tax declarations or any appropriate resale exemption certifications and other similar documentation to qualify for exemption from, or reduction of, any Transaction Taxes. For the avoidance of doubt, Transaction Taxes shall not include any Taxes that are computed on the basis of, or by reference to, Seller's (or any Seller Subsidiary's) gross or net income, overall gross receipts, or capital.

11.2   Cooperation on Tax Matters.   Seller and Buyer shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense), in a timely fashion, such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (a) for the preparation by such other Party or its Affiliates of any Tax Returns or (b) in connection with any Tax audit or proceeding including one Party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

11.3   Allocation of Purchase Price and Purchase Price Allocation Forms.   The Final Cash Purchase Price, the Assumed Liabilities and other relevant items shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code. Buyer shall prepare and deliver to Seller an allocation schedule setting forth Buyer's determination of the allocation within sixty (60) days after the date the Final Cash Purchase Price is finally determined, which schedule shall be subject to the reasonable approval of Seller (such schedule as reasonably approved by Seller, the *"Allocation Schedule"*) The Allocation Schedule shall identify the transferor and transferee thereof and shall be prepared in accordance with Treas. Reg. Section 1.1060-1 (or any comparable provision of state or local Tax Law) or any successor provision. The Parties on behalf of themselves and their respective Affiliates agree that they will report the federal, state, local and other Tax consequences of the purchase and sale hereunder (including in filings on IRS Form 8594) in a manner consistent with such allocation and that they will not take any position inconsistent therewith in connection with any Tax Return, refund claim, litigation or otherwise, unless and to the extent required to do so pursuant to applicable Law. Seller and Buyer shall, and shall cause their Affiliates to, cooperate in the filing of any forms (including Form 8594) with respect to such allocation. Notwithstanding any other provision of this Agreement, this Section 11.3 survives any termination or expiration of this Agreement.

11.4   Unbilled Transactional Taxes.   If a Tax assessment is levied upon any Party or its Affiliates (or its or their Related Persons) by an authorized Tax jurisdiction for unbilled Transaction Taxes, then such Party shall promptly, upon receipt of notification of the same, deliver to the other Party a copy thereof. Notwithstanding anything to the contrary herein, no Party shall be responsible for any interest or penalty relating to any Transaction Taxes to the extent such interest or penalty arises from any breach by any other Party hereto of such other Party's obligations to deliver such notice or to pay such Transaction Tax when due; provided that each Party shall continue to be responsible for 50% of the Transaction Taxes other than any such interest or penalties.

-44-

## ARTICLE 12
## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

12.1    <u>Conditions Precedent to Performance by Seller and Buyer</u>.    The respective obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver by Buyer and Seller (other than the condition contained in <u>Section 12.1(a)</u>, the satisfaction of which cannot be waived), on or prior to the Closing Date, of the following conditions:

(a)    <u>Sale Order</u>.    The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect and the Sale Order shall have become a Final Order.

(b)    <u>No Violation of Orders</u>.    No preliminary or permanent injunction or other Order that declares this Agreement or the Escrow Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect on the Closing Date.

(c)    <u>No Termination of Agreement</u>.    This Agreement shall not have been terminated in accordance with <u>Article 13</u>.

Any condition specified in this <u>Section 12.1</u> (other than the condition contained in <u>Section 12.1(a)</u>, the satisfaction of which cannot be waived) may be waived only by written instrument executed by Buyer and Seller.

12.2    <u>Conditions Precedent to Performance by Seller and Seller Subsidiaries</u>.    The obligations of Seller and each Seller Subsidiary to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller in its sole discretion in a written instrument executed and delivered by Seller:

(a)    <u>Representations and Warranties of Buyer</u>.    Each of the representations and warranties made by Buyer in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as if made anew as of such date (except to the extent any such representation and warranty expressly relates to an earlier date (in which case as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or the Ancillary Agreements or caused by the transactions contemplated hereby or thereby and except for any failure of any such representation and warranty to be true and correct as does not have a Material Adverse Effect, and Seller shall have received on the Closing Date a certificate in the form attached hereto as <u>Exhibit L</u> dated as of the Closing Date and signed by a duly authorized signatory of Buyer to that effect.

(b)    <u>Performance of the Obligations of Buyer</u>.    Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Closing Cash Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received on the Closing Date a certificate in the form attached hereto as <u>Exhibit L</u> dated the Closing Date and signed by a duly

-45-

authorized signatory of Buyer to that effect.

(c)      Cure of Defaults. Without limiting or amending the provisions of Section 3.3(b) with respect to the treatment of Seller Cure Cost Obligations, Buyer shall have, at or prior to the Closing, cured any and all defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code or shall have made adequate provision for payment of such cure amounts at the Closing and shall have provided adequate assurances of future performance required to be provided by Buyer hereunder, so that the Assigned Contracts may be assumed by Seller or the Seller Subsidiaries and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)      Buyer's Deliveries. Buyer shall have delivered to Seller all of the items set forth in Section 3.3(c) of this Agreement.

