# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHICAGO NEWSPAPER | ) | Case No. 09-11092 (CSS) |
| LIQUIDATION CORP., *et al.*,[1] | ) | |
| | ) | Jointly Administered |
| Debtor. | ) | |
| | ) | |

---

**DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST MODIFIED PLAN
OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

James H.M. Sprayregen, P.C.
James A. Stempel
Sarah H. Seewer
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862 2000
Facsimile:  (312) 862-2200

Pauline K. Morgan (Bar No. 3650)
Edmon L. Morton (Bar No. 3856)
Sean M. Beach (Bar No. 4070)
Jaime N. Luton (Bar No. 4936)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors in Possession

Dated:  July 7, 2011

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Chicago Newspaper Liquidation Corp. f/k/a Sun-Times Media Group, Inc. (8892); American Publishing (1991) LLC (9303); American Publishing Company LLC (5797); American Publishing Management Services, Inc. (7433); APAC-95 Oklahoma Holdings, Inc. (1123); CNLC-CSM, LLC f/k/a Centerstage Media, LLC (1160); Chicago Group Acquisition LLC (4250); CNLC-Features, Inc. f/k/a Chicago Sun-Times Features, Inc. (9928); CNLC-CST LLC f/k/a Chicago Sun-Times LLC (7749); CNLC-Digital, Inc. f/k/a Digital Chicago Inc. (0626); CNLC-Fox Valley LLC f/k/a Fox Valley Publications LLC (2434); HGP, Partnership (4292); HIPI (2002) Inc. (3946); Hollinger Australian Holdings Limited (3321); Hollinger International Publishing Inc. (0603); HTH Benholdco LLC (8274); HTH Holdings Inc. (8275); HTNM LLC (0714); HTPC Corporation (9332); LHAT Corporation (8117); Meridian Star, Inc. (3390); CNLC-Midwest, Inc. f/k/a Midwest Suburban Publishing, Inc (1455); Northern Miner U.S.A., Inc. (5174); Oklahoma Airplane LLC (1123); CNLC-Pioneer, Inc. f/k/a Pioneer Newspapers Inc. (0502); CNLC-Reach LLC f/k/a Reach Chicago LLC (4252); Sun Telemarketing LLC (8780); CNLC-Distribution Systems, Inc. f/k/a Sun-Times Distribution Systems, Inc. (9838); CNLC-PRD, Inc. f/k/a Sun-Times PRD Inc. (8118); TAHL (2002) Inc. (3945); The Johnstown Tribune Publishing Company (7927); CNLC-PT LLC f/k/a The Post-Tribune Company LLC (7370); The Red Streak Holdings Company (9358); CNLC-STC, Inc. f/k/a The Sun Times Company (7751); XSTMHoldings LLC (9284).  The location of the Debtors' corporate headquarters and the service address for all Debtors is: 350 N. Orleans St., Floor 10-S, Chicago, IL 60654.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO BANKRUPTCY CODE § 1125 AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH THE FEDERAL OR STATE SECURITIES LAWS OR SIMILAR LAWS. THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' LIQUIDATING PLAN OF CHICAGO NEWSPAPER LIQUIDATION CORP. ("CNLC") AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN COMPLIES WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, THE DEBTORS CANNOT ASSURE SUCH COMPLIANCE OR THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS REGARDING FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN, AND ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM ITS BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS EXPECTED FUTURE RESULTS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR MANAGEMENT'S ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS FUTURE RESULTS AND

OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE FILING DATE OF THIS DISCLOSURE STATEMENT AND THE DEBTORS ARE UNDER NO OBLIGATION, AND EXPRESSLY DISCLAIMS ANY OBLIGATION, TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION..................................................................................................1
    A.    Overview of Chapter 11................................................................1
    B.    The Purpose and Effect of the Plan............................................2
    C.    Treatment of Claims and Interests .............................................2
    D.    Claims Estimates.........................................................................3
    E.    Transactions Contemplated by the Plan .....................................4
    F.    Consummation .............................................................................4
    G.    Certain Factors to Be Considered Prior to Voting.....................4
    H.    Voting and Confirmation .............................................................4

II.     BACKGROUND TO THE CHAPTER 11 CASES ..............................6
    A.    The Debtors' Businesses .............................................................6

III.     THE CHAPTER 11 CASES..................................................................7
    A.    Events Leading to the Chapter 11 Cases and Related Postpetition Events..............7
    B.    Debtors' First Day Motions ........................................................8
    C.    Unsecured Creditors....................................................................8
    D.    Retention of Professionals ..........................................................8
    E.    Sale of Substantially All of the Debtors' Assets........................9
    F.    Interpleader Action .....................................................................9
    G.    The Special Committee Action ..................................................11
    H.    Potential Repayment Actions .....................................................12
    I.    Friedheim Preference Action .....................................................12
    J.    Claim Summary .........................................................................12
    K.    Pending Litigation Proceedings .................................................15

IV.     PLAN SUMMARY ...............................................................................15
    A.    Treatment of Unclassified Claims .............................................15
    B.    Treatment of Classified Claims .................................................16
    C.    Means for Implementation .........................................................17
    D.    Other Terms ...............................................................................20

V.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN..........21
    A.    The Confirmation Hearing.........................................................21
    B.    Confirmation Standards .............................................................21
    C.    Financial Feasibility..................................................................22
    D.    Best Interests of Creditors Test.................................................22
    E.    Acceptance by Impaired Classes ...............................................23

VI.     CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ...........24
    A.    Certain Bankruptcy Law Considerations ..................................24
    B.    Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims ...............................................25
    C.    Disclosure Statement Disclaimer...............................................25

D.     Liquidation Under Chapter 7 ................................................................................27

**VII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ......................................................................................**27**

     A.     Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims .........................................................................................28

     B.     Certain United States Federal Income Tax Consequences to the Debtors.............30

**VIII. VOTING PROCEDURES** ..............................................................................................**30**

**IX.   SETTLEMENT, RELEASE, INJUNCTION  AND RELATED PROVISIONS OF THE PLAN** .............................................................................**31**

     A.     Compromise and Settlement of Claims, Interests, and Controversies...................31

     B.     Debtor Release ......................................................................................................31

     C.     Third Party Release................................................................................................32

     D.     Exculpation ...........................................................................................................33

     E.     Injunction .............................................................................................................34

     F.     Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications ..................................................................................35

**X.    PLAN SUPPLEMENT** ..................................................................................................**35**

**XI.   CONCLUSION AND RECOMMENDATION** .............................................................**35**

**EXHIBITS**

| | |
|---|---|
| **Exhibit A** | Debtors' First Modified Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code |
| **Exhibit B** | Liquidation Analysis |

# I.   INTRODUCTION

On March 31, 2009, the above-captioned debtors and debtors in possession (collectively, the "Debtors," and with their non-Debtor affiliates, the "Company") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code[2] in the United States Bankruptcy Court for the District of Delaware. On April 1, 2009, the Bankruptcy Court entered an order jointly administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) under the lead case: *Sun-Times Media Group, Inc.*; Case No. 09-11092 (CSS). The Debtors are winding down their businesses and properties as debtors in possession pursuant to Bankruptcy Code § § 1107(a) and 1108. On April 15, 2009, the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to Bankruptcy Code § 1102 [Docket No. 75]. On February 17, 2010, the Bankruptcy Court appointed Direct Fee Review LLC as fee examiner pursuant to Bankruptcy Code § 105 [Docket No. 790].

The Debtors submit this Disclosure Statement pursuant to Bankruptcy Code § 1125 for purposes of soliciting votes to accept or reject the Plan, a copy of which is attached to this Disclosure Statement as <u>Exhibit A</u>.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, their reasons for seeking protection under chapter 11, and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the requirements for Confirmation of the Plan and the voting procedures that holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

## A.      Overview of Chapter 11

Chapter 11 is the chapter of the Bankruptcy Code that enables businesses to reorganize or liquidate in an orderly fashion. Chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Chapter 11 Case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession.

As a result of various factors described more fully herein, the Debtors' management has determined that the reorganization of the Debtor as a going concern is not feasible. To fairly and expeditiously distribute the Debtors' assets consistent with the Bankruptcy Code, the Debtors have proposed the Plan, which contemplates liquidation of the Debtors' estates.

Prior to soliciting acceptances of a proposed chapter 11 plan, Bankruptcy Code § 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of Bankruptcy Code § 1125.

---

[2]   Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' First Modified Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan").

### B. The Purpose and Effect of the Plan

The Plan provides for the liquidation and distribution of the Debtors' remaining assets for the benefit of certain Holders of Allowed Claims. Specifically, Holders of Administrative Claims and Priority Non-Tax Claims will be paid in full in Cash. Holders of Priority Tax Claims (namely, Holders of the Allowed IRS Claim and the Allowed NY State Claim), comprising the only voting Class, will receive all of the Debtors' residual net distributable value. All other Classes of Claims and Interests will receive no distribution on account of their respective Claims and Interests.

The Plan contemplates that, on the Effective Date, the Chapter 11 Cases and the Debtors and their Estates will be deemed to be substantively consolidated for all purposes of the Plan. The assets and liabilities of the Debtors will be pooled and all Claims will be satisfied from the assets of a single consolidated Estate. No parties in interest, however, will be prejudiced by this substantive consolidation because Holders of Priority Tax Claims hold their Claims at each Debtor entity and are Impaired. Accordingly, the distributions under the Plan are unaffected by substantive consolidation.

The Debtors believe that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommends that you vote to accept the Plan (if you are entitled to vote). The Debtors believe that any alternative to Confirmation of the Plan, such as a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delay, litigation, and additional costs, and, ultimately, would reduce the recoveries.

### C. Treatment of Claims and Interests

#### 1. Classification

The Plan divides all Claims and Interests into various Classes. Listed below is a summary of the Classes of Claims and Interests under the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Priority Tax Claims | Impaired | Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Deemed to Reject |
| 4 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Interests | Impaired | Deemed to Reject |
| 7 | CNLC Interests | Impaired | Deemed to Reject |

The following tables summarize the treatment and projected recovery for each Class of Claims and Interests under the Plan, as well as Unclassified Claims. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the information set forth in the Plan, the Plan shall govern. The projected recoveries are based upon certain assumptions made by the Debtors, as discussed further herein.