12.3   Conditions Precedent to the Performance by Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion in a written instrument executed and delivered by Buyer:

(a)      Representations and Warranties of Seller. Each of the representations and warranties contained in Article 4 of this Agreement shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent any such representation and warranty expressly relates to an earlier date (in which case as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or the Ancillary Agreements or caused by the transactions contemplated hereby or thereby and except for failure of any such representation and warranty to be true and correct as does not have a Material Adverse Effect, and Buyer shall have received on the Closing Date a certificate in the form attached hereto as Exhibit M dated as of the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(b)      Performance of the Obligations of Seller. Seller shall have materially performed all obligations required under this Agreement to be performed by it on or before the Closing Date, and Buyer shall have received on the Closing Date a certificate in the form attached hereto as Exhibit M dated as of the Closing Date and signed by a duly authorized signatory of Seller to that effect.

(c)      Material Adverse Effect. Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

(d)      Seller's Deliveries. Seller shall have delivered to Buyer all of the items set forth in Section 3.2(a) of this Agreement.

(e)      Union Contracts. Seller shall have entered into amended written Contracts with all of the Unions described on Schedule 12.3(e) including the terms previously agreed between Seller and Buyer and not otherwise including, without Buyer's written consent, any additional terms unfavorable to Seller other than those previously agreed to by Seller and Buyer (the "*Amended Union Contracts*").

(f)    Filing of Bid Procedures and Sale Motions.  Within three (3) Business Days after the execution of this Agreement, Seller shall file with the Bankruptcy Court (i) a motion, reasonably satisfactory to Buyer, seeking, on an expedited basis, entry of the Bidding Procedures Order (the "**Bid Procedures Motion**") and (ii) a motion, reasonably satisfactory to Buyer, seeking entry of the Sale Order (the "*Sale Motion*").

(g)    Auction.  The Auction being scheduled for not more than thirty (30) days after the entry of the Bidding Procedures Motion.

(h)    Timing of Sale Order.  Assuming that the Buyer is the Successful Bidder at the Auction, the Sale Order being entered and approved not more than 45 days after the filing of the Bid Procedures Motion.

(i)    No Sale of Owned Real Property.  During the period beginning on June 1, 2009 and ending on the Closing Date, none of the Owned Real Property shall have been conveyed, transferred or sold or become subject to any Lien, Claim or Interest consensually granted by Sellers, other than Permitted Liens.

(j)    Subscription Revenues.  The aggregate subscription revenues of the Business, taken as a whole, for the period beginning on the June 1, 2009 and ending on the last day of the calendar month most recently completed at least 15 days prior to the Closing shall not be more than 15% less than the aggregate subscription revenues of the Business, taken as a whole, for the same period during the prior year, all as determined in accordance with the Accounting Principles and determined in each case without regard to any revenues generated from any product of the Business eliminated on or after June 1, 2008.

(k)    Advertising Revenues.  The aggregate advertising revenues of the Business, taken as a whole, for the period beginning on the June 1, 2009 and ending on the last day of the calendar month most recently completed at least 15 days prior to the Closing shall not be more than 40% less than the aggregate advertising revenues of the Business, taken as a whole, for the same period during the prior year, all as determined in accordance with the Accounting Principles and determined in each case without regard to any revenues generated from any product of the Business eliminated on or after June 1, 2008.

(l)    Cure Costs.  The Excess Buyer Cure Costs shall not exceed $600,000; provided that the condition set forth in this Section 12.3(l) shall automatically be deemed satisfied if, prior to Closing, Seller delivers to Buyer a written agreement to pay and be responsible for any Excess Buyer Cure Costs in excess of $600,000.  For purposes of this Agreement, "Excess Buyer Cure Costs" shall mean an amount equal to (i) the aggregate amount of Cure Costs with respect to Assigned Contracts to be assumed by Buyer (or any Buyer Designee) at the Closing, minus (i) the aggregate amount of Seller Cure Cost Obligations with respect to such Assigned Contracts.

-47-

12.4    Waiver of Condition; Frustration of Conditions. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Buyer nor Seller may rely on the failure of any condition set forth in this Article 12, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE 13
## TERMINATION AND EFFECT OF TERMINATION

13.1    Right of Termination. Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in this Article 13. In the case of any such termination, the terminating Party shall give notice to the other Party specifying the provision pursuant to which the Agreement is being terminated.