### 2. Unclassified Claims

| Claim | Plan Treatment | Range of Claims | Projected Recovery Under the Plan |
|---|---|---|---|
| Administrative Claims | Paid in full in Cash | $1.7 million[3] | 100.0% |
| Priority Non-Tax Claims | Paid in full in Cash | $0.2 million | 100.0% |

### 3. Summary of Classification, Treatment, and Projected Recoveries of Classified Claims and Interests

The classification, treatment, and projected recoveries of classified Claims and Interests under the Plan are described in summary form below for illustrative purposes only and are subject to the more detailed and complete descriptions contained in Article II of the Plan.

| Class | Claim or Interest | Plan Treatment | Range of Claims or Interests | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1 | Secured Claims | Unimpaired | $0 | 100.0% |
| 2 | Priority Tax Claims | Impaired | $235 million | 0.0–7.0% |
| 3 | General Unsecured Claims | Impaired | In excess of $189 million[4] | 0.0% |
| 4 | Section 510(b) Claims | Impaired | $0 | 0.0% |
| 5 | Intercompany Claims | Impaired | N/A | 0.0% |
| 6 | Intercompany Interests | Impaired | N/A | 0.0% |
| 7 | CNLC Interests | Impaired | N/A | 0.0% |

### D. Claims Estimates

As of March 30, 2011, the Notice and Claims Agent had received approximately 1,240 Proofs of Claim filed against the Debtors. The total amount of Claims remaining on the Claims Register against the Debtors as of such date include: 293 Administrative Claims in the total amount of approximately $4.2 million, of which the Debtors believe that 97 Claims in the total amount of approximately $2.0 million are duplicative; 65 Priority Non-Tax Claims in the total amount of approximately $162,000; and 32 Priority Tax Claims in the total amount of approximately $2.6 billion. The Debtors estimate, however, that upon Confirmation of the Plan, as set forth therein, Allowed Priority Tax Claims will in aggregate equal approximately $235 million, reflecting a valid setoff by the IRS and an adjustment for duplicate Claims,

---

[3]   The projected amount of Administrative Claims is net of amounts previously paid by the Debtors.

[4]   The current face amount of General Unsecured Claims is $502 million including Claims that the Debtors believe are duplicative. The Debtors believe that the amount of valid General Unsecured Claims likely is much lower. The Debtors have not attempted to reconcile or liquidate General Unsecured Claims. Given the available assets and the amount of Priority Tax Claims, the Debtors have determined that reconciliation of General Unsecured Claims would not benefit the Estate.

and Allowed Priority Non-Tax Claims will in aggregate equal approximately $242,000, including amounts set forth on the Debtors' schedules of assets and liabilities filed with the Bankruptcy Court. Also, there are on the Claims Register General Unsecured Claims in the total amount of approximately $502 million, of which the Debtors believe Claims in the total amount of approximately $313 million are duplicative.

These estimates are based upon a number of assumptions, and there is no guarantee that the ultimate total amount of Allowed Claims in each category will conform to the Debtors' estimates. The assumptions regarding Claims estimates are described in further detail below in Article III.I hereof.

### E. Transactions Contemplated by the Plan

On the Effective Date, all of the Debtors' assets shall be transferred into and vest in the Liquidating Trust. The Liquidating Trust Agreement, attached to the Plan, shall provide for the appointment of the Liquidating Trustee. The initial Liquidating Trustee will be Michael Katzenstein, who currently serves on the Board of Directors of CNLC.

Once appointed, the Liquidating Trustee shall be responsible for implementing the Liquidating Trust's terms as set forth under the Liquidating Trust, including liquidating all of the Liquidating Trust's assets, resolving all outstanding Claims, pursuing all appropriate Causes of Action, and distributing net Cash proceeds to the Beneficiaries.

### F. Consummation

Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect, and all conditions to Consummation have been satisfied or waived. Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date in accordance with the Plan.

### G. Certain Factors to Be Considered Prior to Voting

Prior to voting to accept or reject the Plan, each Holder in the voting Class should carefully consider all of the information in this Disclosure Statement, especially the risk factors described in Article VI hereof.

### H. Voting and Confirmation

Holders of Claims in Class 1 are Unimpaired and, therefore, presumed to accept the Plan. Holders of Claims in Class 2 are Impaired and entitled to vote to accept or reject the Plan. Holders of Claims or Interests in Classes 3, 4, 5, 6 and 7 are wholly impaired and, therefore, deemed to reject the Plan. Accordingly, Holders of Claims or Interests in Classes 1, 3, 4, 5, 6 and 7 are not entitled to vote on the Plan, and the vote of such Holders of Claims and Interests shall not be solicited.

Pursuant to Bankruptcy Code § § 1126(c) and 1126(d) and except as otherwise provided in Bankruptcy Code § 1126(e): (1) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan and (2) an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan. The Debtors believe that there are two Holders of Class 2 Claims. Pursuant to

Bankruptcy Code § 1129(a)(9), the Debtors are asking Holders of Class 2 Claims to consent to less than full payment of their Claims.

Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation at the Confirmation Hearing scheduled to commence before the Bankruptcy Court on August 18, 2011 at 2:00 p.m. prevailing Eastern Time. Bankruptcy Code § 1129(a)(10) shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) with respect to any rejecting Class of Claims or Interests. The Debtors also reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.

The Bankruptcy Court has established [July 14], 2011 as the Voting Record Date for determining which Holders of Claims are eligible to vote to accept or reject the Plan. Ballots, along with this Disclosure Statement, the Plan, and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the Voting Record Date that are entitled to vote to accept or reject the Plan. An appropriate return envelope, postage prepaid, will be included with each Ballot, if appropriate.

**BALLOTS CAST BY HOLDERS OF CLAIMS MUST BE RECEIVED BY THE DEBTORS' NOTICE AND CLAIMS AGENT, KURTZMAN CARSON CONSULTANTS LLC ("KCC"), BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY. THE ADDRESS FOR BALLOTS IS:**

> Chicago Newspaper Liquidation Corp. Balloting Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California 90245

**FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL KCC AT (866) 967-0671.**

**TO BE COUNTED, THE BALLOTS CAST BY HOLDERS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KCC NO LATER THAN THE VOTING DEADLINE. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ATTACHED TO THE DISCLOSURE STATEMENT ORDER AS EXHIBIT 1. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTORS.**

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except Ballots), please request a copy, by writing to Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn.: Sarah Seewer.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL HOLDERS OF CLAIMS AND INTERESTS AND RECOMMEND THAT ALL SUCH HOLDERS WHOSE VOTES ARE BEING SOLICITED VOTE TO ACCEPT THE PLAN.

## II.  BACKGROUND TO THE CHAPTER 11 CASES

The following is a general summary of the Debtors' businesses and history prior to filing these Chapter 11 Cases.

### A.  The Debtors' Businesses

#### 1.  Summary of the Debtors' Businesses

Chicago Newspaper Liquidation Corp., formerly known as Sun-Times Media Group, Inc., is the ultimate parent company of each of the Debtors in these chapter 11 cases.  The Company's primary focus was the publishing, printing, and distribution of newspapers in the greater Chicago, Illinois metropolitan area and the operation of various related websites.  The Company also has non-Debtor affiliates in Canada, the United Kingdom and Bermuda.

The Company was incorporated in the State of Delaware on December 28, 1990, as Hollinger International, Inc.  The Company's stock at the time was listed on the New York Stock Exchange ("NYSE") under the ticker symbol HLR.  In July 2006, the Company's stockholders changed the Company's name to Sun Times Media Group, Inc. and changed its ticker symbol to SVN.  In May, 2008, the Company's stock was de-listed from the NYSE, and the Company subsequently moved its securities to the Over-the-Counter Bulletin Board ("OTCBB") on June 17, 2008 under the ticker symbol SUTM.OB.  On January 2, 2009, the Company voluntarily de-registered its Class A Common Stock thereby ending its reporting obligations under the Securities Exchange Act of 1934.  After deregistration, the Company's Class A Common Stock was no longer quoted on the OTCBB.  As of January 6, 2009, it was quoted on the "Pink Sheets" under the ticker symbol SUTM.PK.

#### 2.  Capital Structure

The Company does not have any outstanding funded debt and does not have a working capital or other credit facility with any lender.  The Company funded its business operations with cash on hand and cash generated from its business operations.  Despite the lack of prepetition funded debt, the Company was forced to file these Chapter 11 Cases because of an impending cash shortfall caused, in part, by the significant downturn in the print advertising industry and the overall deteriorating economic climate.

The principal assets of the Debtors' estates now include: Cash (approximately $4.3 million as of May 31, 2011); the Interpleader Recoveries; the Special Committee Action Recoveries; and the Indemnification Action Recoveries.

#### 3.  Revenues

The Company's properties consisted of numerous daily and weekly newspapers, associated websites and news products in the greater Chicago metropolitan area.  While the Company's primary newspaper was the Chicago Sun-Times, which was founded in 1948, the Company produced publications throughout Chicago and the major suburbs in the surrounding high growth counties.  In addition to the Chicago Sun-Times, the Company's newspaper properties included:  (a) the Pioneer Press, which published weekly newspapers in Chicago's northern and northwestern suburbs; (b) the daily Southtown Star in Tinley Park, Illinois; (c) the daily Post-Tribune of northwest Indiana; (d) the Herald News in Joliet; (e) the Courier News in Elgin, Illinois; (f) the Beacon News in Aurora, Illinois; (g) the Naperville Sun in Naperville, Illinois; (h) the Lake County News Sun in Waukegan, Illinois; and (i) 13 other free weekly newspapers in suburban Chicago.

For the last fiscal year prior to the Petition Date, which ended December 31, 2008, the Company's Newspaper segment had revenue of approximately $324 million and an operating loss of approximately $344 million.

### a.     Advertising

The Company's operating revenue was primarily derived from the sale of advertising space within the Company's newspapers and related websites. Advertising revenue for the Company for the year ended December 31, 2008 was approximately $243 million and represented approximately 75% of the Company's revenue for 2008. The Company's advertising revenue was affected by the national and local economy, in addition to fluctuations in individual business sectors. The Company's advertising revenue also experienced seasonality, with the Company generating the least revenue in the first quarter of the year (after the holidays).