13.2    Termination Without Default.

(a)    This Agreement may be terminated at any time before Closing:

(i)    by mutual written consent of Seller and Buyer;

(ii)    by Buyer, within five (5) Business Days after the date specified in such condition, if any condition specified in Section 12.3(f), Section 12.3(g) or Section 12.3(h) has not been satisfied on the date specified in such condition; provided, however, that Buyer shall have no right to terminate this Agreement under this Section 13.2(a)(ii) if Buyer's failure to fulfill any of its obligations under this Agreement is a reason that such condition has not been satisfied;

(iii)    by Buyer on any date that is more than 90 days after the date hereof (the "*Termination Date*"), if any condition contained in Section 12.1 or Section 12.3 has not been satisfied or waived as of such time; provided, however, that Buyer shall have no right to terminate this Agreement under this Section 13.2(a)(iii) if Buyer's failure to fulfill any of its obligations under this Agreement is a reason that the Closing has not occurred on or before said date;

(iv)    by Seller, on or after the Termination Date, if any condition contained in Section 12.1 or Section 12.2 has not been satisfied or waived as of such time; provided, however, that Seller shall have no right to terminate this Agreement under this Section 13.2(a)(iv) if Seller's failure to fulfill any of its obligations under this Agreement is the reason that the Closing has not occurred on or before said date;

(v)    by either Buyer or Seller, immediately upon an Order becoming final and non-appealable that declares this Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby or thereby (a "*Termination Order*"); provided, however, that neither Seller nor Buyer shall have the right to terminate this Agreement pursuant to this Section 13.2(a)(v) if such party or any of its Affiliates has sought entry of, or has failed to use its reasonable best efforts to oppose entry of, such Termination Order, or if such provision of this Agreement declared invalid or unenforceable is

-48-

modified or waived in writing in a manner acceptable to Buyer and Seller and is otherwise valid and enforceable; or

(vi)    by either Buyer or Seller, on any date that is more than 25 days after the date that the Bid Procedures Motion is filed with the Bankruptcy Court, if the Bidding Procedures Order has not been entered by the Bankruptcy Court on or prior to such date; provided, however, that neither Buyer nor Seller shall have the right to terminate this Agreement pursuant to this Section 13.2(a)(vi) if such party's failure to fulfill any of its obligations under this Agreement is the reason that the Bidding Procedures Order has not been entered by the Bankruptcy Court on or prior to such date.

(b)    If this Agreement is terminated pursuant to Section 13.2(a), (i) the Deposit, together with any interest accrued thereon less fees and expenses of the Escrow Agent, shall be returned to Buyer, (ii) this Agreement shall be null and void and have no further legal effect (other than this Section 13.2, Article 15 and Article 16, each of which shall survive termination) and (iii) none of Seller, Buyer or any of their respective Affiliates or Related Persons shall have any liability or obligation arising under or in connection with this Agreement; provided that if this Agreement is terminated (A) by Buyer pursuant to Section 13.2(a)(ii) as a result of the failure of the condition contained in Section 12.3(h) or pursuant to Section 13.2(a)(iii) as a result of the failure of the conditions contained in Section 12.3(c) or Section 12.3(e) or (B) by Seller after the entry of the Sale Order pursuant to Section 13.2(a)(iv) as a result of the Sale Order not having become a Final Order prior to such termination and, prior to such termination, Buyer has agreed and certified to Seller in writing that all of the conditions to Buyer's obligations to consummate the transactions contemplated by this Agreement, other than the condition set forth in Section 12.1(a), have been satisfied or waived and that Buyer stands ready, willing and able to consummate the Closing upon the satisfaction of the condition set forth in Section 12.1(a), then, as Buyer's sole and exclusive remedy upon such termination and as liquidated damages and not a penalty, Seller and the Seller Subsidiaries shall reimburse Buyer for all documented out of pocket costs and expenses incurred by Buyer in connection with its legal, accounting and business due diligence (including costs of obtaining environmental reports and title insurance), negotiating and documenting this Agreement and the transactions contemplated hereby, negotiating and documenting the Amended Union Agreements and documenting the capitalization of the Buyer, including fees and expenses of attorneys, accountants, financial advisors, and other consultants some of whom may be Related Parties or Affiliates of Buyer or entities in which Buyer or its investors have an interest (the *"Buyer Expense Reimbursement"*), up to an amount not to exceed $500,000.  Seller's obligation to pay the Buyer Expense Reimbursement pursuant to this Section 13.2 shall constitute a superpriority administrative expense of Sellers under Section 507(b) of the Bankruptcy Code.

13.3    Effect of Failure of Seller's Conditions to Closing.

(a)    Seller may terminate this Agreement if there has been a material violation or breach by Buyer of any covenant, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller and such violation or breach is not capable of being cured or, if capable of being cured, has not been cured prior to the earlier of (I) ten (10) days after written notice thereof from Seller, or (II) the Termination Date; provided

that the right of termination pursuant to this Section 13.3(a) shall not be available to Seller at any time that Seller has violated or is in breach of any covenant, representation or warranty hereunder if such breach has prevented satisfaction of Buyer's conditions to Closing hereunder and has not been waived by Buyer or, if capable of cure, has not been cured by Seller; provided, further, that the failure to deliver the Closing Cash Purchase Price as required hereunder shall not be subject to cure hereunder unless otherwise agreed to in writing by Seller.