### b.     Circulation

Circulation sales represented the Company's second largest source of revenue. Circulation revenue originated from both sales of single copies of the Company's various newspapers via retailers, street vendors and vending racks as well as newspaper subscribers who paid fees to secure delivery of a newspaper to their homes or offices.

### c.     Online Publications

The Company also operated Suntimes.com and other affiliated newspaper websites, which had approximately 3.4 million unique users and approximately 51 million page impressions per month during 2008.

### 4.     Employees and Labor Relations

As of the Petition Date, the Company had 2,171 employees. Approximately 45% of the Company's employees were represented by 18 collective bargaining units. Direct employee costs (including salaries, wages, severance, fringe benefits, employment-related taxes and other direct employee costs) were equal in aggregate to approximately 52% of the Company's revenue for the year ended December 31, 2008.

## III.    THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including the events leading up to the chapter 11 filing, the stabilization of the Debtors' operations following the chapter 11 filing, certain administrative matters addressed during the Chapter 11 Cases, and the Debtors' restructuring initiatives since the chapter 11 filing.

### A.     Events Leading to the Chapter 11 Cases and Related Postpetition Events

Unlike other recent newspaper companies suffering in this economic climate, the Company commenced these Chapter 11 Cases without any outstanding debt for borrowed money. Nevertheless, the Company was financially and legally burdened by certain legacy liabilities dating back to earlier periods of management and ownership. Further, like most newspapers across the country, the Company was severely impacted by the significant downturn in print advertising revenue. Accordingly, despite steps to reduce costs and strengthen the organization, the deteriorating economic climate, coupled with a

deteriorating cash position and significant, pending IRS tax liabilities dating back to previous management, led the Company to commence these Chapter 11 Cases.

## B. Debtors' First Day Motions

On the Petition Date, the Debtors filed certain motions requesting the authority to pay certain prepetition obligations, including: (1) tax obligations [Docket No. 7]; (2) shipping and lien claimant obligations [Docket No. 8]; (3) insurance obligations [Docket No. 9]; (4) customer program obligations [Docket No. 10]; and (5) employee wages and workers' compensation obligations [Docket No. 12]. On April 1, 2009, the Bankruptcy Court granted the relief sought in these motions.

## C. Unsecured Creditors

### 1. Appointment of the Creditors' Committee

On April 15, 2009, the U.S. Trustee appointed the Creditors' Committee pursuant to Bankruptcy Code § 1102. The members of the Creditors' Committee include the Chicago Newspaper Guild, Argenbright, Inc., d/b/a Skybridge Marketing Group, and Classifieds Plus, Inc.

Since its formation, the Creditors' Committee and its advisors have played an active role in the Chapter 11 Cases.

### 2. Meeting of Creditors

The meeting of creditors pursuant to Bankruptcy Code § 341 was held on April 29, 2009 at J. Caleb Boggs Federal building, 844 King Street, 2nd Floor, Room 2112, Wilmington, Delaware 19801. In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined under oath by a representative of the U.S. Trustee and by any attending parties in interest), James D. McDonough, Senior Vice President, Chief Administrative Officer, General Counsel, and Secretary of Sun-Times Media Group, Inc., and counsel to the Debtors, attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest.

## D. Retention of Professionals

The Bankruptcy Court entered Final Orders approving the retention of: Kirkland & Ellis LLP and Young Conaway Stargatt & Taylor, LLP [Docket Nos. 141 and 123] as the Debtors' co-counsel; Huron Consulting Group as the Debtors' restructuring advisor [Docket No. 139]; Rothschild Inc. as the Debtors' financial advisor and investment banker [Docket No. 173]; Kurtzman Carson Consultants as Notice and Claims Agent [Docket No. 27]; KPMG LLP as the Debtors' auditors and tax consultants [Docket No. 160]; and Paul, Weiss, Rifkind, Wharton & Garrison, LLP as special counsel to the Debtors [Docket No. 161]. Also, on April 28, 2009, the Bankruptcy Court entered a Final Order authorizing the Debtors' to retain and compensate certain professionals used in the ordinary course of the Debtors' business [Docket No. 140].

On June 10, 2009, the Bankruptcy Court entered Final Orders approving the retention of Lowenstein Sandler PC and Cross & Simon, LLC [Docket Nos. 267 and 270] as co-counsel to the Creditors' Committee, and Carl Marks Advisory Group as its financial advisor, primarily to advise and consult with respect to the Plan and any proposed alternative plan or the prospects therefor [Docket No. 266].

E. **Sale of Substantially All of the Debtors' Assets**

From the onset of the Chapter 11 Cases, the Debtors continually reviewed and considered all of their options to maximize the value of the Company, including through a sale of assets. On September 8, 2009, the Debtors filed a motion seeking authorization to: (1) sell substantially all of their assets to STMG Holdings, LLC (the "Purchaser"); (2) enter into an asset purchase agreement with the Purchaser; and (3) assume and assign certain executory contracts [Docket No. 435] (the "Sale Motion"). On that date, they also filed a motion seeking approval of certain bid procedures and scheduling an auction [Docket No. 434]. Despite their marketing efforts, the Debtors received no bids other than the bid of STMG Holdings, LLC. On September 25, 2009, the Court entered an order approving the bid procedures and setting October 5, 2009 as the deadline to submit a qualified bid for the Debtors' assets [Docket No. 504]. On October 6, 2009, the Debtors submitted a notice of cancellation of auction because no qualified bids were received prior to the expiration of the bid deadline. On October 8, 2009, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets to the Purchaser and approving the Asset Purchase Agreement.

Pursuant to the Asset Purchase Agreement, the Purchaser acquired substantially all of the Debtors' assets in exchange for $5 million in Cash (subject to purchase price adjustments discussed below) and approximately $22 million in assumed liabilities, including approximately $16 million in postpetition assumed liabilities. The Purchaser continues to operate the Debtors' former newspaper operations as a going concern.

Subsequent to the closing of the Sale, and pursuant to the Asset Purchase Agreement, Grant Thornton arbitrated a dispute between CNLC and the Purchaser regarding working capital adjustments to the purchase price under the Asset Purchase Agreement. Grant Thornton found that the Closing Cash Purchase Price exceeded the Final Cash Purchase Price. In accordance with Grant Thornton's decision, CNLC paid the Purchaser $644,922 for working capital and certain other agreed adjustments on July 26, 2010. CNLC also paid Price Waterhouse Coopers $53,000 and its share of Grant Thornton's fees, approximately $15,600.

CNLC withheld payment of $291,796 on the basis that it had paid cure costs to parties to assumed contracts in excess of its obligations under the Asset Purchase Agreement, and that those cure costs were the Purchaser's obligations. The Purchaser refuted CNLC's position and had filed unliquidated superpriority administrative expense claims to recover amounts due pursuant to the Asset Purchase Agreement. In order to resolve all outstanding issues under the Purchase Agreement and satisfy the Purchaser's filed claims, CNLC and the Purchaser agreed that the Purchaser would have a superpriority claim in the amount of $145,898.00. On April 22, 2011, the Bankruptcy Court entered an order approving the agreement memorializing this settlement and related releases [Docket No. 1362] and CNLC has since paid the Purchaser the amount of its superpriority administrative expense claim.

F. **Interpleader Action**

In 2002, Sun-Times Media Group, Inc. ("STMG"), now known as CNLC, and certain related companies purchased a $130 million program of executive and organization liability insurance. The directors and officers insurance tower included: (1) primary and two excess policies issued by American Home Assurance Company and Chubb Insurance Company with a combined policy limit of $50 million, all of which was exhausted in a derivative action brought against STMG; (2) excess policies with limits of $40 million issued by Royal & SunAlliance Insurance Company of Canada, ACE INA Insurance Company and Zurich Insurance Company (together, the "Third Layer Insurers" and such layer, the "Third Layer"); and (3) excess policies with limits of $40 million issued by ACE, AXA Corporate Solutions Assurance, GCAN Insurance Company (f/k/a Gerling Global Canada), Temple Insurance Company,

Continental Casualty Company and Lloyd's Underwriting (the "Fourth Layer Insurers" and such layer, the "Fourth Layer"). The Fourth Layer Insurers sold insurance policies to STMG, Hollinger Inc., and The Ravelston Corp., Ltd. ("Ravelston") as named insureds for the policy period of July 1, 2002 to July 1, 2003 (the "Policies"). The Policies provided entity coverage for STMG, Hollinger Inc., and Ravelston, as well as individual coverage for their officers and directors.

In August 2004, a special committee of the board of directors of STMG, then known as Hollinger International Inc., ("International"), issued a report alleging breaches of fiduciary duty by numerous individuals and entities who were or had been International officers, directors and/or controlling shareholders (the "Special Committee Report"). The conduct that was the subject of the Special Committee Report gave rise to significant litigation involving International, Hollinger Inc., Ravelston and Ravelston Management Inc. (collectively, the "Ravelston Entities"), and certain officers and directors. The litigation included a derivative action brought by an International shareholder in the name of the corporation; an action brought by International through the Special Committee against several former International officers, directors, and/or controlling shareholders (the "Special Committee Action," described more fully below); a criminal action brought against Ravelston and five former officers and/or directors of International, Hollinger Inc., and Ravelston, and several securities class actions brought in the United States and Canada against International, Hollinger Inc., and their former officers and directors (the "Securities Class Actions"); and other proceedings in the United States and Canada. The various claims spawned coverage disputes among International, Hollinger Inc. and their insurance carriers, including the Fourth Layer Insurer, including a declaratory judgment action brought in the Delaware Superior Court entitled *Sun-Times Media Group, Inc., et al. v. Royal & SunAlliance Insurance Company of Canada, et al.*, Civil Action 06-C-11-108 (Cooch, J.) (the "Insurance Action").