(b)     If Seller terminates this Agreement pursuant to Section 13.3(a), (a) the Deposit, less Seller's share of any unpaid fees and expenses of the Escrow Agent, shall be paid to Seller (and Buyer shall take all actions reasonably required to cause such Deposit to be released to Seller) and such amounts shall be Seller's sole and exclusive remedy and shall constitute liquidated damages and not a penalty, (b) this Agreement shall be null and void and have no further legal effect (other than this Section 13.3, Article 15 and Article 16, which survive termination) and (c) except as provided in this Section 13.3, none of Sellers, Buyer or any of their respective Related Persons have any liability or obligation arising under or in connection with this Agreement.

13.4    Effect of Failure of Buyer's Conditions to Closing.    Buyer may terminate this Agreement if there has been a material violation or breach by Seller of any covenant, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligation of Buyer at the Closing and such violation or breach has not been waived by Buyer and such violation or breach is not capable of being cured or, if capable of being cured, shall not have been cured prior to the earlier of (I) thirty days after written notice thereof from Buyer, or (II) the Termination Date; provided that the right of termination pursuant to this Section 13.4 shall not be available to Buyer at any time that Buyer has violated or is in breach of any covenant, representation or warranty hereunder if such breach has prevented satisfaction of the Seller's conditions to Closing hereunder and has not been waived by Seller or, if capable of cure, has not been cured by Buyer. If this Agreement is terminated pursuant to this Section 13.4: (a) the Deposit, together with any interest accrued thereon less Buyer's share of any unpaid fees and expenses of the Escrow Agent, shall be returned to Buyer, (b) this Agreement shall be null and void and have no further legal effect (other than this Section 13.4, Article 15 and Article 16, which survive termination) and (c) except as provided in this Section 13.4, none of Sellers, Buyer or any of their respective Related Persons have any liability or obligation arising under or in connection with this Agreement.

13.5    Additional Termination Provisions.

(a)     This Agreement may be terminated at any time before Closing (i) by Buyer if (A) Sellers withdraw or seek authority to withdraw the Sale Motion, (B) there has been an intentional breach by Sellers of or intentional failure by Sellers to comply with any of the covenants in this Agreement contemplating the consummation of the transfer of Acquired Assets to Buyer which has prevented the satisfaction of any condition to the obligation of Buyer at the Closing (including, without limitation, the conditions set forth in Sections 12.3(f), 12.3(g) and 12.3(h) herein), (C) Sellers publicly support or are the co-proponent of any plan of reorganization or liquidation filed with the Bankruptcy Court that does not contemplate the consummation of the transactions contemplated by this Agreement or (D) any plan of reorganization or liquidation that does not contemplate the consummation of the transactions

-50-

contemplated by this Agreement is confirmed by the Bankruptcy Court, (ii) by Buyer if, after Seller's exclusivity period under the Bankruptcy Code (including any extensions thereof) has expired, a plan of reorganization or liquidation that does not contemplate the consummation of the transaction contemplated by this Agreement is filed with the Bankruptcy Court by any Person other than Buyer or any of its Affiliates or any Person working for or in collaboration with Buyer or any of its Affiliates or (iii) by Buyer or Seller if Buyer is not the Successful Bidder at the Auction.

(b)      If this Agreement is terminated pursuant to Section 13.5(a): (i) the Deposit, together with any interest accrued thereon, less Buyer's share of any unpaid fees and expenses of the Escrow Agent, shall be returned to Buyer within five (5) Business Days after such termination (provided that the interest may not be returned until the second day of the month following such termination), (ii) Seller shall pay Buyer the applicable Break-Up Fee and Buyer Expense Reimbursement in accordance with Section 13.5(c), (iii) this Agreement shall be null and void and have no further legal effect (except for this Section 13.5, Article 15 and Article 16, each of which survive termination), and (iv) except as provided in this Section 13.5(b) and in Section 13.5(c), none of Buyer, Seller or their respective Affiliates, or any of theirs or their Affiliates' Related Persons shall have any liability or obligation arising under or in connection with this Agreement.

(c)      Break-Up Fee.

(i)      If this Agreement is terminated pursuant to Section 13.5(a)(i) Sellers shall pay to Buyer in immediately available funds a cash fee (a "*Break-Up Fee*") equal to $500,000, plus Buyer Expense Reimbursement up to an amount not to exceed $500,000. If this Agreement is terminated pursuant to Section 13.5(a)(ii), Buyer shall be entitled only to Buyer Expense Reimbursement up to an amount not to exceed $500,000 (and shall not be entitled to a Break-Up Fee).