In July 2007, CNLC, Hollinger Inc., and their former directors and officers who had been named as defendants in the Securities Class Actions entered into an agreement to settle the Securities Class Actions. In connection with the Securities Class Actions settlement, CNLC, Hollinger Inc., and the other defendants in those actions also entered into a settlement agreement with CNLC's and Hollinger Inc.'s insurance carriers, including the Fourth Layer Insurers (as defined above, the "Insurance Settlement Agreement"), which led to resolution of the Insurance Action. Under the Insurance Settlement Agreement, one group of carriers, the Third Layer Insurers, agreed to pay $30 million to cover the amount of the Securities Class Actions settlement, in return for an agreement that the Third Layer policies were exhausted and no more claims would be brought against the Third Layer Insurers. In addition, the Fourth Layer Insurers agreed to pay $24.5 million into an escrow account (the "Fourth Layer Fund") in return for an agreement that their policies were exhausted and no more claims would be brought against the Fourth Layer Insurers under the Policies. The Insurance Settlement Agreement provided that an action would be brought in Delaware Superior Court to determine the appropriate allocation of the funds that certain of the carriers agreed to pay in settlement of the declaratory judgment action.

On June 10, 2009, the Bankruptcy Court entered an *Order Approving Assumption of Settlement of Class Actions and Related Insurance Litigation* [Docket No. 268], which authorized the Debtors' assumption of, among other things, the Insurance Settlement Agreement and authorized the Debtors to perform under the Insurance Settlement Agreement.

On October 13, 2009, CNLC, Hollinger Inc., JPMorgan Chase Bank ("JPM" or the "Escrow Agent"), and Bouchard Margules & Friedlander, P.A. ("BMF") entered into an escrow agreement providing that JPM would hold the Fourth Layer Fund in escrow, and that BMF would serve as interpleader representative for the Fourth Layer Fund, with all of the powers and authority to commence the allocation proceeding in the Delaware Superior Court as an interpleader action and to direct the Escrow Agent regarding the ultimate disposition of the Fourth Layer Fund as approved by the Delaware Superior Court. The Interpleader Action was filed in Delaware Superior Court on October 15, 2009, by

BMF, as interpleader representative, so that the allocation of funds provided for under the Insurance Settlement Agreement could be determined.

As of March 31, 2011, the amount of money in the Fourth Layer Fund, net of a reserve for taxes, was $24,436,830.80. BMF itself has no claim to the Fourth Layer Fund, except for payment of its fees and reasonable expenses, and has no stake in how the Court decides to distribute the funds. CNLC has filed a claim for $116.7 million against the Fourth Layer Fund, and Hollinger Inc. has filed a liquidated claim for $34.8 million and a contingent claim for $185.2 million against the Fourth Layer Fund. In addition to the claims filed by CNLC and Hollinger Inc., 13 other claims totaling approximately $26 million in aggregate have been filed to date against the Fourth Layer Fund in both liquidated and unliquidated amounts.

Prior to the commencement of the Interpleader Action and these Chapter 11 Cases, CNLC and Hollinger Inc. entered into an agreement to divide any recovery they received from the Fund, gained through settlement or litigation. Pursuant to their agreement CNLC will receive 85% of any such recovery, while Hollinger will receive the remaining 15%.

On August 30, 2010, the Delaware Superior Court entered an order establishing a briefing schedule for the parties to the Interpleader Action to address certain preliminary issues concerning the validity of certain claims or the order of payments. The briefs have been fully submitted. The Court heard oral argument on the issues on April 11, 2011, and reserved judgment.

The Plan provides that all of the Debtors' rights to the Interpleader Action will be transferred to the Liquidating Trust on the Effective Date, to be managed by the Liquidating Trustee, and ultimately distributed to Holders of Allowed Class 2 Claims as the Beneficiaries of the Liquidating Trust. The Debtors estimate that the potential range of recoveries for the estates from the Interpleader Action is approximately $0 to $20.8 million. Any amount recovered as an Interpleader Recovery will largely be used to satisfy outstanding Allowed Class 2 Claims. The Liquidating Trust may retain professionals to prosecute the Interpleader Action after the Effective Date on a contingency fee basis, on an hourly basis, or on any other basis the Liquidating Trustee deems appropriate in accordance with the best interests of the Liquidating Trust and its Beneficiaries.

G.      The Special Committee Action

The Special Committee Action was filed on January 30, 2004, in the United States District Court for the Northern District of Illinois against Hollinger Inc., the Ravelston Entities, and three former executives of both companies. The action is entitled *Sun Times Media Group, Inc. v. The Ravelston Corporation Limited, et al.*, Case No. 04C-0698, pending before the Honorable Blanche R. Manning. The complaint was amended on May 7, 2004; October 29, 2004; and October 8, 2008. The operative complaint names as defendants the Ravelston Entities, former STMG Chief Executive Officer and Chairman Conrad M. Black, former STMG Chief Financial Officer, Executive Vice-President, and director John A. Boultbee., former STMG director Daniel W. Colson, and former STMG director and Vice President Barbara Amiel Black.

The complaint alleges that (i) all defendants breached their fiduciary duties of loyalty, care, and good faith and/or aided and abetted others' breaches of their fiduciary duties; (ii) all defendants engaged in an unlawful civil conspiracy; (iii) certain defendants unlawfully engaged in fraud; and (iv) certain defendants unlawfully converted Plaintiff's assets. The Company seeks compensatory damages of approximately $425,000,000, plus interest on transactions dating back to the 1990s, as well as punitive damages on the fraud and conversion counts. The Company also seeks, for the period of Defendants' alleged fiduciary duty breaches, disgorgement of compensation paid to the individual defendants and

management fees paid to the Ravelston Entities. The Company also seeks a variety of other equitable remedies. The Company has already obtained an order of default against the Ravelston Entities

The case was first stayed on motion of the U.S. Attorney's Office on September 6, 2005, pending resolution of criminal charges against several of the defendants. After several of the defendants had been convicted on multiple felony charges, the Company sought to lift the stay. That request was denied on January 16, 2008, and a second request was denied on May 22, 2009. The criminal defendants are seeking certiorari for the second time on their criminal appeal. Once their criminal appeals are exhausted and the criminal proceedings are over, the Special Committee Action can proceed.

The Plan provides that all of the Debtors' rights to the Special Committee Action will be transferred to the Liquidating Trust on the Effective Date, to be managed by the Liquidating Trustee, and ultimately distributed to Holders of Allowed Class 2 Claims as the Beneficiaries of the Liquidating Trust. Any amount recovered will largely be used to satisfy outstanding Allowed Class 2 Claims. Despite the aggregate amount of damages the Debtors seek in the Special Committee Action, the Debtors estimate that any amount the Debtors may recover will be insufficient to pay Holders of Allowed Class 2 Claims in full.

The Liquidating Trust may retain professionals to prosecute the Special Committee Action after the Effective Date on a contingency fee basis, on an hourly basis, or on any other basis the Liquidating Trustee deems appropriate in accordance with the best interests of the Liquidating Trust and its Beneficiaries.

### H.    Potential Repayment Actions

The Debtors have advanced millions of dollars in legal fees to certain former directors and officers in connection with their defense of federal criminal charges that were filed against them. Some of those former directors and officers were convicted on certain of the criminal charges and acquitted on others. The convictions remain subject to review on appeal to the United States Supreme Court, which the convicted parties have requested. Under Delaware law, if the convictions are affirmed and it is ultimately determined that the defendants were not entitled to be indemnified in connection with the criminal charges on which they were convicted, the Debtors are entitled to seek repayment from the defendants of the fees that were advanced to them in connection with their defense of those charges. The Debtors have not yet asserted such claims for repayment or filed any Repayment Actions because the Delaware Court of Chancery has ruled that they may not seek such repayment until the appeals of the criminal convictions are resolved. If the Debtors were to assert such claims for repayment or file a Repayment Action, any amount recovered would be insufficient to pay Holders of Allowed Class 2 Claims in full.

### I.    Friedheim Preference Action

CNLC made a demand against Cyrus Friedheim for a payment he received from Sun-Times Media Group on January 27, 2009. CNLC settled its preference action with Mr. Friedheim for $205,000, which was approved by the Bankruptcy Court on August 25, 2010 [Docket No. 1104]. Mr. Freidheim has since paid the settlement amount to CNLC.

### J.    Claim Summary

On July 15, 2009, the Bankruptcy Court entered an order establishing bar dates and approving the form of the Debtors' notice thereof, setting September 30, 2009 and October 7, 2009 as the Claims Bar Dates for non-governmental prepetition Claims and governmental prepetition Claims filed against the

Debtors, respectively [Docket No. 350]. On November 24, 2009, the Bankruptcy Court entered an order (the "Administrative Bar Date Order") establishing January 8, 2010 at 4:00 p.m. Eastern Time as the bar date for claims seeking administrative expense status [Docket No. 661].

To date, 404 Administrative Claims have been filed against the Debtors requesting approximately $7.5 million. The Debtors have allowed or resolved 299 of those Administrative Claims through their claim reconciliation efforts. The Debtors believe that the total Allowed Administrative Claims based on filed Claims is approximately $2.2 million. In addition, the Debtors owed $3.4 million in Allowed Administrative Claims on account of which Proofs of Claim were not filed but which were Allowed as provided in the Administrative Bar Date Order.

On multiple dates throughout these Chapter 11 Cases, the Debtors made partial payments totaling approximately $3.9 million on account of Allowed Administrative Claims. The total amount of outstanding Administrative Claims is now approximately $1.7 million.

To date, 43 Priority Tax Claims have been filed against the Debtors requesting $2.9 billion and 189 Priority Non-Tax Claims have been filed against the Debtors requesting $5.2 million. Additionally, $940,000 of Priority Non-Tax Claims appeared on the Debtors' schedules, in connection with which Proofs of Claim in the total amount of $855,000 were also filed. As of March 30, 2011, 32 outstanding Priority Tax Claims with a face value of approximately $2.6 billion and 65 outstanding Priority Non-Tax Claims with a face value of approximately $162,000 remained outstanding. The Debtors estimate that approximately $2.3 billion of Priority Tax Claims are duplicative Claims filed by the Internal Revenue Service ("IRS") and the New York State Department of Taxation and Finance ("NY State"), which the Plan (if Confirmed) contemplates disallowing.[5] Thus, the Debtors estimate that approximately $235 million of Priority Tax Claims will be Allowed through the Plan. The Debtors estimate that Allowed Priority Non-Tax Claims will total approximately $242,000 in the aggregate.