(ii)      If this Agreement is terminated pursuant to Section 13.5(a)(iii), Sellers shall pay to Buyer in immediately available funds a Break-Up Fee of $500,000 plus Buyer Expense Reimbursement up to an amount not to exceed $350,000; provided, however, that if Sellers fail to consummate a sale with either the Successful Bidder or Back-up Bidder, Sellers shall pay to Buyer funds in an additional amount not to exceed $150,000 on account of the Buyer Expense Reimbursement.

(iii)      Seller's obligation to pay the applicable Break-Up Fee and/or Buyer Expense Reimbursement pursuant to this Section 13.5(c) shall survive the termination of this Agreement pursuant to Section 13.5(a) and shall constitute a superpriority administrative expense of Seller under Section 507(b) of the Bankruptcy Code.

(iv)      The applicable Break-Up Fee and/or Buyer Expense Reimbursement payable under the circumstances provided in this Section 13.5(c) constitutes liquidated damages and not a penalty and is the exclusive remedy of Buyer and its Affiliates for any termination of this Agreement pursuant to this Section 13.5. Buyer shall not, and shall cause each of its Related Persons not to, bring any cause of action against or otherwise seek remedies from Seller or any of its Affiliates or any of its or their Seller's Related Persons or any counterparty to an

-51-

Alternative Transaction or any of such counterparty's Affiliates or its or their Related Persons (other than for payment of the applicable Break-Up Fee and/or Buyer Expense Reimbursement when payable hereunder), whether at equity or in law, for breach of contract, in tort or otherwise, in the event that this Agreement is terminated for any reason in accordance with this Section 13.5, and any claim, right or cause of action by Buyer or any other Person against Seller or its Affiliates or its or their Related Persons (other than for such payment of the applicable Break-Up Fee and/or Buyer Expense Reimbursement) is hereby fully waived, released and forever discharged.

**ARTICLE 14**
**ADDITIONAL AGREEMENTS**

14.1    <u>Litigation Support</u>.    In the event and for so long as any Party or any of its Affiliates or any of its or their Related Persons actively is contesting or defending against any action, suit, audit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (a) any transaction contemplated by this Agreement or the Ancillary Agreements or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Seller, any Seller Subsidiaries, or the Business, the other party will cooperate with the contesting or defending Person and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Person (unless the contesting or defending Person is entitled to indemnification therefor pursuant to this Agreement).

14.2    <u>Insurance Matters</u>.    As of the Closing Date, the coverage under all insurance policies maintained by Seller or any of its Affiliates related to the Business which is not assumed by Buyer shall continue in force only for the benefit of Seller and its Affiliates and not for the benefit of Buyer or its Affiliates (including, after the Closing, the Business) with respect to all insurance policies that are Excluded Assets.  Buyer agrees to arrange for its own insurance policies with respect to the Business covering all periods beginning on the Closing Date and agrees not to seek, through any means, to benefit from any of the insurance policies maintained by Seller or its Affiliates which may provide coverage for claims relating in any way to the Business prior to the Closing.

14.3    <u>Intellectual Property; Name Change</u>.

(a)    No later than thirty (30) days following the Closing, each Seller and Seller Subsidiary shall, and shall cause each of its Affiliates to, file amendments with the appropriate Government changing its corporate name, "doing business as" name, trade name, and any other similar corporate identifier (each a "*Corporate Name*") to a Corporate Name that does not contain any of the trademarks or trade names included in the Transferred Intellectual Property owned by Seller or the Seller Subsidiaries.

(b)    After the date hereof and for a period of ninety (90) days after the Closing Date, Sellers shall grant to Buyer access to Sellers' administrative contact for Sellers' Internet domain names and make sure such person available to Purchaser and its representatives and agents to

-52-

effectuate the transfer to Buyer of the Internet domain names which constitute an Acquired Asset hereunder.

(c)    On or before the Closing Date, the Sellers shall deliver to Buyer all records and information in the Sellers' possession or under the Sellers' control concerning the Transferred Owned Intellectual Property, and all copies thereof, including, but not limited to, any license and settlement agreements, the documentation, source code and object code for all computer software, documentation concerning registrations and applications, prosecution histories, correspondence with Government, litigation files relating to infringements, disputes or demands, including opposition and cancellation proceedings, cease and desist and protest letters, and all documents concerning Liens encumbering such Transferred Owned Intellectual Property (it being understood that any such records or information located at any Real Property need not be physically delivered, but will be deemed delivered at the Closing, provided that, for any such records or information not located at any Real Property, Seller may deliver such records or information to Buyer promptly after the Closing Date, but in no event later than thirty (30) days after the Closing Date.