1.      Priority Tax Claims

Under the Plan, the Holders of Priority Tax Claims form the only Impaired Voting Class—Class 2. Class 2 is comprised of two Holders, the IRS and NY State.

The IRS filed 31 Proofs of Claim against the Debtors for unpaid taxes. To date, three of those Claims have been disallowed and expunged from the Debtors' Claims Register. The 28 remaining Priority Tax Claims assert Claims for approximately $2.6 billion. The Debtors believe that approximately $2.3 billion of the Priority Tax Claims asserted by the IRS are duplicative, and, as a result, the Plan provides that all Claims of Holders of the Allowed IRS Claim other than Claims in Class 2 shall be expunged, disallowed, and removed from the Debtors' Claims Register. Accordingly, the Plan contemplates allowance of an approximately $231 million Priority Tax Claim in favor of the IRS.

NY State has asserted Priority Tax Claims against the Debtors in the amount of $4,066,819 for various unpaid corporate taxes. The assessment by the NY State was the result of an audit performed shortly before the filing of these Chapter 11 Cases. The Plan contemplates allowance of this Claim. NY State also filed duplicative claims and a claim after the applicable Claims Bar Date. The Plan provides that all Claims of the State of NY other than Claims in Class 2 shall be expunged, disallowed, and removed from the Debtors' Claims Register. Accordingly, the Plan contemplates allowance of a $4,066,819 Priority Tax Claim in favor of NY State.

---

[5]   NY State also untimely filed a Proof of Claim in the amount of $1.9 million, which would be expunged and disallowed under the Plan.

### 2.    Employee-Related Priority Claims

Former employees of the Debtors filed 41 Priority Non-Tax Claims (not including duplicative claims) based on their prepetition severance and accrued vacation time that would be entitled to priority status under Bankruptcy Code § § 507(a)(4) and (a)(5).  Of those 41 Priority Non-Tax Claims, 16 were filed by former employees of the Debtors' operating facility in Joliet, Illinois that total $173,726.85.  The Debtors have lodged objections to those 16 Proofs of Claim, which have been granted, reducing the aggregate amount of such Claims to $68,183.14.

The remaining 25 Priority Non-Tax Claims currently total $93,570.  Under the Plan, Allowed Priority Non-Tax Claims will be paid in full in Cash as soon as practicable after the Effective Date.

### 3.    Pension Related Claims

Claims have also been filed against the Debtors based on their single-employer and multi-employer pension plans.

### a.    Single-Employer Pension Plans

The Debtors maintained seven single-employer, tax-qualified defined benefit pension plans, all but one of which were frozen long before the filing of these Chapter 11 Cases.  CNLC has not made any minimum funding contributions on account of those pension plans since January, 2009.  CNLC executed documents to allow the Pension Benefit Guaranty Corporation ("PBGC") to assume the single-employer pension plans in July, 2010, with a retroactive termination date of October 8, 2009.

The PBGC filed contingent and unliquidated Claims for the missed minimum funding contributions and unfunded benefit liability based on the termination of the pension plans.  The Debtors estimate that the amount of such General Unsecured Claims could reach $100 million, but such Claims will not receive a distribution under the Plan.  The PBGC also alleged that $517,351 of its Claims are entitled to administrative priority and another $517,351 of its Claims are entitled to priority under Bankruptcy Code § § 507(a)(5) or 507(a)(8).

The Debtors have reached an agreement with the PBGC in full and final settlement of the PBGC's Claims.  As set forth in the Plan, subject to and upon Confirmation and the occurrence of the Confirmation Date and the Effective Date, in settlement of PBGC's Claims, PBGC shall have the following:  (1) an Allowed Administrative Claim against the Estates in the amount of $419,704 and (2) an Allowed General Unsecured Claim against the Estates in the amount of $75,131,742 (collectively, the "PBGC Allowed Claims").  The PBGC shall not be required to amend its Proofs of Claim.  The only Claims the PBGC shall have against the Debtors and their Estates are the PBGC Allowed Claims. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Plan and the Confirmation Order will not release, enjoin, or exculpate any non-Debtor Entities from any liability with respect to fiduciary breach or prohibited transactions, as defined under the Employee Retirement Income Security Act of 1974 (as amended from time to time), for the single-employer pension plans sponsored by the Debtors.

### b.    Multiemployer Pension Plans

The Debtors contributed to six multiemployer pension plans.  Before the Debtors sold substantially all of their assets under the Asset Purchase Agreement and their employees were terminated, their obligation to contribute to these plans ceased and potential withdrawal liability was triggered.  Two of these multiemployer pension plans filed timely claims for withdrawal liability—the GCC/IBT National

Pension Fund ("GCC/IBT") and the CWA ITU Negotiated Pension Plan (the "CWA ITU"). The GCC/IBT has an Allowed Administrative Claim in the amount of $15,000 and an Allowed General Unsecured Claim. The CWA ITU also has an Allowed General Unsecured Claim.

The Graphic Communications National Health and Welfare Fund also timely filed an unliquidated priority claim for contributions allegedly owed pursuant to a series of collective bargaining agreements. On April 21, 2011, the Debtors objected to this claim. On June 22, 2011, the Court entered an order disallowing and expunging this claim in its entirety [Docket No. 1431].

### K.    Pending Litigation Proceedings

In the ordinary course of business, the Debtors are a party to various lawsuits, legal proceedings, and claims arising out of its business. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. Nevertheless, the Debtors do not believe that the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on its financial condition.

With certain exceptions, the filing of the Chapter 11 Cases operates to stay the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these Chapter 11 Cases. The Plan enjoins the continuation of litigation against the Debtors. In addition, Holders of litigation Claims against the Debtors receive no distribution under the Plan.

## IV.   PLAN SUMMARY

### A.    Treatment of Unclassified Claims

Administrative Claims

Except to the extent that the Holder of an Allowed Administrative Claim agrees to less favorable treatment, each such Holder will receive, in full and final satisfaction of such Claim, Cash equal to the unpaid amount of such Claim on the later of: (1) the Unclassified Claim Payment Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Unclassified Claim Payment Date, as soon as practicable after the date on which such Claims becomes Allowed; and (3) the date on which such Claim becomes due and payable. The Liquidating Trustee shall have authority to resolve (including the authority to pay) any Administrative Claim.

Professional Fee Claims

Final applications of Professionals for services rendered prior to the Confirmation Date shall be filed no later than 30 days after the Effective Date. The Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. All such Claims shall be paid in full in Cash as soon as practicable after the date on which such Claims become Allowed.

Priority Non-Tax Claims

Except to the extent that the Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each such Holder will receive, in full and final satisfaction of such Claim, Cash equal to the unpaid amount of such Allowed Claim on the

Unclassified Claim Payment Date or as soon as practicable thereafter.

### B. Treatment of Classified Claims

| | |
|---|---|
| Class 1: Secured Claims | Except to the extent that a Holder of an Allowed Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every such Claim, each Holder of such Claim shall, at the sole option of the Debtors, either (1) receive the collateral securing any such Claim or (2) otherwise be treated in any other manner such that the Allowed Secured Claim shall be rendered Unimpaired. Class 1 is Unimpaired, and Holders of Class 1 Secured Claims are not entitled to vote to accept or reject the Plan pursuant to Bankruptcy Code § 1126(f). |
| Class 2: Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every such Claim, each Holder of such Claim shall receive on the Effective Date or as soon after the Effective Date as reasonably practicable such Holder's Pro Rata share of the Liquidating Trust Interests, the precise number of which shall be established and distributed by the Liquidating Trustee in accordance with this Plan and the Liquidating Trust Agreement. Class 2 is Impaired. Therefore, Holders of Allowed Class 2 Priority Tax Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan pursuant to Bankruptcy Code § 1126(f). |
| Class 3: General Unsecured Claims | Holders of Class 3 General Unsecured Claims shall not receive any distribution on account of such Claims. Class 3 is Impaired, and Holders of Class 3 General Unsecured Claims are not entitled to vote to accept or reject the Plan pursuant to Bankruptcy Code § 1126(f) |
| Class 4: Section 510(b) Claims | Holders of Section 510(b) Claims shall not receive any distribution on account of such Claims. Class 4 is Impaired, and Holders of Class 4 Section 510(b) Claims are not entitled to vote to accept or reject the Plan pursuant to Bankruptcy Code § 1126(f). |
| Class 5: Intercompany Claims | Holders of Allowed Class 5 Intercompany Claims shall not receive any distribution on account of such Claims. On the Effective Date all Intercompany Claims shall be deemed cancelled and discharged. Class 5 is Impaired, and Holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject the Plan pursuant to Bankruptcy Code § 1126(f). |
| Class 6: Intercompany Interests | Holders of Allowed Class 6 Intercompany Interests shall not receive any distributions on account of such Interests. Class 6 |

Intercompany Interests shall be cancelled and extinguished as of the Effective Date. Class 6 is Impaired, and Holders of Class 6 Intercompany Interests are not entitled to vote to accept or reject the Plan pursuant to Bankruptcy Code § 1126(f).

Class 7: CNLC Interests

Holders of CNLC Interests will not receive any distribution on account of such Interests, and CNLC Interests shall be cancelled and extinguished as of the Effective Date. Class 7 is Impaired, and Holders of Class 7 CNLC Interests are not entitled to vote to accept or reject the Plan pursuant to Bankruptcy Code § 1126(f).