## ARTICLE 15
## MISCELLANEOUS

15.1    Successors and Assigns.    Except as otherwise provided in this Agreement, no Party may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other Party and any such attempted assignment without such prior written consent shall be void and of no legal force or effect.  This Agreement inures to the benefit of and is binding upon the successors and permitted assigns of the Parties.  For all purposes hereof, a transfer, sale or disposition of a majority of the voting capital stock or other voting interests of Buyer (whether by contract or otherwise) shall be deemed an assignment hereunder. Notwithstanding anything herein to the contrary, without amending, modifying or terminating any of Buyer's obligations under this Agreement, Buyer may, not less than five (5) Business Days prior to Closing, designate one or more Buyer Designee to purchase all or any portion of the Acquired Assets and execution and delivery by such Person(s) of any agreement or document contemplated by Section 3.3(c) of this Agreement shall be in full satisfaction of Buyer's obligations under Section 3.3(c) to deliver any such agreement or document; provided that no such designation by Buyer shall release or otherwise affect any of Buyer's other obligations under this Agreement, including Buyer's obligations under Section 3.3(b).   Notwithstanding anything herein to the contrary, Buyer acknowledges and agrees that Seller may from time to time assign, without the consent of Buyer, all or any portion of its rights, interests and/or obligations under this Agreement or the Ancillary Agreements to a purchaser of assets of Seller (however structured, including through the direct or indirect sale of equity securities or assets of Seller or one or more Subsidiaries) as long as the agreement by which any obligations of Seller hereunder are assumed by such purchaser are in a written instrument that includes Buyer as a third-party beneficiary thereof with respect to the obligations owing to Buyer under this Agreement.

15.2    Governing Law; Jurisdiction.    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof that would cause the application of the

-53-

law of another jurisdiction), except to the extent that the Laws of such State are superseded by the Bankruptcy Code; provided that the validity and enforceability of all conveyance documents or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the Laws of the jurisdiction in which the Real Property is located. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby may be brought in the courts of the State of Illinois sitting in Chicago, Illinois or of the United States for the Northern District of Illinois, and by execution and delivery of this Agreement, each of the Parties consents to the non-exclusive jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in any such jurisdiction in respect of this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby.

15.3    Notification of Certain Matters; Schedules.

(a)    Buyer and Sellers acknowledge that certain of the representations and warranties of Sellers affirmatively require that Sellers list certain factual information on the Disclosure Schedules. Sellers shall be permitted to update the Disclosure Schedules on or prior to the Closing Date but only with respect to events or circumstances arising between the date hereof and the Closing Date. Any additional disclosure or update by Sellers pursuant to this Section 15.3(a) shall be deemed to amend or supplement the Disclosure Schedules for all purposes, unless within ten (10) days from the receipt of such additional disclosure or update Buyer provides notice in good faith that the facts described in such additional disclosure or update will have a Material Adverse Effect on the Business. If Buyer provides such notice, the Disclosure Schedules are deemed amended by all such disclosures or updates for all purposes, except for purposes of determining whether the conditions set forth in Section 12.3(a) of the Agreement have been satisfied.

(b)    The inclusion of information by the Seller in the Disclosure Schedules shall not be construed as or constitute an admission or agreement that such information is material to the Business, the Acquired Assets or the Assumed Liabilities, or to Seller or any of its Subsidiaries. In addition, matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedules is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material or would or would not cause, or be expected to cause, a Material Adverse Effect, and no Party (or their respective Related Persons) shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedules is or is not material or would cause, or be expected to

-54-

cause, a Material Adverse Effect, in each case, for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedules is intended to imply that such item or matter, or other items or matters, are or are not in the Ordinary Course of Business, and no Party (or their respective Related Persons) shall use the fact of the inclusion of any such items or matters in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedules is or is not in the Ordinary Course of Business for purposes of this Agreement. The Disclosure Schedules shall be arranged in sections in corresponding to the sections contained in Article 4 and the disclosure in any section shall qualify such section and each other section to the extent that it is reasonably apparent on the face of such schedule that it applies to such other section.

15.4    Warranties Exclusive.

(a)    The representations, warranties, covenants and agreements contained in this Agreement and the Ancillary Agreements are the only representations, warranties, covenants or agreements given by Seller, Seller Subsidiary and its Related Persons and all other express or implied warranties are disclaimed. Buyer acknowledges that, except with respect to the representations in Sections 4.7 and 4.23 Seller is making no representations or warranties, in this Agreement or in any Ancillary Agreement, regarding or relating to any Non-Seller Subsidiary and, neither Seller nor any Seller Subsidiary, nor any Non-Seller Subsidiary shall have any obligations or liabilities under this Agreement or any Ancillary Agreements with respect to any Non-Seller Subsidiary. Furthermore, Buyer acknowledges and agrees that (i) the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that ALL WARRANTIES OF MERCHANTABILITY, USAGE OR SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED, (ii) it has not relied on any representation, warranty, covenant or agreement of Seller or its Affiliates or its or their Related Persons, other than the express representations, warranties, covenants and agreements of Seller made in this Agreement, (iii) Buyer has made its own investigation of the Acquired Assets and Assumed Liabilities and, based on such investigation and its own conclusions derived from such investigation, has elected to proceed with the transactions contemplated hereby and (iv) no material or information provided by or communications made by (or on behalf of) Seller or its Affiliates or its or their Related Persons will create any representation or warranty of any kind, whether express or implied, with respect to the Acquired Assets and the title thereto, the operation of the Acquired Assets, the Assumed Liabilities, the Business or the prospects (financial and otherwise), risks and other incidents of the Business.