## C. Means for Implementation

Liquidating Trust

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of (1) administering and liquidating the Liquidating Trust Assets, with no objective to continue or engage in the conduct of a trade or business, (2) resolving all Disputed Claims, (3) pursuing or otherwise litigating any Causes of Action, and (4) making all distributions provided for under the Plan. On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust free and clear of all Liens, claims, encumbrances, and other interests. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. Upon the transfer of the Liquidating Trust Assets, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

On the Effective Date, the Liquidating Trustee shall be appointed through execution of the Liquidating Trust Agreement. The Liquidating Trustee shall be deemed the Estate's representative in accordance with Bankruptcy Code § 1123 and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Bankruptcy Code § § 704 and 1106 and Bankruptcy Rule 2004 (including without limitation, the right to: (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate any Liquidating Trust Assets in one or more transactions; (3) prosecute, settle, abandon or compromise any Causes of Action, including the Interpleader Action, the Special Committee Action, the Repayment Action and any Causes of Action related to recoveries pursuant to the foregoing Causes of Action, and pay any contingency or other fees of the Liquidating Trustee's professionals relating to same; (4) make distributions contemplated herein, (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve such objections; (7) employ and compensate professionals and other agents, on an hourly, contingency fee, or other basis as the

Liquidating Trustee deems appropriate, without further order of the Bankruptcy Court, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes; (8) abandon or destroy Estate records without notice to any party; (9) destroy property of the Estate constituting confidential customer information without notice to any party; and (10) make, in good faith, determinations of the value of all Liquidating Trust Assets for consistent use by all parties to the Liquidating Trust Agreement for all federal tax purposes).

CNLC owns an HP ProLiant DL 380 G3 server and related operating software (collectively, the "Server") that is currently used by CNLC, Hollinger Canadian Publishing Holdings Co. ("HCPH") (a debtor in a Canadian insolvency proceeding under the Companies' Creditors Arrangement Act (Canada)), and the Purchaser. Ownership of the Server will vest in the Liquidating Trust on the Effective Date. The Liquidating Trustee will have the authority to dispose of or administer the Server as an asset of the Liquidating Trust, which may include transferring ownership of the Server to HCPH and retaining rights to use the Server until the dissolution of the Liquidating Trust. The Liquidating Trustee will not sell or transfer the Server to any party other than HCPH without HCPH's consent.

| | |
|---|---|
| Distributions | The Liquidating Trust will make distributions to the Beneficiaries as provided by the Plan and pursuant to the Liquidating Trust Agreement. The Liquidating Trust may withhold from amounts distributable to any Entity any and all amounts, determined in the Liquidating Trustee's sole discretion, required by the Plan, or applicable law, regulation, rule, ruling, directive or other governmental requirement. |
| Liquidating Trustee's Fees | The Liquidating Trustee will be entitled to receive (1) reimbursement for professional fees and expenses incurred by its counsel in reviewing, negotiating, executing, and implementing the Liquidating Trust Agreement prior to the Effective Date and (2) reimbursement of all reasonable out-of-pocket expenses incurred by the Liquidating Trustee or any personnel, including personnel of FTI Consulting (each a "Supplemental FTI Resource"), employed by the Liquidating Trustee in connection with the Liquidating Trustee's performance under the Liquidating Trust Agreement. The Liquidating Trustee also will be entitled to receive fees for the performance of its duties from and after the Effective Date, including for services rendered by any personnel employed by the Liquidating Trustee. For purposes of determining the Liquidating Trustee's fees, Michael Katzenstein will bill at the hourly rate that FTI Consulting applies to Mr. Katzenstein (currently $895), minus 10% of that rate, and Supplemental FTI Resources utilized by the Liquidating Trustee will bill at standard FTI Consulting rates not to |

exceed those rates for "Senior Consultants" (currently $410 to $500), minus 15% of those rates. After the fourth full month that the Liquidating Trust is in effect, the Liquidating Trustee will pay standard hourly rates for any Supplemental FTI Resources utilized, without any discounting, and a $25,000 monthly maximum shall apply to cap the Liquidating Trustee's fees; provided, such $25,000 monthly cap will not apply to months during which the Liquidating Trust is preparing for or attending contested hearings, responding to discovery, or preparing briefs or other pleadings in connection with contested litigation. The Liquidating Trustee currently intends to employ certain Supplemental FTI Resources in connection with the Liquidating Trustee's performance under the Liquidating Trust Agreement. FTI Consulting's standard rates will be subject to change from time to time without notice.

Maintenance of Books and Records

The Liquidating Trust will have the responsibility of storing and maintaining books and records transferred to the Liquidating Trust from the Debtors on, or accumulated after, the Effective Date until the Chapter 11 Cases are closed. The Liquidating Trustee, however, may, to the extent not prohibited by applicable law, abandon or destroy, without Bankruptcy Court order or notice to any party, any books and records deemed by the Liquidating Trustee, in its sole discretion, to be unnecessary for the administration of the Liquidating Trust. "Books and records" include any computer generated or computer maintained books and records and computer data, as well as any electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties and all of the claims and rights of the Debtors in and to their books and records, wherever located. The Liquidating Trustee may, to the extent not prohibited by applicable law, destroy, without Bankruptcy Court order or notice to any party, any books and records that constitute confidential customer information that the Liquidating Trustee determines, in its sole discretion, to be unnecessary for the administration of the Liquidating Trust.

Reporting

The Liquidating Trustee will file, and distribute to Beneficiaries and the United States Trustee, reports (the "Liquidating Trust Reports") at least quarterly regarding the liquidation or other administration of the Liquidating Trust's assets. After entry of a final decree closing the Chapter 11 Cases, the Liquidating Trust will not be obligated to file Liquidating Trust Reports and will distribute Liquidating Trust Reports at least quarterly to Beneficiaries only. Liquidating Trust Reports will include descriptions of: (1) assets and liabilities of the Liquidating Trust; (2) any distributions made and expenses paid pursuant to the Plan and the Liquidating Trust Agreement during the applicable quarter; (3) any changes to the Liquidating Trust's assets that have not been previously reported; and (4) any material action taken by the Liquidating Trustee in the performance of its duties under the

Liquidating Trust Agreement that has not been previously reported.

Additionally, the Liquidating Trustee, within 90 days after the termination of the Liquidating Trust, or the death, dissolution, liquidation, resignation, or removal of the Liquidating Trustee, will render a final accounting of the Liquidating Trust's assets. A copy of the final accounting will be made available to Beneficiaries and the United States Trustee upon request.

Directors and Officers

Upon the Effective Date, the terms of all directors and officers of all Debtors shall be deemed to have expired, all such directors and officers shall be released of their duties, and all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by the Debtors, Holders of Claims or Interests, directors, managers, or officers of the Debtors, or any other Entity or Person, including the transfer of assets of the Debtors to the Liquidating Trust and the dissolution or winding up of the Debtors.

## D.    Other Terms

Executory Contracts

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, including the Plan Supplement, all Executory Contracts and Unexpired Leases to which the Debtors are a party and that are not assumed or rejected, on or prior to the Confirmation Date, shall be deemed rejected.

The Debtors may, on or before the date that is at least 5 Business Days before the Voting Deadline, file a Plan Supplement setting forth Executory Contracts and Unexpired Leases to be assumed and serve the Plan Supplement on counterparties to any such Executory Contracts and Unexpired Leases. Any contract identified in such Plan Supplement will be deemed automatically assumed as of the Effective Date pursuant to section 365 of the Bankruptcy Code. The Plan Supplement will also set forth cure amounts, if any, in connection with contracts identified therein and describe the procedures for filing objections to a proposed assumption or cure amount. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and rejections.

Retained Causes of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with Bankruptcy Code § 1123(b), the Debtors shall retain all Causes of Action, which shall vest in the Liquidating Trust pursuant to the terms of the this Plan and the Liquidating Trust Agreement, including the Interpleader Action, the Special Committee Action, the Repayment Action and

Causes of Action related to (i) the foregoing Causes of Action or (ii) former directors or officers.

## V.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

### A.  The Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to conduct a hearing to consider confirmation of a plan.  Bankruptcy Code § 1128(b) provides that any party in interest may object to confirmation.

### B.  Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code § 1129.  The Debtors believe that:  (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will comply with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of Bankruptcy Code § 1129, including those set forth below.

1.  The Plan complies with the applicable provisions of the Bankruptcy Code.

2.  The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

3.  The Plan has been proposed in good faith and not by any means forbidden by law.

4.  Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the Confirmation of the Plan will be reasonable; or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

5.  Each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  Each Holder of an Impaired Interest will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

6.  Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to Bankruptcy Code § 1129(b) of the Bankruptcy Code.

7.    Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (a) Holders of Allowed Administrative Claims will receive on account of such Claims Cash equal to the allowed amount of such Claim on or prior to the Effective Date of the Plan, or as soon thereafter as is reasonably practicable; (b) Holders of Allowed Claims specified in Bankruptcy Code § 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the allowed amount of such Claim on or prior to the Effective Date of the Plan, or as soon thereafter as is reasonably practicable; and (c) through their consent or deemed consent, Holders of Allowed Claims specified in Bankruptcy Code § 507(a)(8) of the Bankruptcy Code will receive on account of such Claims the Liquidating Trust Interests.

8.    At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in that Class.

9.    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

10.   The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

11.   In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month following the calendar quarter for which the fee is owed in the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the United States Trustee.

## C.    Financial Feasibility

Bankruptcy Code § 1129(a)(11) requires that the Bankruptcy Court find, as a condition to Confirmation, that the Confirmation is not likely to be followed by further liquidation of the Debtor, unless such liquidation is proposed in the Plan. The Plan contemplates that all assets of the Debtors ultimately will be transferred to the Liquidating Trust to be disposed of, with proceeds being distributed pursuant to the terms of the Plan. The Debtors believe that as of the Effective Date, the Liquidating Trust will have adequate Cash to pay any remaining Administrative Claims and Priority Non-Tax Claims in full, and that it will have adequate Cash to monetize the remaining assets of the Estate. The Debtors therefore believe that the Plan can be consummated without a risk of an additional liquidation or conversion, and therefore that the Plan meets the feasibility requirement.

## D.    Best Interests of Creditors Test

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Debtors' Chapter 11 Cases was converted to a liquidation case under chapter 7 of the Bankruptcy Code, and the Bankruptcy

Court appointed a chapter 7 trustee to liquidate all of the Debtors' assets into Cash. The Debtors' "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Debtors at the time of the conversion to a chapter 7 case and the proceeds resulting from the chapter 7 trustee's sale and administration of the Debtors' remaining assets, including the Interpleader Action, the Special Committee Action and the Repayment Action. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation, including, significantly, costs associated with asset sales, the trustee's fees, and the trustee's costs for its professionals, as well as any additional Administrative Claims incurred during the chapter 7 cases. The Debtors believe that such costs and fees would likely exceed the expenditures that are likely to occur under the Plan.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Debtors (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims under the Plan. It is possible that in a chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical chapter 7 liquidation of the Debtors' assets, the rule of absolute priority of distribution would apply, i.e., no junior Creditor would receive any distribution until payment in full of all senior Creditors, and no Holder of an Interest would receive any distribution until all Creditors have been paid in full.