(b)    Without limiting the generality of the foregoing, Buyer acknowledges and agrees that none of Seller or its Affiliates or its or their Related Persons has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Business, except as expressly set forth in this Agreement or as and to the extent required by this Agreement to be set forth in the Disclosure Schedules. Buyer further agrees that none of Seller or its Affiliates or its or their Related Persons will have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information and any information, document or material made available to Buyer or its Related Persons in any offering memorandum or similar document, in certain "data rooms" and online "data sites," management, marketing or banking presentations or any other form in expectation of

-55-

the transactions contemplated by this Agreement.

(c)     In connection with Buyer's investigation of the Business, Buyer may have reviewed certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information regarding the Business. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or its Affiliates or its or their Related Persons arising therefrom or related thereto.  Accordingly, none of Seller or its Affiliates or its or their Related Persons makes any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

15.5    Survival of Representations and Warranties.  The representations and warranties, and covenants and agreements set forth in this Agreement or in any Ancillary Agreement to the extent contemplating or requiring performance prior to the Closing, shall not survive the Closing. Each of the representations and warranties set forth in this Agreement or in any Ancillary Agreement shall terminate effective immediately as of the Closing such that no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at law or equity) may be brought after the Closing.  The covenants and agreements of any Party set forth in this Agreement and in any Ancillary Agreement, to the extent contemplating or requiring performance by such Party prior to the Closing, shall terminate effective immediately as of the Closing such that no claim for breach of any such covenant, detrimental reliance or other right or remedy (whether in contract, in tort or at law or equity) may be brought after the Closing.  Each covenant and agreement requiring performance at or after the Closing shall expressly survive Closing and nothing in this Section 15.5 shall be deemed to limit any rights or remedies of any Person for breach of any such covenant (with it being understood that nothing herein shall limit or affect Buyer's or any of its Affiliates' liability for the failure to pay the Closing Cash Purchase Price, assume the Assumed Liabilities or pay other amounts as required under this Agreement).

15.6    No Recourse Against Affiliates or Related Persons of Seller.

(a)     Buyer (on its behalf and on behalf of its Related Persons) acknowledges and agrees that, from and after the Closing, to the fullest extent permitted under applicable Law, any and all rights, claims and causes of action it may have against Seller or any Seller Subsidiary relating to the operation of the Business or relating to the subject matter of this Agreement and the transactions contemplated hereby arising under or based upon any Law (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages, or any other recourse or remedy, including as may arise under common law or Environmental Law) are hereby waived.  Furthermore, without limiting the generality of this Section 15.6, no claim shall be brought or maintained by or on behalf of any of Buyer or its Affiliates or its or their Related Persons against any of Seller or any Seller Subsidiary, and no recourse shall be sought or granted against any of them, by virtue of or based upon any alleged

K&E 14573112.33

misrepresentation or inaccuracy in or breach of any of the representations, warranties or covenants of Seller or any Seller Subsidiary set forth or contained in this Agreement or of Seller or any Seller Subsidiary in any Ancillary Agreement, the subject matter of this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby, the business, the ownership, operation, management, use or control of the Business, any of their assets, or any actions or omissions at or prior to the Closing.

(b)    Furthermore, without limiting the generality of this Section 15.6, Buyer (on its behalf and on behalf of its Affiliates and its or their Related Persons), hereby waives any right, whether arising at law or in equity, to seek contribution, cost recovery, damages, or any other recourse or remedy from Seller or any Seller Subsidiary, and hereby releases each such Person from any claim, demand or liability, with respect to any such environmental, health, or safety matter (including any matter arising under any Environmental Law).

(c)    Buyer acknowledges and agrees that the representations, warranties, covenants agreements contained in Section 15.4, Section 15.5 and this Section 15.6 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, Sellers would not enter into this Agreement.

15.7    Mutual Drafting.    This Agreement is the result of the joint efforts of Buyer and Sellers, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

15.8    Waiver of Bulk Sales Laws.    Each of the parties acknowledges and agrees that neither Seller nor any of its Subsidiaries will comply with, and hereby waives compliance by Seller and its Subsidiaries with, any "bulk sales", "bulk transfer" or similar law relating to the transactions contemplated hereby.