Of the foregoing groups of Claims, Class 1 is "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims are deemed to accept the Plan. The remainder of the Classes of Claims and Interests are "Impaired" under the Plan and are either entitled to vote on, or deemed to reject, the Plan. Because the Bankruptcy Code requires that Impaired Creditors either accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation, after accounting for recoveries by Class 1, the Holders of Impaired Claims and Interests will receive more or less than under the Plan. If the probable distribution to Holders of Impaired Claims and Interests under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of Holders of Impaired Claims and Interests.

Under the Plan, Holders of Claims and Interests in Classes 3, 4, 5, 6, and 7 do not receive any distribution. As illustrated in the Debtors' liquidation analysis, attached hereto as **Exhibit B**, based on the Bankruptcy Code's priority scheme, a chapter 7 liquidation would result in the same outcome. The Debtors believe that the value of distributions, if any, in a hypothetical chapter 7 liquidation to Holders of Priority Tax Claims in Class 2 would be less than the value of distributions to such Holders under the Plan. The primary reason for this conclusion is that the estate would likely incur significant additional administrative costs and expenses from conversion and appointment of a chapter 7 trustee. In addition, conversion likely would cause delays in receiving distributions. At a minimum, Holders of Priority Tax Claims would receive less in a chapter 7 liquidation than under the Plan. Therefore, the Plan satisfies the "best interests" test of Bankruptcy Code § 1129(a)(7).

E.     **Acceptance by Impaired Classes**

The Bankruptcy Code § 1129(a)(8) requires, as a condition to confirmation, that each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default and reinstates the original terms of such obligation; or (3) provides

that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Bankruptcy Code § 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

## VI. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

### A. Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1. Failure to Satisfy Vote Requirements

In the event that one or both creditors in Class 2 does not vote to accept the Plan, it is possible that the Court will decline to confirm the Plan, in which case the Debtors may seek to pursue another strategy to wind down the estates, such as an alternative chapter 11 plan, a dismissal of the chapter 11 cases and out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable as those proposed in the Plan.

#### 2. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Bankruptcy Code § 1122 provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification scheme under the Plan complies with the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 3. The Debtors May Not Be Able to Secure Confirmation of the Plan

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article VII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

### 4. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection or is not yet Allowed. Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 5. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### B. Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims

### 1. The Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims

No fewer than two unknown factors make certainty of creditor recoveries under the Plan impossible. First, the Debtors cannot know with any certainty, at this time, how much money will be available for distribution to Holders of Priority Tax Claims after liquidation of the Debtors' assets. Second, the Debtors cannot know with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed.

### 2. The Debtors Cannot State with any Degree of Certainty What the Amount of Litigation Recoveries Will Be

The amount of Cash received by the Debtors through the Interpleader Recoveries, the Special Committee Action Recoveries and the Repayment Action Recoveries, if any, is highly uncertain and subject to litigation. While the Debtors believe they can make compelling arguments to secure a substantial recovery, there can be no guarantee of success in the litigation. In addition, because of potentially lengthy litigation surrounding these causes of action, the Debtors are uncertain about the timing of any recovery, and consequently uncertain about the timing of any distribution of such recoveries to Holders of Allowed Class 2 Claims.

### C. Disclosure Statement Disclaimer

### 1. Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2. This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the Securities Exchange Commission under the Securities Exchange Act of 1934 and Securities and Exchanges Commission Rules or applicable state

securities laws. Neither the Securities Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, or object to Confirmation of the Plan.

### 4. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 5. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

### 6. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Professionals

The Professionals have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Professionals have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 7. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 8. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, this Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan

that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor, the counsel to the Creditors' Committee, and the U.S. Trustee.

### D. Liquidation Under Chapter 7

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims is set forth in Article V herein, "Statutory Requirements for Confirmation of the Plan."

## VII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain Holders of Claims and Interests. This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims or Interests that are not "United States persons" (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that Holders of Claims or Interests hold such Claims or Interests as "capital assets" within the meaning of section 1221 of the Internal Revenue Code. Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Holders of Claims and Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY

ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A. Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims

#### 1. Consequences to Holders of Administrative Claims

Pursuant to the Plan, Holders of Allowed Administrative Claims, will receive payment in full in Cash before, on or as soon as practicable after the Effective Date. A Holder that receives Cash in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Claim and (ii) the Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the Holder.

#### 2. Consequences to Holders of Class 1 Secured Claims

Pursuant to the Plan, each Holder of an Allowed Class 1 Secured Claim will either be paid in full in Cash, will receive the collateral securing the Claim, plus post-petition interest, or will otherwise be rendered unimpaired for the benefit of the Holder thereof. A Holder of an Allowed Class 1 Secured Claim that receives Cash or Collateral plus interest in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash or the value of Collateral plus interest received in exchange for its Claim and (ii) the Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the Holder.

#### 3. Consequences to Holders of Class 3 General Unsecured Claims

Pursuant to the Plan, each Class 3 General Unsecured Claim will be cancelled without distribution. A Holder of such a Claim may be entitled in the year of cancellation (or in an earlier year) to either a worthless security deduction under section 165(g) of the Internal Revenue Code or a bad debt deduction under section 166(a) of the Internal Revenue Code to the extent of such Holder's tax basis in the General Unsecured Claim. The rules governing the timing and amount of such deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Class 3 General Unsecured Claims therefore are urged to consult their own tax advisors with respect to their ability to take such a deduction.

#### 4. Consequences to Holders of Class 7 Equity Interests

Pursuant to the Plan, each Class 7 Equity Interest will be cancelled without distribution. A Holder of such an Interest may be entitled in the year of cancellation (or in an earlier year) to a worthless stock deduction under section 165(g) of the Internal Revenue Code to the extent of such Holder's tax basis in the Equity Interest. The rules governing the timing and amount of worthless stock deductions place considerable emphasis on the facts and circumstances of the Holder, the issuer, and the instrument with respect to which a deduction is claimed. Holders of Interests therefore are urged to consult their own tax advisors with respect to their ability to take such a deduction.

### 5. Accrued Interest

To the extent that any amount received by a Holder of a surrendered Claim under the Plan is attributable to accrued interest, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a surrendered Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Claim will be attributable to accrued interest on the debts constituting the surrendered Claim is unclear. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 6. Market Discount

Holders who exchange Allowed Claims for Cash may be affected by the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Internal Revenue Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 7. Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that

the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

### B. Certain United States Federal Income Tax Consequences to the Debtors

#### 1. Cancellation of Debt Income

Under the Internal Revenue Code, a taxpayer generally recognizes gross income to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions. The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the cancellation of debt income ("CODI") avoided. In this case, the Debtors expect that they will recognize significant CODI from the implementation of the Plan. As a result, the Debtors expect that their net operating losses ("NOLs") will be reduced on account of such CODI. However, since the Debtors intend to liquidate, any remaining NOLs will have no ongoing value to the Debtors or to the Holders of Claims or Interests.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF INTERESTS OR CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### VIII. VOTING PROCEDURES

On [July 14], 2011 the Bankruptcy Court entered the Disclosure Statement Order approving the adequacy of this Disclosure Statement and approving procedures for the solicitation of votes to accept or reject the Plan. A copy of the Disclosure Statement Order and Solicitation Procedures will be provided to Holders of Claims who are entitled to vote on the Plan. In addition to approving the Solicitation Procedures, the Disclosure Statement Order established certain dates and deadlines, including the date for the Confirmation Hearing, the deadline for parties to object to Confirmation, the Voting Record Date, and the Voting Deadline. The Disclosure Statement Order also approved the forms of Ballots and certain Confirmation-related notices. The Disclosure Statement Order and the Solicitation Procedures should be read in conjunction with this Disclosure Statement.

## IX. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS OF THE PLAN

### A. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trustee may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

### B. Debtor Release

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN; AND (2) THE SERVICES OF THE DEBTORS' PRESENT OFFICERS, DIRECTORS, MANAGERS, PROFESSIONALS, AND ADVISORS AND FORMER DIRECTORS AND OFFICERS WHO SERVED ON OR AFTER THE PETITION DATE IN FACILITATING THE IMPLEMENTATION OF THE LIQUIDATION CONTEMPLATED IN THE PLAN, EACH OF THE DEBTORS AND THE DEBTORS' ESTATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE CHAPTER 11 CASES, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR ANY DEBTOR RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE

DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; <u>PROVIDED</u> <u>THAT</u> THE FOREGOING DEBTOR RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY DEBTOR EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR RELATED DOCUMENTS. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE LIQUIDATING TRUST HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, <u>AND FURTHER</u>, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE LIQUIDATING TRUSTEE ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

C.     Third Party Release

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE CHAPTER 11 CASES, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY DEBTOR RELEASEE OR THIRD PARTY RELEASEE, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE

DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) ARISING UNDER ANY AGREEMENTS ENTERED INTO PURSUANT TO THE PLAN; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR RELATED DOCUMENTS; OR (3) AGAINST A PROFESSIONAL WITH RESPECT TO SUCH PROFESSIONAL'S FINAL FEE APPLICATION OR ACCRUED PROFESSIONAL COMPENSATION CLAIMS IN THESE CHAPTER 11 CASES.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION THAT THE RELEASING PARTIES, THE DEBTORS, OR THE LIQUIDATING TRUST MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES OR RELATED TO A RELEASEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH AS DETERMINED BY A FINAL ORDER.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

D.     Exculpation

The Exculpated Parties shall neither have, nor incur, any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to, formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

### E. Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VI.B OF THE PLAN; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VI.C OF THE PLAN; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VI.D OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VI.D OF THE PLAN); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS OBTAINED ENTRY OF A FINAL ORDER AUTHORIZING SUCH SETOFF AS PROVIDED HEREIN; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO

**SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; _PROVIDED_, _FURTHER_, _THAT_ NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.**

**F.      Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications**

For the avoidance of doubt, the foregoing Debtor Release and Third Party Release shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Accrued Professional Compensation Claim or final fee application Filed by any Professional in these Chapter 11 Cases.