15.9    Expenses.    Except as otherwise provided herein, each of the Parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal, accounting, banking, consulting and advisory fees, whether or not the transactions contemplated hereby are consummated.

15.10    Broker's and Finder's Fees.    Each of the Parties represents and warrants that it has not dealt with any broker or finder in connection with any of the transactions contemplated by this Agreement in a manner so as to give rise to any claims against the other Party for any brokerage commission, finder's fees or other similar payout (except that Seller and its Affiliates have retained Paine Wetzel and Rothschild) and each will pay its retained advisors, but in the case of Seller, only to the extent that such fees are approved by the Bankruptcy Court. Buyer acknowledges and agrees that if any brokerage commission, finder's fee or other similar payout are owed to any Person as a result of any agreement or understanding entered into by Buyer or its Affiliates or its or their Related Persons with respect to any of the transactions contemplated hereby, Buyer shall be solely responsible for payment of all fees, expenses, liabilities and other obligations to such Person.

15.11 Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

15.12 Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if deposited in the United States mail, first-class postage prepaid, on the fifth Business Day following the date of such deposit, (d) if delivered by telecopy, upon confirmation of successful transmission, (i) on the date of such transmission, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient party on a Business Day, on the date of such transmission, and (ii) on the next day following the date of transmission, if such transmission is completed after 5:00 p.m., local time of the recipient party, on the date of such transmission or is transmitted on a day that is not a Business Day, or (e) if delivered by Internet mail (with a delivery report); provided that the relevant computer record indicates a full and successful transmission or no failure message is generated (i) on the date of such transmission, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient party on a Business Day, on the date of such transmission, and (ii) on the next Business Day following the date of transmission, if such transmission is completed after 5:00 p.m., local time of the recipient party or is transmitted on a day that is not a Business Day.  All notices, demands and other communications hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

| | |
|---|---|
| Notices to Seller or any Seller Subsidary: | Sun-Times Media Group, Inc.<br>350 North Orleans Street, 10-S<br>Chicago, Illinois 60654<br>Attention: James McDonough, General Counsel<br>Telephone: 312-321-2949<br>Telecopy: 312-321-0629<br>Email: jmcdonough@suntimes.com |

K&E 14573113.33

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:    Richard J. Campbell, P.C.
Telephone: 312-862-2000
Telecopy: 312-862-2200
Email: richard.campbell@kirkland.com

Notices to Buyer or any Buyer Designee:

STMG Holdings, LLC
350 North Clark Street
Chicago, Illinois 60654
Attention: James C. Tyree
Telephone: 312-595-6090
Telecopy: 312-595-7204
Email: jtyree@mesirowfinancial.com

with a copy to (which shall not constitute notice):

Goldberg Kohn Bell Black
  Rosenbloom & Moritz, Ltd.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
Attention: Denise B. Caplan
Telephone: 312-201-4000
Telecopy: 312-332-2196
Email: Denise.Caplan@goldbergkohn.com

15.13  Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties, or in the case of a waiver, by the Party waiving compliance. Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, is not deemed to be nor construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

15.14  Public Announcements.   No Party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other Party, unless a press release or public announcement is required by Law or Order of the Bankruptcy Court.  If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party shall give the non-disclosing Party prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Seller will file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and Bidding Procedures Order.

15.15  Entire Agreement.  This Agreement and the Ancillary Agreements contain the entire understanding among the Parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or

-59-

written, with regard to such transactions. All Disclosure Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

15.16 Parties in Interest.

(a)     Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns; provided that (i) each covenant or agreement of Buyer in this Agreement is expressly for the benefit of Seller and its Affiliates and shall be enforceable by Seller and its Affiliates (including the estate(s) of Seller and the Seller Subsidiaries in the Chapter 11 Case) and (ii) any Related Person of Seller or its Affiliates or Buyer, as applicable, may enforce the terms of any provision of this Agreement in which such Related Person is referenced as a beneficiary of such provision.

(b)     Without limiting or amending the obligations of Buyer hereunder, to the extent that any obligation or liability of Buyer hereunder is to be performed or paid by a Related Person of Buyer, this Agreement shall constitute an obligation of Buyer to cause such Related Person to perform. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Seller or Buyer or their respective Affiliates. No provision of this Agreement gives any third Persons any right of subrogation or action over or against Seller or Buyer or their respective Affiliates.

15.17 DAMAGES. FROM AND AFTER THE CLOSING, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT. THE EXCLUSION OF CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES AS SET FORTH IN THE PRECEDING SENTENCE SHALL NOT LIMIT THE RIGHTS OF ANY PERSON ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT TO ANY SUCH DAMAGES PAYABLE TO THIRD PERSONS IN CONNECTION WITH A MATTER FOR WHICH A PERSON ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT.

15.18 WAIVER OF JURY TRIAL. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN

K&E 14573112.33