## X.      PLAN SUPPLEMENT

The Plan Supplement, if any, will be filed with the Bankruptcy Court no later than ten Business Days prior to the Voting Deadline.  The Debtors reserve the right to modify and supplement the Plan Supplement through and including the Confirmation Date.

## XI.      CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all Holders of Claims and urges all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by Kirkland by the Voting Deadline.

*The remainder of this page is intentionally left blank.*

Dated:  July 7, 2011

Respectfully submitted,


Chicago Newspaper Liquidation Corp.
(for itself and all Debtors)

By:      */s/ Michael Katzenstein*
Name:   Michael Katzenstein
Title:    Director
          Chicago Newspaper Liquidation Corp.

## EXHIBIT A

**Debtors' First Modified Plan of Liquidation
Pursuant to Chapter 11 of the Bankruptcy Code**

[*Intentionally omitted; the Debtors' First Modified Plan of Liquidation
Pursuant to Chapter 11 of the Bankruptcy Code is filed separately with the Bankruptcy Court*]

**EXHIBIT B**

**Liquidation Analysis**

**CHICAGO NEWSPAPER LIQUIDATION CORP., ET AL. HYPOTHETICAL LIQUIDATION ANALYSIS**

*Summary for all Debtors - Low Recovery Scenario* [1]

*(all values in USD thousands)*

**CHAPTER 7 CONVERSION SCENARIO**

| | Gross Assets[2] | Ch. 7 Costs[3] | Proceeds Less Costs | Administrative and Priority Non-Tax Claims | | | Available For Priority Tax | Priority Tax Claims | | | Available For Unsec. | General Unsecured, Section 510(b), and Intercompany Claims | | |
| | | | | Claim | Recovery | % | | Claim | Recovery | % | | Claim | Recovery | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chicago Newspaper Liquidation Corp., *et al.* | 10,000 | 1,133 | 8,867 | 1,900 | 1,900 | 100.0% | 6,967 | 234,744 | 6,967 | 3.0% | - | 189,000 | - | 0.0% |

**CHAPTER 11 LIQUIDATION SCENARIO**

| | Gross Assets[2] | Wind Down Costs[4] | Proceeds Less Costs | Administrative and Priority Non-Tax Claims | | | Available For Priority Tax | Priority Tax Claims | | | Available For Unsec. | General Unsecured, Section 510(b), and Intercompany Claims | | |
| | | | | Claim | Recovery | % | | Claim | Recovery | % | | Claim | Recovery | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chicago Newspaper Liquidation Corp., *et al.* | 10,000 | 700 | 9,300 | 1,900 | 1,900 | 100.0% | 7,400 | 234,744 | 7,400 | 3.2% | - | 189,000 | - | 0.0% |

Notes:

(1) Analysis assumes a conversion date / Effective Date of August 31, 2011. Capitalized terms not defined herein shall have those meanings ascribed to them in the Disclosure Statement, to which this exhibit is annexed.

(2) Gross assets available for distribution have been assumed to equal a hypothetical $10 million in the "Low Recovery Scenario" for illustrative purposes only. Gross assets comprises: (a) unencumbered and unrestricted Cash; (b) proceeds from the resolution of the Interpleader Action, the Special Committee Action and the Repayment Action; and (c) proceeds from the liquidation of any remaining assets. Unencumbered and unrestricted Cash is estimated to equal $3.8 million. Pubic disclosure of the Debtors' anticipated proceeds from the resolution of the Interpleader Action, the Special Committee Action and the Repayment Action could imprudently harm the Debtors' Estates in connection with the Debtors' ongoing litigation settlement discussions. The $10 million gross asset value assumed here, thus, includes an arbitrary estimation of the value of the Interpleader Action, the Special Committee Action and the Repayment Action and is not based on the Debtors' assessment of their anticipated gross asset value available for distribution. Accordingly, the value of gross assets may differ materially from the actual value of the Debtors' assets available for distribution. The value of any remaining assets in the Debtors' Estates has been assumed to be $0 for simplicity of analysis. Although the Debtors believe that the ultimate value realized for the assets likely will be greater under the Plan than in the hypothetical Chapter 7 liquidation scenario, this liquidation analysis is based on the conservative assumption that the value realized will be the same under both scenarios.

(3) Costs comprise: (a) Chapter 7 trustee fees of $323,250 in aggregate, including compensation of $53,250 plus 3% of all distributed assets over $1 million (under Bankruptcy Code § 326(a)); and (b) additional wind down costs of approximately $810,000, including for: (1) legal counsel and other professionals engaged by the Chapter 7 trustee, assuming that the Chapter 7 trustee and its professionals will require at least an additional four months to ramp up relative to the Liquidating Trustee and its professionals (all of whom are already engaged in the Chapter 11 Cases) and that the Chapter 7 trustee and such professionals will necessarily duplicate certai of the Debtors' and their professionals' review and analysis of the Debtors' assets, including ongoing litigation, and decisions already made in connection therewith; and (2) satisfaction of reporting and other requirements necessary for a Chapter 7 trustee to fulfill its duties in accordance with applicable law. It is assumed that the Chapter 7 trustee will require 16 months from the conversion date to wind down the Estates.

(4) Costs comprise: (a) the Liquidating Trustee's fees of approximately $340,000 in aggregate; and (b) additional wind down costs of approximately $360,000 in connection with the liquidation and administration of the Liquidating Trust's assets. It is assumed that the Liquidating Trustee will require 12 months from the Effective Date to wind down the Estates.

# CHICAGO NEWSPAPER LIQUIDATION CORP., ET AL. HYPOTHETICAL LIQUIDATION ANALYSIS

*Summary for all Debtors - High Recovery Scenario [1]*

(all values in USD thousands)

## CHAPTER 7 CONVERSION SCENARIO

| | Gross Assets[2] | Ch. 7 Costs[3] | Proceeds Less Costs | Administrative and Priority Non-Tax Claims | | | Available For Priority Tax | Priority Tax Claims | | | Available For Unsec. | General Unsecured, Section 510(b), and Intercompany Claims | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Claim | Recovery | % | | Claim | Recovery | % | | Claim | Recovery | % |
| Chicago Newspaper Liquidation Corp., *et al.* | 50,000 | 2,333 | 47,667 | 1,900 | 1,900 | 100.0% | 45,767 | 234,744 | 45,767 | 19.5% | - | 189,000 | - | 0.0% |

## CHAPTER 11 LIQUIDATION SCENARIO

| | Gross Assets[2] | Wind Down Costs[4] | Proceeds Less Costs | Administrative and Priority Non-Tax Claims | | | Available For Priority Tax | Priority Tax Claims | | | Available For Unsec. | General Unsecured, Section 510(b), and Intercompany Claims | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Claim | Recovery | % | | Claim | Recovery | % | | Claim | Recovery | % |
| Chicago Newspaper Liquidation Corp., *et al.* | 50,000 | 700 | 49,300 | 1,900 | 1,900 | 100.0% | 47,400 | 234,744 | 47,400 | 20.2% | - | 189,000 | - | 0.0% |

Notes:

(1) Analysis assumes a conversion date / Effective Date of August 31, 2011. Capitalized terms not defined herein shall have those meanings ascribed to them in the Disclosure Statement, to which this exhibit is annexed.

(2) Gross assets available for distribution have been assumed to equal a hypothetical $50 million in the "High Recovery Scenario" for illustrative purposes only. Gross assets comprises: (a) unencumbered and unrestricted Cash; (b) proceeds from the resolution of the Interpleader Action, the Special Committee Action and the Repayment Action; and (c) proceeds from the liquidation of any remaining assets. Unencumbered and unrestricted Cash is estimated to equal $3.8 million. Pubic disclosure of the Debtors' anticipated proceeds from the resolution of the Interpleader Action, the Special Committee Action and the Repayment Action could imprudently harm the Debtors' Estates in connection with the Debtors' ongoing litigation settlement discussions. The $50 million gross asset value assumed here, thus, includes an arbitrary estimation of the value of the Interpleader Action, the Special Committee Action and the Repayment Action and is not based on the Debtors' assessment of their anticipated gross asset value available for distribution. Accordingly, the value of gross assets may differ materially from the actual value of the Debtors' assets available for distribution. The value of any remaining assets in the Debtors' Estates has been assumed to be $0 for simplicity of analysis. Although the Debtors believe that the ultimate value realized for the assets likely will be greater under the Plan than in the hypothetical Chapter 7 liquidation scenario, this liquidation analysis is based on the conservative assumption that the value realized will be the same under both scenarios.

(3) Costs comprise: (a) Chapter 7 trustee fees of $1,523,250 in aggregate, including compensation of $53,250 plus 3% of all distributed assets over $1 million (under Bankruptcy Code § 326(a)); and (b) additional wind down costs of approximately $810,000, including for: (1) legal counsel and other professionals engaged by the Chapter 7 trustee, assuming that the Chapter 7 trustee and its professionals will require at least an additional four months to ramp up relative to the Liquidating Trustee and its professionals (all of whom are already engaged in the Chapter 11 Cases) and that the Chapter 7 trustee and such professionals will necessarily duplicate certain of the Debtors' and their professionals' review and analysis of the Debtors' assets, including ongoing litigation, and decisions already made in connection therewith; and (2) satisfaction of reporting and other requirements necessary for a Chapter 7 trustee to fulfill its duties in accordance with applicable law. It is assumed that the Chapter 7 trustee will require 16 months from the conversion date to wind down the Estates.

(4) Costs comprise: (a) the Liquidating Trustee's fees of approximately $340,000 in aggregate; and (b) additional wind down costs of approximately $360,000 in connection with the liquidation and administration of the Liquidating Trust's assets. It is assumed that the Liquidating Trustee will require 12 months from the Effective Date to wind down the Estates.